# UNITED STATES DISTRICT COURT
## WESTERN DISTRICT OF MICHIGAN - SOUTHERN DIVISION

ABIGAIL MEALY, AMANDA MEALY,
MARIA VANORT, ZENA MALDONADO
and MEAGHAN ASHCRAFT;

               Plaintiffs,

v.

MICHIGAN STATE UNIVERSITY; THE BOARD
OF TRUSTEES OF MICHIGAN STATE
UNIVERSITY; LAWRENCE GERARD NASSAR
(individual capacity); USA GYMNASTICS, INC.;
TWISTARS, INC. d/b/a GEDDERT'S TWISTARS
GYMNASTICS CLUB USA; JOHN GEDDERT;
KATHIE KLAGES (individual capacity); WILLIAM
D. STRAMPEL, D.O., (individual capacity);
JEFFREY R. KOVAN, D.O., (individual and
official capacity); GARY STOLLAK (individual
capacity); DOUGLAS DIETZEL, D.O., (individual
and official capacity); BROOKE LEMMEN, D.O.,
(individual capacity);DESTINY TEACHNOR-HAUK
(individual capacity); KRISTINE MOORE (individual
capacity);

               Defendants.

**Case No.:**

**Hon.**

**COMPLAINT & JURY DEMAND**

> Civil actions between these parties or other parties arising out of the transaction or occurrence alleged in this complaint have been previously filed in this court, where they were given docket numbers 1:17-cv-00349, 1:17-cv-29, 1:17-cv-222, 1:17-cv-288, and 1:17-cv-676, and were assigned to Judge Quist. Those actions remain pending. A motion to consolidate with Lead Case 1:17-cv-29 will be filed concurrently or shortly hereafter.

---

Lisa M. Esser (P70628)
**SOMMERS SCHWARTZ, P.C.**
Attorney for Plaintiffs
1 Towne Square, Suite 1700
Southfield, MI 48076
(248) 355-0300
lesser@sommerspc.com

---

## COMPLAINT

1

**NOW COME** Plaintiffs, by and through their attorneys, **SOMMERS SCHWARTZ, P.C.**, and for their Complaint against the above-named Defendants, Michigan State University (hereinafter *"Defendant MSU"*), the Board of Trustees of Michigan State University, Kathie Klages, William D. Strampel, D.O., Jeffrey R. Kovan, D.O., Douglas Dietzel, D.O., Brooke Lemmen, D.O., Gary E. Stollak, Kristine Moore, Destiny Teachnor-Hauk (hereinafter with Defendant MSU collectively referred to as *"MSU Defendants"*), Lawrence Gerard Nassar (hereinafter *"Defendant Nassar"*), United States of America Gymnastics, Inc. (hereinafter *"Defendant USAG"*), and John Geddert, Twistars USA, Inc., doing business as, Geddert's Twistars Gymnastics Club USA (hereinafter *"Defendant Twistars"*), state as follows:

## INTRODUCTORY STATEMENTS

1.     This is a civil action for declaratory, injunctive, equitable, and monetary relief for injuries sustained by Plaintiffs as a result of acts and omissions of Defendant MSU, Defendant The Board of Trustees of Michigan State University, Defendant Nassar, Defendant USAG, and Defendant Twistars, and their respective employees, agents, and/or representatives, relating to sexual assault, battery, molestation, harassment, and discrimination by Defendant Nassar against Plaintiffs.

2.     At all times pertinent hereto, Defendant Nassar was retained by Defendant MSU and Defendant USAG to provide medical care, treatment, and advice to Michigan State University athletes and members of the general public. Defendant Nassar regularly provided such medical care, treatment, and advice at Defendant MSU's training department, MSU Jenison Fieldhouse, MSU Breslin Center, MSU Sports Medicine Clinic, Holt High School, and/or Twistars USA Gymnastics Club.

3.    Defendant Nassar came highly recommended to Plaintiffs as a renowned orthopedic sports medicine physician, purportedly well-respected in the sports medicine community, and specifically in the gymnastics community as the Team Physician for the United States Gymnastics team.

4.    Upon information and belief, Defendant Nassar used his position of trust and confidence to regularly and systematically sexually assault, batter, molest, and harass female patients over the entire course of his career in his capacity as an employee, agent, and/or representative of Defendants MSU, USAG, and Twistars, for his own personal self-gratification.

5.    Despite being informed of Defendant Nassar's sexual assault, battery, molestation, and harassment, Defendants MSU, USAG, and Twistars failed to take appropriate action to prevent Defendant Nassar from sexually molesting, abusing, and harassing his patients over the course of his career in his capacity as an employee, agent, and/or representative of Defendants MSU, USAG, and Twistars.

## JURISDICTION AND VENUE

6.    Plaintiffs incorporate by reference the allegations contained in the previous paragraphs.

7.    This action is brought pursuant to Title IX of the Education Amendments of 1972, 20 U.S.C. 1681 *et seq.*, as more fully set forth herein.

8.    This action also seeks to redress the deprivation of Plaintiffs' rights secured by the Equal Protection Clause and Due Process Clause of the Fourteenth Amendment of the United States Constitution pursuant to 42 U.S.C. § 1983.

9.    This Court has subject matter jurisdiction over this action pursuant to Title 28 U.S.C.

§ 1331 in that the controversy arises under the Constitution, laws, and treaties of the United States.

10.     Subject matter jurisdiction is also founded upon 28 U.S.C. § 1343 which grants district courts original jurisdiction over any civil action authorized by law to be commenced by any person to redress the deprivation, under color of any state law, statute, ordinance, regulation, custom or usage, of any right, privilege or immunity secured by the Constitution of the United States or by any Act of Congress providing for equal rights of citizens or of all persons within the jurisdiction of the United States; or any action to recover damages or to secure equitable or other relief under any Act of Congress providing for the protection of civil rights.

11.     Subject matter jurisdiction is also founded upon 28 U.S.C. § 1332 as it relates to Plaintiffs' claims against Defendant USAG for the reason that 28 U.S.C. § 1332 grants subject matter jurisdiction over civil actions involving citizens of different states where the amount in controversy exceeds the sum or value of $75,000.00, exclusive of interest and costs.

12.     Plaintiffs further invoke the supplemental jurisdiction of this Court, pursuant to 28 U.S.C. § 1367(a) to hear and decide claims arising under state law that are so related to the claims within the original jurisdiction of this Court that they form part of the same case or controversy.

13.     Plaintiffs' claims are cognizable under the United States Constitution, 42 U.S.C. § 1983, 20 U.S.C. § 1681, *et seq.,* 42 U.S.C. § 18116, and under Michigan law.

14.     Venue is proper in this Court pursuant to 28 U.S.C. § 1391(b) because the events giving rise to Plaintiffs' claims arose in this judicial district, in Ingham County, Michigan and Eaton County, Michigan.

4

15.     All Plaintiffs have or will file the appropriate Notice of Intent to File Claim with the Michigan Court of Claims pursuant to MCL 600.6431.

## **PARTIES AND KEY INDIVIDUALS**

16.     Plaintiffs incorporate by reference the allegations contained in the previous paragraphs.

17.     Plaintiff Abigail Mealy is an adult female and is a resident of the State of Michigan. She was a minor for most of the time she was sexually assaulted, abused, and molested by Defendant Nassar.

18.     Plaintiff Amanda Mealy is an adult female and is a resident of the State of Michigan.  She was a minor at the time she was sexually assaulted, abused and molested by Defendant Nassar.

19.     Plaintiff Zena Maldonado is an adult female and is a resident of the State of Colorado.

20.     Plaintiff Maria VanOrt is an adult female and is a resident of the State of Indiana.

21.     Plaintiff Meaghan Ashcraft is an adult female and is a resident of the State of Michigan.  She was a minor at the time she was sexually assaulted, abused and molested by Defendant Nassar.

22.     Defendant Lawrence "Larry" Nassar (hereinafter "*Defendant Nassar*") was formerly a Doctor of Osteopathic Medicine, was a Michigan resident at the time of the events set forth herein, and currently resides in federal prison in Tucson, Arizona.

23.     Defendant Michigan State University is and was, at all times pertinent hereto, a state-owned and operated public university and institution of higher education organized and

5

existing under laws of the State of Michigan.

24.    Michigan State University receives federal financial assistance and is therefore subject to Title IX of the Educational Amendments of 1972, 20 U.S.C. § 1681 *et seq.*

25.    Defendant The Board of Trustees of Michigan State University is the governing body for Michigan State University.

26.    Lou Anna K. Simon is the immediate past President of Defendant MSU, serving from approximately January 2005 - 2018.  Lou Anna K. Simon resigned her position as President on Defendant MSU on January 24, 2018.

27.    John Mathias Engler is the former Governor of the State of Michigan and is currently serving as interim President of Defendant MSU.

28.    M. Peter McPherson is a past President of Defendant MSU and served as President from approximately 1993 - 2004.

29.    Defendant William D. Strampel, D.O. (hereinafter *"Defendant Strampel"*) was the Dean of the College of Osteopathic Medicine at Defendant MSU, serving as Dean from approximately April 15, 2002 to December 14, 2017. Defendant Strampel was said to have stepped down from his position as Dean for "medical reasons."

30.    On February 2, 2018, Defendant Strampel's computer in his MSU office was seized under a search warrant.  It contained 50 pornographic images, many of which were thought to be of MSU students.[1]   Among additional pornographic videos, a video of Defendant Nassar

---

[1] *See*, "Timeline: Former Dean Strampel's Involvement at MSU, Alleged Misconduct", Anna Nichols, April 5, 2018.  Available at, http://statenews.com/article/2018/04/timeline-of-strampel-alleged-misconduct.  Last accessed April 5, 2018.

performing "treatment" on a young female patient was found.[2]

31.     On February 9, 2018, interim president John Engler filed a request to the Office of the Provost to begin terminating Defendant Strampel's employment at MSU.

32.     On March 26, 2018, Defendant Strampel was arrested and charged with fourth degree criminal sexual conduct, a felony count of misconduct in office and two misdemeanor counts of willful neglect.

33.     Defendant Jeffrey R. Kovan, D.O. (hereinafter *"Defendant Kovan"*), is or was the Director of Division of Sports Medicine at Defendant MSU and was the supervisor of the Department of Radiology, under which Defendant Nassar practiced medicine.

34.     Defendant Douglas Dietzel, D.O. (hereinafter *"Defendant Dietzel"*), is the Clinical Director of MSU Sports Medicine and Team Orthopedic Surgeon for MSU Department of Intercollegiate Athletics serving as Clinical Director of MSU Sports Medicine since approximately 2004.

35.     Defendant Brooke Lemmen, D.O. (hereinafter *"Defendant Lemmen"*), is or was a practicing physician with MSU Sports Medicine from approximately 2010 to 2017.

36.     Defendant Kathie Klages (hereinafter *"Defendant Klages"*) was the head coach of the Michigan State University Gymnastics Program until her suspension and resignation in early 2017; she also conducted gymnastics classes and programs for children and young adults not on the varsity gymnastics team.

37.     Defendant Klages regularly referred MSU student athletes as well as young

_____

[2] *Id.*

athletes who were not MSU students to Defendant Nassar for medical treatment.

38.    Defendant Destiny Teachnor-Hauk (hereinafter *"Defendant Teachnor- Hauk"*) is or was an athletic trainer for Defendant MSU for various sports including, but not limited to, softball, track and field, gymnastics, rowing, and volleyball.

39.    Defendant Teachnor-Hauk regularly referred MSU student athletes to Defendant Nassar for medical treatment.

40.    Defendant Gary E. Stollak (hereinafter *"Defendant Stollak"*) was a professor in the clinical program within the Michigan State University Department of Psychology.

41.    Defendant Kristine M. Moore (hereinafter *"Defendant Moore"*) served as the Assistant Director for Institutional Equity Office for Inclusion and Intercultural Initiatives in 2014. Following the incident that is the subject of this civil action, Defendant Moore began serving as, and remains at this time, Assistant General Counsel at Michigan State University.

42.    At all relevant times, the MSU Defendants maintained employment and offices at Defendant MSU in East Lansing, Michigan.

43.    Defendant USA Gymnastics, Inc. (hereinafter "*Defendant USAG*") was and continues to be an organization incorporated in Indiana, authorized to conduct business and conducting business throughout the United States including, but not limited to, the State of Michigan.

44.    The U.S. Olympic Committee and the International Gymnastics Federation has designated Defendant USAG as the national governing body for the sport of gymnastics in the United States.

45.    USAG advertises on its website: "Since 1990 – prior to almost all other National

Governing Bodies – USA Gymnastics has provided awareness, prevention and reporting information regarding sexual misconduct to professional members, athlete members and their families."[3]

46.    Steve Penny was the president of Defendant USAG from approximately April 2005 to March 2017.  He was responsible for the overall management and strategic planning of Defendant USAG.

47.    Robert Colarossi is the past president of Defendant USAG and held the position from approximately 1998 to 2005 and during that time was responsible for the overall management and strategic planning of Defendant USAG.

48.    Defendant Twistars USA, Inc. d/b/a Geddert's Twistars Gymnastics Club USA (hereinafter "*Defendant Twistars*") was and continues to be an organization incorporated in Michigan.

49.    Defendant John Geddert (hereinafter *"Defendant Geddert"*) is the owner and operator of Defendant Twistars USA, Inc. d/b/a Gedderts' Twistars USA Gymnastics Club and has been the head coach of Defendant Twistars from approximately 1996 to the present.

50.    Defendant Twistars is a member club and agent or instrumentality of Defendant USAG.

51.    Defendant USAG requires member clubs to pay it a fee in order to hold Defendant USAG sanctioned events.

52.    Defendant USAG also issues rules and requirements for its member clubs and

---

[3] https://usagym.org/pages/education/safesport/.

exercises some degree of control over its member clubs because Defendant USAG has the authority to revoke a club's membership.

53.     Defendant USAG also requires all coaches, judges, and athletes to pay it a membership fee if they want to participate in USA Gymnastics sanctioned events.

54.     Defendant Twistars required all gymnasts interested in competing to become members of Defendant USAG and to pay a membership fee to Defendant USAG.

55.     Club membership in Defendant USAG is a substantial benefit for Defendant Twistars and Defendant Geddert, as membership with Defendant USAG and participation in Defendant USAG sanctioned events is a considerable factor that interested gymnasts consider in joining a gymnastics club-particularly gymnasts who have collegiate, national, or Olympic aspirations in competitive gymnastics.

56.     At all relevant times, Defendant Geddert served as an agent of Defendant USAG and served as the 2011 USA World Championship Team Head Coach and the 2012 USA Olympic Team Head Coach through his affiliations with Defendant USAG and Defendant Twistars.

57.     Defendant Twistars's website states, regarding Defendant Geddert, "Being named Head coach for the USA Olympic and World Championships Gold Medal Winning team, paints the picture of national respect."

58.     Defendant USAG received a financial benefit through its relationship with Defendants Twistars and Geddert in the form of membership fees and fame.

59.     Defendants Twistars and Geddert received a benefit through its relationship with Defendant USAG in the form of national and global exposure, fame, and increased enrollment.

## **GENERAL FACTUAL ALLEGATIONS**

60.     Plaintiffs incorporate by reference the allegations contained in the previous paragraphs.

61.     Plaintiffs also incorporate by reference the allegations contained in the various complaints filed in the respective member cases of the consolidated action under case number 1:17-cv-29.

62.     At all times pertinent hereto, Defendant Nassar maintained an office at Defendant MSU in East Lansing, Michigan.

63.     At all relevant times, Defendants MSU, MSU Trustees, Nassar, Stollak, Strampel, Kovan, Teachnor Hauk, Klages, and Lemmen were acting under color of law, to wit, under color of statutes, ordinances, regulations, policies, customs, and usages of the State of Michigan and/or Defendant Michigan State University.

64.     At all times pertinent hereto, including the years 1996 to 2016, Defendant Nassar was an employee, representative, and/or agent of Defendant MSU acting under their control and supervision.

65.     At all times pertinent hereto, including the years 1996 to 2015, Defendant Nassar was an employee, representative, and/or agent of Defendant USAG acting under their control and supervision.

66.     At all times pertinent hereto, including the years 1996 to 2016, Defendant Nassar was an agent and/or representative of Defendant Twistars acting under their control and supervision.

67.     At all times pertinent hereto, including the years 1996 to 2016, Defendant Nassar

11

was acting in the scope of his employment or agency with Defendant MSU.

68.   At all times pertinent hereto, including the years 1996 to 2015, Defendant Nassar was acting in the scope of his employment or agency with Defendant USAG.

69.   At all times pertinent hereto, including the years 1996 to 2016, Defendant Nassar was acting in the scope of his employment or agency with Defendant Twistars.

70.   At all times pertinent hereto, the MSU Defendants and Defendant Nassar were acting under color of law, including acting under color of statutes, ordinances, regulations, policies, customs, and usages of the State of Michigan and/or Defendant MSU.

71.   Defendant Nassar graduated with a Doctor of Osteopathic Medicine degree from Defendant MSU in approximately 1993.

72.   Defendant Nassar was employed by, and/or an agent of, Defendant USAG from approximately 1986 to 2015, serving in various positions, including, but not limited to: (a) Certified Athletic Trainer; (b) Osteopathic Physician; (c) National Medical Doctor; (d) National Team Physician for USA Gymnastics; and (e) National Team Physician for USA Gymnastics' Women's Artistic Gymnastics National Team.

73.   Defendant Nassar received a benefit from his relationship with Defendant USAG in the form of national and global exposure, fame, and increased patients at his office at MSU, which resulted in Defendant Nassar receiving higher compensation.

74.   Defendant USAG received a benefit from its relationship with Defendant Nassar in the form of medical services rendered to its member athletes, national and global exposure, fame, and increased enrollment.

75.   Defendant Nassar was employed by, and/or an agent of, Defendant MSU from

12

approximately 1996 to 2016, serving in various positions, including, but not limited to: (a) Associate Professor of Defendant MSU's Division of Sports Medicine, Department of Radiology, College of Osteopathic Medicine; (b) Team Physician of Defendant MSU's Men's and Women's Gymnastics Teams; (c) Team Physician of Defendant MSU's Men's and Women's Track and Field Teams; (d) Team Physician of Defendant MSU's Men's and Women's Crew Teams; (e) Team Physician of Defendant MSU's Intercollegiate Athletics; (f) Medical Consultant with Defendant MSU's Wharton Center for the Performing Arts; and (g) Advisor for Student Osteopathic Association of Sports Medicine.

76.     As part of Defendant Nassar's employment and contractual duties with MSU, Defendant Nassar was responsible for spending between 50 to 70% of his time engaged in "Outreach" and/or "Public Services."

77.     A part of Defendant Nassar's outreach included providing medical treatment to athletes affiliated with Defendants USAG and Twistars as well as other organizations such as Holt High School.

78.     Based on MSU's decision to compensate Nassar for his work with USAG, Twistars and Holt High School, Nassar was acting in the scope of his employment with MSU while he was working at USAG, Twistars and Holt High School and also while he was working with athletes from those institutions.

79.     Defendant Twistars is a gymnastics facility with which Defendant Nassar affiliated from its inception in or around 1996.

80.     Defendant John Geddert ("*Defendant Geddert*"), owner and operator of Twistars USA, Inc. d/b/a Gedderts' Twistars Gymnastics Club USA served as the USA World and Olympic

13

Women's Gymnastics Team Head Coach.

81.     Defendant Geddert regularly recommended Defendant Nassar to members of Defendant Twistars as a reputable physician.

82.     For a period of time, Defendant Twistars displayed a photo of Defendant Nassar at its facility.

83.     As an agent of Defendant Twistars, Defendant Nassar regularly provided services and treatment to Defendant Twistars' members and Defendant USAG's members on Defendant Twistars' premises.

84.     Defendant Nassar received a benefit from his relationship with Defendant Twistars in the form of national and global exposure, fame, and increased patients at his office at MSU.

85.     Defendant Twistars received a benefit from its relationship with Defendant Nassar in the form of medical services rendered to its member athletes, national and global exposure, fame, and increased enrollment.

86.     As a former physician of Osteopathic Medicine, Defendant Nassar's medical care and treatment should have consisted largely of osteopathic adjustments and kinesiology treatment to patients, including students and student athletes of Defendant MSU.

87.     Defendant Nassar is not and has never been a medical doctor of obstetrics or gynecology.

88.     While employed by Defendants MSU and USAG, Defendant Nassar practiced medicine at Defendant MSU's Sports Medicine Clinic, Jenison Fieldhouse and the Breslin Center, all facilities at MSU.

89.     For over 20 years, Defendant MSU's Sports Medicine Clinic has provided health

care to MSU student athletes and the general public.[4]

90.    When the MSU Defendants operated the MSU Sports Medicine Clinic and provided medical services to Plaintiffs and others, they were acting as an arm of the state.

91.    The MSU Sports Medicine Clinic charged patients, including Plaintiffs, for their receipt of medical services.

92.    Charging Plaintiffs (and others) and billing insurance companies for medical services is proprietary in nature.

93.    The MSU Defendants charged fees comparable to specialists for the services provided at the MSU Sports Medicine Clinic.[5]

94.    The MSU Sports Medicine Clinic engaged in proprietary functions by entering into the business of providing medical services for the primary purpose of raising funds and making a profit for the MSU Defendants.

95.    The MSU Sports Medicine Clinic cannot be normally supported by taxes and fees.

96.    While employed by Defendant MSU and Defendant USAG, and acting as an agent and/or representative of Defendant Twistars, Defendant Nassar sexually assaulted, abused, and molested numerous female patients by engaging in nonconsensual sexual assault, battery, molestation, and harassment, including, but not limited to, digital vaginal and anal penetration without the use of gloves or lubricant.

97.    The use of gloves when exposed to potentially infectious material, including vaginal

---

[4] *See* "MSU Sports Medicine," http://sportsmed.msu.edu/, last accessed Feb. 24, 2018.
[5] *See* "MSU Sports Medicine," http://sportsmed.msu.edu/patients.html, last accessed Feb 24, 2018.

secretion, is mandated by the Michigan Administrative Code R.325.70001 et seq.

98.     As early as 1997 and/or 1998, employees, representatives, and agents of Defendant MSU were made aware of Defendant Nassar's conduct, yet failed to appropriately respond to allegations, resulting in the sexual assault, battery, molestation, and harassment of Plaintiffs and other female patients through approximately 2016.

99.     Upon information and belief, in or around 1998 a parent of a gymnast at Defendant Twistars' facility complained to Defendant Geddert regarding Defendant Nassar's conduct, yet the concerns and allegations went unaddressed.

100.    Upon information and belief, Defendant MSU and Kathie Klages were expressly notified by a minor female athlete at the time, Larissa Boyce, in 1997 and/or 1998, while under the instruction of Kathie Klages and MSU Youth Gymnastics, that Defendant Nassar sexual assaulted, battered, molested, and harassed Larissa Boyce on multiple occasions.

101.    Upon information and belief, after receiving Larissa Boyce's complaint, Katie Klages told Larissa Boyce that she must be "misunderstanding" or "reading into" what Defendant Nassar was doing. Kathie Klages convinced Larissa Boyce not to file a formal complaint by explaining that it would have serious consequences for Larissa Boyce and Defendant Nassar.

102.    As a result of MSU gymnastics head coach Kathie Klages being informed by Larissa Boyce of Defendant Nassar's conduct, Jane B8 Doe was asked by Klages if Nassar had performed the "procedure" involving digital vaginal and anal penetration on Jane B8 Doe, and Jane B8 Doe responded in the affirmative. Klages told Jane B8 Doe that there is no reason to bring up Nassar's conduct.

103.    Despite her complaints to Defendant MSU employees, agents, and/or

16

representatives, including Kathie Klages, Larissa Boyce's concerns and allegations went unaddressed in violation of reporting policies and procedures and Title IX and in a manner that was reckless, deliberately indifferent, and grossly negligent.

104.   Also, in or around 1998, Jane A71 Doe complained to a coach at Twistars' facility regarding Defendant Nassar's conduct, yet the concerns and allegations went unaddressed.

105.   In or around 1999 the MSU Defendants were also put on notice of Defendant Nassar's conduct by a MSU student and track and cross-country athlete, Christie Achenbach, after she complained to MSU employees, including trainers and her head coach, Kelli Bert, that Defendant Nassar touched her vaginal area although she was seeking treatment for an injured hamstring.

106.   Despite her complaints to Defendant MSU's employees, agents, and/or representatives, including trainers and head coaches, Christie Achenbach's concerns and allegations went unaddressed in violation of reporting policies and procedures and Title IX and in a manner that was reckless, deliberately indifferent, and grossly negligent.

107.   Upon information and belief, Defendant MSU was notified in 2000 that Defendant Nassar committed acts of sexual assault, battery, molestation, and harassment when a student athlete, Tiffany Thomas Lopez, reported to MSU employees, agents, and/or representatives, including the highest ranking employees within MSU's Training Staff, that Defendant Nassar touched her vaginal area on multiple occasions and inserted his ungloved hand into her vagina, although she was seeking treatment for back pain.

108.   Upon information and belief, an employee, agent, and/or representative of Defendant MSU, who was one of three individuals that supervised the training department, told

17

Tiffany Thomas Lopez that what happened to her was not sexual abuse, that Defendant Nassar was a world renowned doctor, that she was not to discuss what happened, and that she was to continue seeing Defendant Nassar for purported treatment.[6]

109.   One of the trainers that Ms. Lopez reported to was Lianna Hadden, who is still presently employed by MSU as an athletic trainer with the volleyball team.

110.   After reporting the assault to Ms. Hadden, Ms. Lopez also reported the assault to Defendant Destiny Teachnor-Hauk.

111.   Ms. Lopez told Defendant Teachnor-Hauk that she was "extremely uncomfortable," but Teachnor-Hauk told Ms. Lopez that Nassar was engaged in actual medical treatment.

112.   Defendant Teachnor-Hauk further dissuaded Ms. Lopez from reporting Nassar's conduct by telling Ms. Lopez that if Lopez pursued the matter further that it would cast a burden over her family and cause Ms. Lopez a lot of heartache and trauma.

113.   Defendant Teachnor-Hauk also defended Nassar by stating to Ms. Lopez why she would want to drag Nassar through an allegation of sexual assault.

114.   Despite her complaints to Defendant MSU employees, agents, and/or representatives, including the highest ranking employees within MSU's Training Staff, Tiffany Thomas Lopez's concerns and allegations went unaddressed in violation of reporting policies and procedures and Title IX and in a manner that was reckless, deliberately indifferent, and grossly negligent.

115.   Upon information and belief, Defendant MSU was notified in approximately 2001 or

---

[6] *See,* Case No. BC644417, filed with the Superior California Court of the State of California, County of Los Angeles, December 21, 2016, ¶26.

2002 that Defendant Nassar committed acts of sexual assault, battery, molestation, and harassment when Jennifer Rood Bedford, an MSU student athlete on the women's volleyball team, was sexually assaulted and abused during "treatment" by Defendant Nassar and reported Defendant Nassar's conduct to Defendant MSU's employees, including MSU athletic trainer Lianna Hadden.[7]

116.    According to Ms. Bedford, Nassar was known among the women's volleyball team as the "crotch doc" because of his "unconventional methods" of treating sports injuries with vaginal penetrations.

117.    Ms. Hadden dissuaded Ms. Bedford from filing a formal complaint against Nassar because it would result in an investigation against Nassar, making an accusation against Nassar and statement that she felt that what Nassar did was unprofessional or criminally wrong.

118.    Upon information and belief, Defendant MSU was notified in approximately 2004 that Defendant Nassar committed acts of sexual assault, battery, molestation, and harassment when Kyle Stephens–then 11 or 12 years old–was sexually assaulted and abused during "treatment" by Defendant Nassar and reported Defendant Nassar's conduct to Defendant MSU's employees, including Defendant Gary E. Stollak.

119.    Kyle Stephens was not a medical patients of Defendant Nassar, so there was no medical pretext for Defendant Nassar to commit the abuse.

120.    Defendant Stollak did not report the abuse to law enforcement or to child protective

---

[7] *See* "Nassar Victim: Jennifer Rood Bedford Statement", Jan. 16, 2018, Available at https://www.clickondetroit.com/video/nassar-victim-jennifer-rood-bedford-statement.  Last accessed February 1, 2018.

services.

121.   Instead, Defendant Stollak suggested that Ms. Stephens and her parents meet with Nassar.

122.   Ms. Stephens refused to attend the meeting, but her parents met with Defendant Stollak and Defendant Nassar.

123.   Defendant Stollak's failure to report Defendant Nassar endangered dozens, if not hundreds, of plaintiffs who were subsequently sexually abused, assaulted, and molested by Defendant Nassar.

124.   Also in 2004, a 16-year old woman, Brianne Randall-Gay, reported Defendant Nassar's conduct to her parents and to the Meridian Township Police Department in Meridian Township, Michigan in 2004.

125.   The employees, agents, and/or representatives of Defendant MSU, including MSU trainers, coaches, Katie Klages, Lianna Hadden, and Gary Stollak, had a duty to report allegations of Defendant Nassar's inappropriate sexual conduct directed at Larissa Boyce, Christie Achenbach, Tiffany Thomas Lopez, Jennifer Rood Bedford, and Kyle Stephens.

126.   Because MSU took no action to investigate the 1997/1998, 1999, 2000, 2001/2002, and 2004 complaints and took no corrective action, from 1997 and/or 1998 to 2016, under the guise of treatment, several individuals, including Plaintiffs, were sexually assaulted, abused, molested, and harassed by Defendant Nassar by vaginal and/or anal digital penetration, without the use of gloves or lubricant and by touching and groping their breasts and/or buttocks.

127.   Defendant MSU's deliberate indifference before, during, and after the sexual assault, battery, molestation, and harassment of Plaintiffs was in violation of Title IX of the

20

Education Amendments of 1972, 20 U.S.C. § 1681 *et seq.,* 42 U.S.C. § 1983, as well as other federal and state laws.

128.    Defendant MSU's failure to comply with Title IX of the Education Amendments of 1972, 20 U.S.C. § 1681, *et seq.*, 42 U.S.C. 1983, and other federal and state laws, as described in this Complaint, contributed to the creation of a sexually hostile environment on MSU's campus between 1997 and 2018.

129.    In 2014, following receipt of an unrelated complaint regarding a sexual assault on Defendant MSU's campus, between 2014 and 2015 the U.S. Department of Education's Office of Civil Rights (hereinafter "OCR") conducted an investigation regarding the complainant's allegations, another complaint regarding sexual assault and retaliation from 2011, and Defendant MSU's response to said complaints, and their general policies, practices, and customs pertaining to their responsibilities under Title IX.[8]

130.    The OCR concluded their investigation in 2015 and presented Defendant MSU with a twenty-one-page agreement containing measures and requirements to resolve the 2011 and 2014 complaints and to bring Defendant MSU in compliance with Title IX.[9]

131.    The report confirmed that the "*OCR determined that the University's Title IX grievance procedures, in place during the time period covered by OCR's investigation, failed to*

_____

[8] *See*, Letter from U.S. Department of Education Office for Civil Rights to Michigan State University, September 1, 2015, OCR Docket #15-11-2098, #15-14-2113.  Available at https://www2.ed.gov/documents/press-releases/michigan -state-letter.pdf.  Last accessed February 1, 2018.

[9] *See*, Resolution Agreement, August 28, 2018, OCR Document #15-11-2098, #15-14-2133. Available at, https://www.2ed.gov/documents/press-releases/michigan-state-agreement.pdf. Last accessed February 1, 2018.

comply with the requirements of Title IX."

132.   The report further confirmed that the *"OCR determined that a sexually hostile environment existed for and affected numerous students and staff on campus at the University during the time period covered by OCR's investigation; and that the University's failure to address complaints of sexual harassment, including sexual violence, in a prompt and equitable manner caused and may have contributed to a continuation of this sexually hostile environment."*

133.   While the OCR was conducting their investigation, additional complaints regarding Defendant Nassar's conduct surfaced in 2014. Amanda Thomashow reported she had an appointment with Defendant Nassar to address hip pain and was sexually abused and molested by Defendant Nassar when he cupped her buttocks, massaged her breast and vaginal area, and he became sexually aroused.[10]

134.   Upon information and belief, Kristine Moore, an attorney investigator in Defendant MSU's Title IX office investigated the 2014 complaints.

135.   However, Amanda Thomashow reported to Defendant MSU facts which were omitted or withheld from the investigative report including but not limited to the following:

   a.   Defendant Nassar was sexually aroused while touching her;

   b.   The appointment with Defendant Nassar did not end until Amanda Thomashow physically removed his hands from her body.

136.   Three months after initiating the investigation, in July 2014, Amanda Thomashow's

---

[10] *See*, At MSU: Assault, harassment and secrecy.  Matt Mencarini, December 15, 2016. Available at, http://www.lansingstatejournal.com/story/news/local/2016/12/15/michigan-state-sexual-assault-harassment-larry-nassar/94993582/.  Last accessed January 30, 2018.

complaints were dismissed and Defendant MSU determined she didn't understand the "nuanced difference" between sexual assault and an appropriate medical procedure and deemed Defendant Nassar's conduct "medically appropriate" and "[n]ot of a sexual nature."[11]

137.   Two of the medical experts consulted by the Office of Institutional Equity in investigating the victim's allegations were Defendants Lemmen and Teachnor-Hauk.

138.   Following the investigation, on or about July 30, 2014, Defendant Strampel sent an e-mail to Defendant Nassar that provided new institutional guidelines and restrictions that Defendant Nassar was subject to including:

a.   Defendant Nassar was not to examine or treat patients alone but was to be accompanied by a chaperone such as a resident or nurse;[12]

b.   The alleged "procedure" was to be altered to ensure there would be little to no skin to skin contact when in certain "regions" and if skin to skin contact was "absolutely necessary" the "procedure" was to be explained in detail with another person in the room for both the explanation and the "procedure;" and,

c.   New people in the practice were to be "oriented" to ensure understanding with the guidelines.

139.   Defendant Strampel sent a copy of the July 30, 2014 e-mail that outlined Defendant Nassar's restrictions and guidelines to Defendant Dietzel.

140.   At all relevant times, Defendant Dietzel, Defendant Strampel, and Defendant Kovan were acting in a supervisory role to Defendant Nassar.

141.   The MSU Defendants failed to take any actions to enforce or ensure that Defendant Nassar was in compliance with the restrictions outlined by Defendant Strampel in his July 30,

---

[11] *Id.*
[12] *Id.*

2014 e-mail to Defendant Nassar.

142.    Upon information and belief, the MSU Defendants failed to take any action to orient new MSU employees to ensure that they were aware of the restrictions placed on Nassar.

143.    In approximately March 2016, Diane Rork was an employee of MSU serving as a registered medical assistant.[13]

144.    Through her employment with MSU, Diane Rork had occasion to work with patients who were to be seen by Defendant Nassar.

145.    At no point in time was Diane Rork ever told of any restrictions or guidelines regarding Defendant Nassar's treatment of patients.

146.    On one occasion in March 2016, Diane Rork was completing a chart of a girl younger than 13 who was set to be examined by Defendant Nassar in an exam room at Defendant MSU's Sports Medicine Clinic.

147.    Defendant Nassar ordered Diane Rork to leave the room so that he could "treat" the young girl alone.

148.    Diane Rork reported her March 2016 interaction with Defendant Nassar to the MSU Police Department in January 2017.

149.    MSU terminated Diane Rork's employment approximately two weeks later.

150.    In addition, an unnamed registered nurse employed by MSU at the MSU Sports Medicine from approximately 2015 to 2016, has indicated that she was never made aware of any

---

[13] *See*, Witness: MSU Knew Nassar Asked Her to Leave Girl's Exam, Kim Kozlowski, DETROIT NEWS (Dec. 21, 2017), http://www.detroitnews.com/story/news/michigan/2017/12/21/msu-nassar-scandal-witness-claims-retribution/108800992/.  Last visited January 30, 2018.

restrictions or guidelines concerning Defendant Nassar.

151.   This unnamed registered nurse was the only registered nurse employed by Defendant MSU's Sports Medicine Clinic during the time of her employment.

152.   From July 2014 to September 2016, despite complaints about Defendant Nassar's conduct and an open criminal investigation into Defendant Nassar's conduct, Defendant MSU continued to permit Defendant Nassar unfettered access to female athletes without adequate oversight or supervision to ensure he was complying with the new guidelines.

153.   In a March 14, 2017 interview with Michigan State University Police Department Detective Sergeant Christopher Rozman, Defendant Strampel admitted that the institutional restrictions and guidelines that Defendant Nassar was subject to were illusory in nature because he only shared them with Defendant Dietzel and took no action whatsoever to ensure that the institutional restrictions and guidelines were implemented, followed, or enforced.

154.   Defendant Strampel also told Detective Sergeant Rozman that he did not want any other employees in the Sports Medicine Clinic to know that Defendant Nassar had been accused of sexual assault or that Nassar was subject to institutional restrictions or guidelines.

155.   Defendant Strampel also admitted to Detective Sergeant Rozman that he did not take any steps to orient any new employees at Defendant MSU's Sports Medicine Clinic to the institutional restrictions or guidelines that Defendant Nassar was purportedly subject to until after Defendant Nassar's termination.

156.   In a March 15, 2017 interview with Michigan State University Police Department Detective Lieutenant Andrea Munford, Michigan State University Police Department Detective Sergeant Christopher Rozman, and Federal Bureau of Investigation Special Agent Rodney

Charles, Defendant Teachnor-Hauk stated that she had never had an athlete tell her that Defendant Nassar had made them uncomfortable or that Defendant Nassar had performed digital vaginal penetration.

157.   Defendant Teachnor-Hauk's March 15, 2017 statements to law enforcement were false for the reason that numerous athletes had previously reported concerns of uncomfortable and inappropriate treatment by Defendant Nassar to her, including complaints of digital vaginal penetration by Defendant Nassar under the guise of medical treatment.

158.   Plaintiffs were made aware of Defendant Nassar's widespread sexual abuse recently through recent related media coverage.[14]

159.   After receiving allegations of "athlete concerns," in approximately summer 2015, Defendant USAG relieved Defendant Nassar of his duties.[15]

160.   Defendant Nassar's employment ended with Defendant MSU on approximately September 20, 2016 only after the MSU Defendants became aware that:

    a.   Defendants Nassar and USAG were sued by a former Olympian who alleged she was sexually assaulted by Defendant Nassar; and,

    b.   A former patient of Defendant Nassar, Rachel Denhollander, filed a criminal complaint with the Michigan State University Police Department alleging Defendant Nassar sexually assaulted her when she was 15 years old and seeking treatment for back pain as a result of gymnastics. Ms. Denhollander's allegations of sexual assault by Defendant Nassar included but were not limited to:

---

[14] *Id.*

[15] *See*, Former USA Gymnastics Doctor Accused of Abuse, Mark Alesia, Marisa Kwiatkowski, Tim Evans, September 12, 2016.  Available at, http://www.indystar.com/story/news/2016/09/12/former-usa-gymnastics-doctor-accused-abuse/89995734/.  Last accessed January 30, 2018.

      i.      Massaging her genitals;

      ii.     Penetrating her vagina and anus with his finger and thumb; and,

      iii.    Unhooking her bra and massaging her breasts.

161.    Reasons given to Defendant Nassar for his termination included but were not limited to:

a.    Deviation from "required best practices put in place following the internal sexual harassment investigation conducted … in 2014;"

b.    Failure to disclose a 2004 complaint to Meridian Township Police; and,

c.    Dishonesty by Defendant Nassar when Defendant MSU questioned him about receiving prior complaints about the "procedure" at issue.

162.    Defendant MSU's failure to properly supervise Defendant Nassar and their negligence in retaining Defendant Nassar is in violation of Michigan common law.

163.    In 2004, Defendant Nassar authored a chapter in Principles of Manual Sports Medicine by Steven J. Karageanes.

164.    In the chapter, Defendant Nassar described the pelvic diaphragm, coccyx, and sacroiliac ligaments as an area of the body not fully examined due to its proximity to the genitalia and buttocks, and stated it was "referred to as the 'no fly zone' because of the many cultural stigmas in touching this area."

165.    Defendant Nassar recommended taking "special measures to explain any examination and techniques applied in this region," and "warning in advance of what you are planning to do," among other suggestions.

166.    There is no mention of intravaginal or intra-rectal techniques or procedures in the

27

chapter.

167.   As described in detail below, Defendant Nassar often failed to follow his own recommendations with Plaintiffs as:

a.   He did not explain any intravaginal or intra-rectal techniques to Plaintiffs or their parents; and,

b.   He did not warn Plaintiffs he was going to engage in vaginal or anal digital penetration before doing so.

168.   Shortly after MSU terminated Defendant Nassar's employment, Defendant Klages requested the MSU Women's Gymnastics Team members to sign a card for the team to show their support for Defendant Nassar-despite the fact that Defendant Klages was aware that Defendant Nassar's employment had been terminated due to numerous claims of sexual assault against patients and athletes.[16]

169.   Defendant Klages also passionately defended Defendant Nassar to the MSU Women's Gymnastics Team and told her athletes that she would trust her own grandkids with him-despite the numerous allegations of sexual assault against Defendant Nassar and the existence of open criminal investigations into his conduct.

170.   In September 2016, following MSU's termination of Defendant Nassar's employment, MSU Athletic Department's Director of Athletic Communications, Jamie Weir Baldwin, instructed members of the MSU Women's Gymnastics Team not to speak to the media or post on their social media accounts regarding Defendant Nassar's actions.

---

[16] *See*, MSU Abuse Scandal: Coach Had Gymnasts Sign Card for Dr. Larry Nassar, Stephanie Gosk, Kristen Powers, and Tracy Connor, March 21, 2017.  Available at, https://www.nbcnews.com/news/us-news/msu-abuse-scandal-coach-had-gymnasts-sign-card-dr-larry-n731781.  Last accessed January 30, 2018.

171.   Based on the communications of the MSU Athletic Department, members of the MSU Women's Gymnastics Team believed that they would be punished by MSU or face consequences if they came forward to the police or media to describe sexual assaults against them.

172.   In December 2016, following the filing of federal child pornography charges against Defendant Nassar, Defendant Klages continued to defend Defendant Nassar and told the parent of one of Defendant Nassar's victims that the child pornography "could have been planted" by somebody suing Defendant Nassar and also continued to deny that Defendant Nassar had sexually assaulted any patients by suggesting that the victims had "misinterpreted the treatment."

173.   MSU did not directly encourage the members of the MSU Women's Gymnastics Team to report suspected abuse by Defendant Nassar to the police until February 2017- approximately 5 months after MSU terminated Defendant Nassar's employment.

174.   In approximately December 2016, Defendant USAG settled one or more claims against it involving allegations of sexual abuse by Defendant Nassar against Olympic gold-medal-winning gymnast McKayla Maroney pursuant to a confidential settlement agreement in California.

175.   Upon information and belief, USAG entered into one or more confidential settlement agreements in California involving claims of child sex abuse or other acts that could be prosecuted as a felony sex offense by Defendant Nassar.

176.   Notably, California law prohibits confidential settlements in cases involving allegations of child sexual abuse or an act that could be prosecuted as a felony sex offense. CAL. CIV. PROC. CODE § 1002.

177.   Upon information and belief, USAG's settlement agreement with McKayla Maroney

is not the first or the only settlement agreement that USAG has entered into to resolve civil claims of victims of sexual abuse by Defendant Nassar against USAG.

178.   At no time did Defendant USAG inform Defendants MSU, MSU Trustees, or other MSU representatives of the concerns that led to Defendant Nassar being relieved from his duties with Defendant USAG.

179.   At no time did Defendant USAG inform Defendant Twistars or Defendant Geddert of the concerns that led to Defendant Nassar being relieved from his duties with Defendant USAG –despite the fact that Defendant Twistars is a USAG member club and Defendant Geddert is a USAG member coach.

180.   In late November 2016, Defendant Nassar was arrested and charged in Ingham County, Michigan on three charges of first-degree criminal sexual conduct with a person under 13, and was later released on a $1 million bond.[17]

181.   In mid-December 2016, Defendant Nassar was indicted, arrested, and charged in the United States District Court for the Western District of Michigan in Grand Rapids, Michigan on charges of possession of child pornography and receipt/attempted receipt of child pornography.

182.   According to the federal indictment[18], Defendant Nassar:

a.   Knowingly received and attempted to receive child pornography between approximately September 18, 2004 and December 1, 2004;

b.   Knowingly possessed thousands of images of child pornography between approximately February 6, 2003 and September 20, 2016, including images involving a minor who was under the age of 12.

---

[17] State of Michigan, Ingham County Circuit Court Case No. 17-142-FC.
[18] 1:16-cr-00242 PageID.1-4.

183.    Testimony given by an FBI agent at a hearing held on December 21, 2016, alleged, among other allegations, that Defendant Nassar used a GoPro camera to record video images of children in a swimming pool and that:

a.    Defendant Nassar's hand can be seen grabbing one girl's hand and shoving it into the vaginal area of another girl; and[19]

b.    Defendant Nassar's thumb can be seen pressing into a child's vagina/vaginal area.[20]

184.    In mid-January 2017, Brooke Lemmen, D.O. submitted a letter of resignation to Mr. Strampel amid allegations that she:

a.    Removed several boxes of confidential treatment patient records from Defendant MSU's Sports Medicine clinic at Defendant Nassar's request;

b.    Did not disclose to Defendant MSU that Defendant USAG was investigating Defendant Nassar as of July 2015; and

c.    Made a staff member feel pressured not to fully cooperate in an internal investigation into allegations against Defendant Nassar.

185.    On February 7, 2017, a superseding indictment added an additional count of "Destruction and Concealment of Records and Tangible Objects" alleging between September 19, 2016 and September 20, 2016, Defendant Nassar "caused a third-party vendor to permanently delete and destroy all images, records, documents, and files contained on the hard drive of a laptop computer, and the defendant threw in the trash a number of external hard drives."[21]

186.    On February 17, 2017, following a preliminary examination, Defendant Nassar was

---

[19] *Id.* at PageID.49-50.
[20] *Id.* at PageID.50.
[21] *Id.* at PageID.88.

ordered to stand trial on three charges of first-degree criminal sexual conduct with a person under 13 in Ingham County following testimony, which included, among other, allegations of digital vaginal penetration at Defendant Nassar's residence.

187.   On February 22, 2017, Defendant Nassar was arraigned on 22 counts of first- degree criminal sexual conduct with a person under 13 years old, and 14 counts of third- degree criminal sexual conduct with a person under 13 years old in Ingham County, Michigan and Eaton County, Michigan.

188.   On March 17, 2017, Defendant MSU's Office of Institutional Equity released a Title IX report concluding that Defendant Nassar sexually assaulted one of his patients, Rachael Denhollander, in or about 2000. The report stated that evidence supports a finding that Defendant Nassar "committed these acts in a sexual manner regardless of whether it was done for medical purposes."

189.   At least three more internal Title IX investigations conducted by Michigan State University following the Title IX investigation for Rachael Denhollander determined Larry Nassar violated University policy.

190.   Defendant Nassar's preliminary examinations on the second set of charges in Ingham County were held on May 12, 2017, May 26, 2017, and June 23, 2017.

191.   During Nassar's preliminary examination on May 12, 2017 in the 55th District Court in Ingham County, Michigan, a young woman testified regarding an instance of sexual assault that occurred at Twistars's facility in Dimondale, Michigan in approximately 2010 when she was fifteen years old as follows, "Mostly all I remember is [Nassar] doing the treatment on me with his fingers in my vagina, massaging my back with a towel over my butt, and John [Geddert] walking

in and making a joke that I guess my back really did hurt, and then I was uncomfortable because John [Geddert] was in there during that."

192.   At the conclusion of the preliminary examinations, Defendant Nassar was ordered to stand trial on 12 counts of first-degree criminal sexual conduct following testimony by Rachael Denhollander and others, which included among others, allegations of digital vaginal penetration by Defendant Nassar.

193.   Defendant Nassar's preliminary examination on the charges issued in Eaton County, Michigan was held on June 30, 2017.

194.   At the conclusion of the preliminary examination, Defendant Nassar was ordered to stand trial on 7 counts of first-degree criminal sexual conduct following testimony, which included among others, allegations of digital vaginal penetration by Defendant Nassar.

195.   On or about July 11, 2017, Defendant Nassar pled guilty in his federal criminal case to: (1) Receipt and Attempted Receipt of Child Pornography, in violation of 18 U.S.C. § 2252A(a)(2)(A); (2) Possession of Child Pornography, in violation of 18 U.S.C. § 2252A(a)(5)(B); and (3) Destruction and Concealment of Records and Tangible Objects, in violation of 18 U.S.C. § 1519.

196.   On November 11, 2017 Defendant Nassar pleaded guilty to seven counts of first-degree criminal sexual conduct in Ingham County Circuit Court.

197.   On November 29, 2017 Defendant Nassar pleaded guilty to three counts of first-degree criminal sexual conduct in Eaton County Circuit Court.

198.   On December 7, 2017 Defendant Nassar was sentenced in the United States District Court for the Western District of Michigan by District Court Judge Janet T. Neff to three

twenty-year sentences to be served consecutively on his convictions for (1) Receipt and Attempted Receipt of Child Pornography, in violation of 18 U.S.C. § 2252A(a)(2)(A); (2) Possession of Child Pornography, in violation of 18 U.S.C. § 2252A(a)(5)(B); and (3) Destruction and Concealment of Records and Tangible Objects, in violation of 18 U.S.C. § 1519.

199.   On January 24, 2018, Defendant Nassar was sentenced in the Ingham County Circuit Court for the State of Michigan by the Honorable Rosemarie E. Aquilina to 40 to 175 years in prison on seven sexual assault charges.

200.   On February 5, 2018, Defendant Nassar was sentenced in the Eaton County Circuit Court for the State of Michigan by the Honorable Janice K. Cunningham to 40 to 125 years in prison on three sexual assault charges.

201.   Between the sentencing hearings Ingham and Eaton Counties, approximately 204 victim impact statements were given over nine days.

202.   The acts, conduct, and omissions of the MSU Defendants, and their policies, customs, and practices with respect to investigating sexual assault allegations severely compromised the safety and health of Plaintiffs and an unknown number of individuals, and have resulted in the sexual assault, battery, molestation, and harassment of Plaintiffs by Defendant Nassar, which has been devastating for Plaintiffs and their families.

203.   A special, confidential, and fiduciary relationship was created between Plaintiffs and Defendant Nassar when Plaintiffs sought medical treatment from Defendant Nassar in the course of his employment, agency, and/or representation of the MSU Defendants, resulting in Defendant Nassar owing Plaintiffs a duty to disclose known acts of sexual assault, battery, molestation, and harassment against Plaintiffs.

34

204.    A special, confidential, and fiduciary relationship was created between Plaintiffs and the MSU Defendants when Plaintiffs sought medical treatment from Defendant Nassar in the course of his employment, agency, and/or representation of the MSU Defendants, resulting in the MSU Defendants owing Plaintiffs a duty to disclose known acts of sexual assault, battery, molestation, and harassment against Plaintiffs.

205.    A special, confidential, and fiduciary relationship was created and existed between Nassar and the MSU Defendants, resulting in the MSU Defendants owing Plaintiffs a duty to disclose known acts of sexual assault, battery, molestation, and harassment to Plaintiffs.

206.    A special, confidential, and fiduciary relationship was created between Plaintiffs and Defendant USAG when Plaintiffs sought medical treatment from Defendant Nassar in the course of his employment, agency, and/or representation of Defendant USAG, resulting in Defendant USAG owing Plaintiffs a duty to disclose known acts of sexual assault, battery, molestation, and harassment against Plaintiffs.

207.    A special, confidential, and fiduciary relationship was created and existed between Nassar and Defendant USAG, resulting in Defendant USAG owing Plaintiffs a duty to disclose known acts of sexual assault, battery, molestation, and harassment to Plaintiffs.

208.    A special, confidential, and fiduciary relationship was created between Plaintiffs and Defendant Twistars when Plaintiffs sought medical treatment from Defendant Nassar in the course of his employment, agency, and/or representation of Defendant Twistars, resulting in Defendant Twistars owing Plaintiffs a duty to disclose known acts of sexual assault, battery, molestation, and harassment against Plaintiffs.

209.    A special, confidential, and fiduciary relationship was created and existed between

35

Nassar and Defendant Twistars, resulting in Defendant USAG owing Plaintiffs a duty to disclose known acts of sexual assault, battery, molestation, and harassment to Plaintiffs.

210.    This action arises from Defendants' blatant disregard for Plaintiffs' federal and state rights, and Defendants' deliberately indifferent and unreasonable response to physician-on-patient/physician-on-student/physician-on-athlete sexual assault, battery, molestation, and harassment.

## ALLEGATIONS SPECIFIC TO EACH PLAINTIFF

### A.    PLAINTIFF ABIGAIL MEALY:

211.    Plaintiffs reallege and incorporate by reference the allegations contained in the previous paragraphs.

212.    Plaintiff Abigail Mealy is an adult female. She was a minor for most of the time she was sexually assaulted, abused, and molested by Defendant Nassar.

213.    Plaintiff Abigail Mealy was a competitive gymnast and a member of USA Gymnastics.

214.    Plaintiff Abigail Mealy was a competitive gymnast and member of Defendant Twistars and was coached by Defendant Geddert.

215.    Plaintiff Abigail Mealy was referred to Defendant Nassar for treatment of hamstring pain initially by her gymnastics coach Defendant Geddert and she underwent frequent and regular treatments with Defendant Nassar from approximately 2008 until immediately before his arrest in 2016.

216.    Plaintiff Abigail Mealy was approximately 11 years old when she began treatments with Defendant Nassar.  She was a minor during almost all of the sexual assaults.

217.   Defendant Nassar treated Abigail Mealy at Defendant Twistars facility, Michigan State University facilities, including the MSU Sports Medicine Clinic, Holt High School and his home.  Over the years, treatments were for hamstring injuries, shoulders, knees, elbows and a spinal stress fracture.

218.   Defendant Nassar provided Plaintiff Abigail Mealy with his personal cell phone number to arrange "treatments".

219.   During hundreds of visits over the course of 8 years, Defendant Nassar fondled her genitals and digitally penetrated her vagina and anus without gloves, lubricant, or chaperone.

220.   Some of this conduct occurred after Michigan State University imposed a particular protocol for Defendant Nassar, including, but not limited to: 1) having another person (resident, nurse, etc.) in the room while he performed treatments; 2) procedures were to involve little to no skin contact; 3) procedures were to be explained in detail with another person in the room for both the explanation and the procedure.

221.   Michigan State University and MSU Sports Medicine Clinic had received notice of Nassar's inappropriate conduct on multiple occasions dating back to at least 1997.

222.   These actions were intentionally and fraudulently concealed and not documented in the medical record.

223.   Defendant Nassar did not give prior notice or obtain consent for the digital penetration of Abigail Mealy without gloves from either Abigail Mealy or her parents.

224.   Plaintiff Abigail Mealy did not treat or intend to treat with Defendant Nassar for OB/GYN related issues.

225.   Plaintiff, Abigail Mealy, a minor during most of the abuse, believed the conduct of

Defendant Nassar constituted medical treatment and did not discover or become aware that said conduct breached the standard of care or practice or was otherwise unlawful or tortious until recent media publications and victim impact statements.

226.   Plaintiff Abigail Mealy now believes the conduct committed by Defendant Nassar was sexual assault, abuse, molestation and harassment performed for Defendant Nassar's sexual pleasure and gratification.

### B.   PLAINTIFF AMANDA MEALY:

227.   Plaintiffs reallege and incorporate by reference the allegations contained in the previous paragraphs.

228.   Plaintiff Amanda Mealy is an adult female.  She was a minor when she was sexually assaulted, abused, and molested by Defendant Nassar.

229.   Plaintiff Amanda Mealy was a competitive gymnast and a member of USA Gymnastics before the sexual assault.

230.   Plaintiff Amanda Mealy was a member of  Defendant Twistars and was coached by Defendant John Geddert before the sexual assault.

231.   Plaintiff Amanda Mealy treated with Defendant Nassar at the MSU Sports Medicine Clinic shortly before his arrest in 2016 for general aches and pains from competitive dance.

232.   Plaintiff Abigail Mealy is Plaintiff Amanda Mealy's older sister and was also present at the MSU Sports Medicine Clinic during the time of the assault in 2016.

233.   During this visit in the late summer of 2016, Defendant Nassar massaged Plaintiff Amanda Mealy's buttocks, inner thighs, and genitals and digitally penetrated her vagina without

38

gloves, lubricant, or chaperone.

234.   This conduct occurred after Michigan State University imposed a particular protocol for Defendant Nassar, including, but not limited to: 1) having another person (resident, nurse, etc.) in the room while he performed treatments; 2) procedures were to involve little to no skin contact; 3) procedures were to be explained in detail with another person in the room for both the explanation and the procedure.

235.   Michigan State University and MSU Sports Medicine Clinic had received notice of Nassar's inappropriate conduct on multiple occasions dating back to at least 1997.

236.   These actions were intentionally and fraudulently concealed and not documented in the medical record.

237.   Defendant Nassar did not give prior notice or obtain consent for massaging and the digital penetration of Amanda Mealy without gloves from either Amanda Mealy or her parents.

238.   Plaintiff Amanda Mealy did not treat or intend to treat with Defendant Nassar for OB/GYN related issues.

239.   Defendant Nassar did not provide notice to Amanda Mealy or her parents of the above-described intended treatments, nor did he obtain their consent.

240.   Plaintiff Amanda Mealy did not treat or intend to treat with Defendant Nassar for OB/GYN related issues.

241.   Plaintiff Amanda Mealy, a minor at the time of the abuse, believed the conduct of Defendant Nassar constituted medical treatment and did not discover or become aware that said conduct breached the standard of care or practice or was otherwise unlawful or tortious until recent media publications and victim impact statements.

242.    Plaintiff Amanda Mealy now believes the conduct committed by Defendant Nassar was sexual assault, abuse, molestation and harassment performed for Defendant Nassar's sexual pleasure and gratification.

C.    **PLAINTIFF ZENA MALDONADO**:

243.    Plaintiffs reallege and incorporate by reference the allegations contained in the previous paragraphs.

244.    Plaintiff Zena Maldonado is an adult female.

245.    Plaintiff Zena Maldonado was not a member of USA Gymnastics.

246.    Plaintiff Zena Maldonado was not a member of Defendant Twistars gym.

247.    Plaintiff Zena Maldonado was a student at Michigan State University from 1995 to 1999.  Her maiden name when she was a MSU student was Cummings.

248.    Plaintiff Zena Maldonado was an avid runner and in 1995/1996 she began to experience shoulder pain.  She presented to the MSU Sports Medicine Clinic on campus.  Dr. Julie Dodds initially treated her with steroid injections.  However, shortly thereafter, Defendant Nassar took over her care and treatment at the Clinic.  She saw Defendant Nassar on an as needed basis thereafter.

249.    After graduating from MSU, Plaintiff Zena Maldonado remained in the Lansing area.

250.    In approximately 2006, Plaintiff Zena Maldonado began to have hip pain.  At this time, her married name was Zena Rochford.  She presented to Defendant Nassar at the MSU Sports Medicine Clinic for treatment.  During two consecutive visits, Defendant Nassar fondled her genitals and digitally penetrated her vaginally.  During said digital penetrations, Plaintiff

Zena Maldonado could see that Defendant Nassar was sexually aroused.

251.    Defendant Nassar committed the digital vaginal penetrations of Plaintiff Zena Maldonado without gloves, without lubrication and without providing notice to her, or obtaining consent from her.

252.    Michigan State University and MSU Sports Medicine Clinic had received notice of Defendant Nassar's inappropriate conduct on multiple occasions dating back to at least 1997.

253.    These actions were intentionally and fraudulently concealed and not documented in the medical record.

254.    Plaintiff Zena Maldonado did not treat or intend to treat with Defendant Nassar for OB/GYN related issues.

255.    Plaintiff Zena Maldonado believed the conduct of Defendant Nassar constituted medical treatment and did not discover or become aware that said conduct breached the standard of care or practice or was otherwise unlawful or tortious until recent media publications and victim impact statements.

256.    Plaintiff Zena Maldonado now believes the conduct of Nassar was sexual assault, abuse, molestation and harassment performed for Defendant Nassar's sexual pleasure and gratification.

**D.    PLAINTIFF MARIA VANORT:**

257.    Plaintiff Maria VanOrt is an adult female.

258.    Plaintiff Maria VanOrt was not a member of USA Gymnastics.

259.    Plaintiff Maria VanOrt was not a member of Defendant Twistars gym.

260.    Plaintiff Maria VanOrt was a student at Michigan State University from 2000 to

41

2003. She was also a member of the MSU Women's Basketball Team during that time.  Her maiden name when she was a student was Recker.

261.    Defendant Kovan was a team doctor at the time of the sexual assaults by Defendant Nassar.

262.    Plaintiff Maria VanOrt treated with Defendant Nassar at regular and frequent intervals while she was on the Michigan State University campus from 2000 to 2003 for shoulder and back pain.  She would receive treatments primarily at the Jenison Fieldhouse and Breslin Center.

263.    During dozens of treatments over several years, Defendant Nassar would massage Plaintiff Maria VanOrt's buttocks, breasts, give her wedges with her underwear, fondle her genitals and digitally penetrate her vaginally.

264.    Defendant Nassar committed the digital vaginal penetrations of Plaintiff Maria VanOrt without gloves, without lubrication and without providing notice to her, or obtaining consent from her.

265.    Michigan State University and MSU Sports Medicine Clinic had received notice of Defendant Nassar's inappropriate conduct on multiple occasions dating back to at least 1997.

266.    These actions were intentionally and fraudulently concealed and not documented in the medical record.

267.    Plaintiff Maria VanOrt did not treat or intend to treat with Defendant Nassar for OB/GYN related issues.

268.    Plaintiff Maria VanOrt believed the conduct of Defendant Nassar constituted medical treatment and did not discover or become aware that said conduct breached the

42

standard of care or practice or was otherwise unlawful or tortious until recent media publications and victim impact statements.

269.    Plaintiff Maria VanOrt now believes the conduct of Dr. Nassar was sexual assault, battery, abuse, molestation and harassment performed by Defendant Nassar for Defendant Nassar's sexual pleasure and gratification.

### E.  PLAINTIFF MEAGHAN ASHCRAFT:

270.    Plaintiffs reallege and incorporate by reference the allegations contained in the previous paragraphs.

271.    Plaintiff Meaghan Ashcraft is an adult female. She was a minor when she was sexually assaulted, abused, and molested by Defendant Nassar.

272.    Plaintiff Meaghan Ashcraft was a competitive gymnast and a member of USA Gymnastics and Twistars.

273.    Starting in approximately 2005, while in the 6th grade, Plaintiff Meaghan Ashcraft was referred to Defendant Nassar for treatment of a separated growth plate in her foot.

274.    Plaintiff Meaghan Ashcraft also saw Defendant Nassar for injuries to her ribs and clavicle over the next couple years.

275.    In 10th grade, or approximately 2009, Plaintiff Meaghan Ashcraft fractured her knee cap and tore her hamstring.  She received treatment from Defendant Nassar for said injury.

276.    Plaintiff Meaghan Ashcraft received treatment for the aforementioned injuries at the MSU Sports Medicine Clinic, Defendant Twistars and at various gymnastic meets.

277.    During each of the visits to Defendant Nassar, Defendant Nassar extensively massaged her inner thighs and buttocks, fondled her genitals and digitally penetrated her vagina

43

without gloves, lubricant, or proper chaperone.

278.   Michigan State University and MSU Sports Medicine Clinic had received notice of Nassar's inappropriate conduct on multiple occasions dating back to at least 1997.

279.   These actions were intentionally and fraudulently concealed and not documented in the medical record.

280.   Defendant Nassar did not give prior notice or obtain consent for the digital penetration of Meaghan Ashcraft without gloves from either Meaghan Ashcraft or her parents.

281.   Plaintiff Meaghan Ashcraft did not treat or intend to treat with Defendant Nassar for OB/GYN related issues.

282.   Plaintiff, Meaghan Ashcraft, a minor all of the abuse, believed the conduct of Defendant Nassar constituted medical treatment and did not discover or become aware that said conduct breached the standard of care or practice or was otherwise unlawful or tortious until recent media publications and victim impact statements.

283.   Plaintiff Meaghan Ashcraft now believes the conduct committed by Defendant Nassar was sexual assault, abuse, molestation and harassment performed for Defendant Nassar's sexual pleasure and gratification.

## ALLEGATIONS OF FRAUDULENT CONCEALMENT

### A.     THE MSU DEFENDANTS

284.   Plaintiffs reallege and incorporate by reference the allegations contained in the previous paragraphs.

285.   Plaintiffs sought treatment at Defendant MSU's Sports Medicine Clinic and were in a special relationship in which they paid or were billed for medical treatment.

286.    Given the special relationship, the MSU Defendants had a duty to disclose and to warn and protect the athletes and patients who sought treatment at its facility with its doctor.

287.    Plaintiffs hereby allege that the MSU Defendants committed Fraudulent Concealment by committing Fraud, as described in detail above and below, and concealing the existence of Plaintiffs' claims and that Plaintiffs had a cause of action against Defendant Nassar and/or the MSU Defendants at the time Defendant Nassar's sexual assaults occurred by making a material representation(s) to Plaintiffs involving a past or existing fact by:

a.    Making the statement, explaining, that his acts and/or conduct were a "new procedure" which involved vaginal or anal penetration;

b.    Making the statement, referring to his conduct, disguised as "treatment," as a pelvic adjustment;

c.    Making the statement, explaining, that his acts and/or conduct was "checking your sternum;"

d.    Making the statement, explaining, that his acts and/or conduct was doing a "breast exam;"

e.    Making the statement, explaining, that his acts and/or conduct was medical "treatment" or for a legitimate medical purpose;

f.    Making the statement, explaining, that his acts and/or conduct was "attempting to manipulate [their] ribs;" and,

g.    Making a statement, explaining to Plaintiffs and another medical professional; that the position of his hand was in an appropriate place, when it was not and while he was digitally penetrating Plaintiffs, all which were made contemporaneously and/or shortly after the abrupt, sudden, quick, and unexpected sexual assaults by Defendant Nassar.

288.    When Defendants' agents and employees made the material representation(s), they knew that they were false, in that they knew that the "treatment[s]" were not proper, appropriate, legitimate, and/or considered within standard of care by any physician of any

45

specialty and/or sports therapist.

289.   Defendants made the material representation(s) with the intent that the material representation(s) should be acted or relied upon by Plaintiffs or their parents, such that Plaintiffs:

a.   Should believe that the "treatments" were in fact legitimate medical "treatments;"

b.   Should believe that the "treatment[s]" were proper, appropriate, and legitimate;

c.   Should not believe that they had been sexually assaulted;

d.   Should not believe that they had been sexually assaulted so that he could prevent discovery of his sexual assaults;

e.   Should continue the "treatment[s]" so that he could continue to sexually assault them;

f.   Should not question and/or report the conduct to appropriate authorities; and

g.   Should not reasonably believe and not be aware of a possible cause of action that they have against Defendant Nassar and/or Defendant MSU.

290.   Plaintiffs acted in reliance upon the material representation(s), in that Plaintiffs:

a.   Reasonably believed that the "treatments" were in fact "treatments;"

b.   Reasonably believed that the "treatments" were proper, appropriate, and legitimate;

c.   Reasonably did not believe that they had been sexually assaulted;

d.   Believed that they should continue the "treatment[s];"

e.   Did not believe that they should question and/or report the conduct to appropriate authorities; and,

f.   Did not reasonably believe that they had and were not aware of a possible cause of action that they had against Defendant Nassar and/or the MSU Defendants.

291.   Plaintiffs thereby suffered injury, in that Plaintiffs:

a.   Could not stop the sexual assault;

b. Continued to undergo the "treatment[s]" and sexual assault[s];

c. And suffered discomfort, bleeding, and infections, related physical manifestations thereof, sleep deprivation, physical illness, vomiting, severe emotional distress, shock, humiliation, fright, grief, embarrassment, loss of self-esteem, disgrace, loss of familial relationships, loss of enjoyment of life and will continue to suffer pain of mind and body, were prevented and will continue to be prevented from performing Plaintiffs' daily activities and obtaining the full enjoyment of life, and have sustained and continue to sustain loss of earnings and earning capacity, among other injuries more fully described below.

292. Concealing the fraud by making a fraudulent material representation(s) to Plaintiffs that was/were designed and/or planned to prevent inquiry and escape investigation and prevent subsequent discovery of his fraud, in that he made a material representation(s) to Plaintiffs involving a past or existing fact by:

a. Making the statement, explaining, that his acts and/or conduct were a "new procedure" which involved vaginal or anal penetration;

b. Making the statement, referring to his conduct, disguised as "treatment," as a pelvic adjustment;

c. Making the statement, explaining, that his acts and/or conduct was "checking your sternum;"

d. Making the statement, explaining, that his acts and/or conduct was doing a "breast exam;"

e. Making the statement, explaining, that his acts and/or conduct was medical "treatment" for a legitimate medical purpose and that it was the same that he performed on Olympic athletes;

f. Making the statement, explaining, that his acts and/or conduct was "attempting to manipulate [their] ribs;" and,

g. Making the statement that the position of his hand was in an appropriate place-when it was not-while he was digitally penetrating Plaintiffs, all of which were made contemporaneously and/or shortly after the abrupt, sudden, quick, and unexpected sexual assaults by Defendant Nassar.

47

293.     Defendants' agents and employees concealed the fraud by affirmative act(s) that was/were designed and/or planned to prevent inquiry and escape investigation and prevent subsequent discovery of his fraud, in that Defendant Nassar:

a.     Positioned himself in a manner in which parents or chaperones in the room could not see his conduct, so that he could conceal and prevent discovery of his conduct;

b.     Dismissed a medical professional from the room, during an examination of a plaintiff while he was digitally penetrating a plaintiff, who questioned the placement of his hands;

c.     Prevented other medical professionals, chaperones, parents, guardians, and/or caregivers from being in the room during examinations and treatments of Plaintiffs so that he could sexually assault Plaintiffs;

d.     Did not abide by or follow the standard and care which requires another medical professional, chaperone, parent, guardian, and/or caregiver be in the room during the examination and treatment of minors and female patients;

e.     Did not abide by or follow the restrictions that had been put into place in 2014 by Defendant MSU restricting his examination and treatment of patients only with another person in the room; and,

f.     Gave Plaintiff(s), at appointments, gifts such as t-shirts, pins, flags, leotards, and other items, some with USAG logos and others without, in order to gain their trust.

294.     The actions and inactions of Defendants, as described in the preceding paragraphs, constituted Fraudulent Concealment.

295.     At all times pertinent to this action, Defendant Nassar was an agent, apparent agent, servant, and employee of Defendant MSU and operated within the scope of his employment and his negligence is imputed to Defendant MSU.

296.     At all times material hereto, Plaintiffs were entirely free of any negligence contributing to the injuries and damages hereinafter alleged.

297.     Plaintiffs did not know, could not have reasonably known, and were reasonably

unaware of a possible cause of action that they had against Defendant Nassar and/or Defendant

MSU until sometime thereafter September 2016, for the following reasons among others:

a.  Plaintiffs reasonably relied on the Fraud committed by Defendant Nassar by his material representations and concealment of the true nature of his "treatments[s]"and his actions;

b.  Plaintiffs were minors and/or young females at the time of the assaults and "treatments;"

c.  Plaintiffs did not know what a legitimate and appropriately performed intra-vaginal or intra-anal/rectal treatment was like because they had never experienced and/or had an intra-vaginal or intra-anal/rectal treatment before;

d.  Plaintiffs had never experienced and/or had an intra-vaginal treatment before because they had never been treated by a physician and/or therapist that performed them;

e.  Plaintiffs did not know what a legitimate and appropriately performed pelvic, vaginal, anal, and/or breast exam was like because they had never experienced and/or had a pelvic, vaginal, anal, and/or breast exam before;

f.  Plaintiffs had never experienced and/or had a pelvic and/or vaginal exam before because pelvic and/or vaginal exams are not recommended and routinely performed until a female reaches at least the age of 18 years old, pursuant to longstanding recommendations in the literature, expert opinions, treatment guidelines, and position statement from the American Academy of Pediatrics, American Academy of Family Physicians, American Cancer Society, American College of Obstetricians and Gynecologists, American Society for Clinical Pathology, and American Society for Colposcopy and Cervical Pathology;

g.  Plaintiffs had never experienced and/or had a breast exam before because breast exams are not recommended and routinely performed until a female reaches at least the age of 21 years old, pursuant to longstanding recommendations in the literature, expert opinions, treatment guidelines, and position statement from the American Academy of Pediatrics, American Academy of Family Physicians, American Cancer Society, American College of Obstetricians and Gynecologists, American Society for Clinical Pathology;

h.  Because of these recommendations and never having had one of these treatments or exams, it was very difficult if not impossible for Plaintiffs to differentiate a legitimate and appropriately performed intra-vaginal treatment, pelvic, vaginal, anal,

and/or breast exam from a sexual assault;

i.   Plaintiffs could not have possibly known because there were no parents, chaperones, guardians, caregivers, and/or other medical professionals in the room during the "treatments" to observe, question, and/or discover that his "treatments" were sexual assaults and inform Plaintiffs that they had been sexually assaulted and had a cause of action against Defendant Nassar;

j.   In the instances where a parent was present in the room, Defendant Nassar's actions to conceal the physical assaults from the view of the parents prevented the parents from discovering that his "treatments" were sexual assaults and informing Plaintiffs that they had been sexually assaulted and had a cause of action against Defendant Nassar;

k.   Based on Neuroscience, the prefrontal cortex of the brain, which we use to make decisions and distinguish right from wrong, is not fully formed until around the age of 23;

l.   Based on Neuroscience, as the prefrontal cortex of the brain matures teenagers are able to make better judgments;

m.   Plaintiffs were intimidated by Defendant Nassar's notoriety and reputation and therefore believed his misrepresentations that the "treatment[s]" were legitimate and appropriate;

n.   Plaintiffs trusted Defendant Nassar due to his notoriety and reputation;

o.   Plaintiffs trusted Defendant Nassar because he groomed them to believe that his "treatments" were legitimate;

p.   Plaintiffs trusted and felt that Defendant Nassar was a friend because at appointments he gave Plaintiff(s) gifts such as t-shirts, pins, flags, leotards, and other items, some with USAG logos and others without, in order to gain their trust;

q.   Plaintiffs had no reason to believe or be aware that they could possibly sue or had a possible cause of action because they were minors and young females who were not knowledgeable or aware of the civil justice system;

r.   Plaintiffs had no reason to believe or be aware that they could possibly sue or had a possible cause of action because they were minors and young females who were not knowledgeable or aware of any remedy at law;

s.   Plaintiffs had no reason to believe or be aware that they could possibly sue or had

a possible cause of action evidenced by the fact that so many other girls had been sexually assaulted by Defendant Nassar over the past few decades, none of them had a reason to believe or be aware that they could possibly sue or had a possible cause of action in the past; and none of them have ever sued him in the past;

t.    Plaintiffs were never told by Defendant Nassar that his conduct was sexual in nature and not legitimate and appropriate "treatment[s]" and to conceal the sexual conduct from their parents and others, unlike other victims of sexual abuse who are typically told by their perpetrators that their conduct is of a sexual nature and to conceal the sexual conduct from their parents and others;

u.    Plaintiffs were compelled by Defendant Nassar to undergo "treatment[s]" like other athletes if they wanted to continue being involved in their relevant sport therefore the "treatments" were legitimate and appropriate;

v.    Plaintiffs were minors and young athletes; therefore, they were easily suggestible; and,

w.    Plaintiffs had never previously heard about any allegations in the media regarding sexual assaults or misconduct by Defendant Nassar, and some Plaintiffs were out of State.

298.    Defendant MSU's sports medicine trainers, employees, staff, managers, supervisors, directors, agents, apparent agents, and/or servants made material representation(s) to Plaintiffs involving a past or existing fact by making statements that:

a.    Defendant Nassar was an "Olympic doctor" and "knew what he was doing" in regard to performing appropriate "treatments;"

b.    Defendant Nassar was a "world-renowned doctor" and that "it was legitimate medical treatment," in regard to the legitimacy and appropriateness of the "treatments;"

c.    Defendant Nassar's conduct was "not sexual abuse;"

d.    Defendant Nassar was a "world-renowned doctor;" and,

e.    Defendant Nassar's conduct and "treatment[s]" were "medically appropriate" and "[n]ot of a sexual nature" because the complainant "didn't understand the "nuanced differrence" between sexual assault and an appropriate medical procedure."

51

299.   The material representation(s) to Plaintiffs were false, in that the MSU Defendants had previously received strikingly similar complaints of abuse by Defendant Nassar from other patients, students, and student athletes and knew that the appropriateness of his "treatment[s]" had been questioned in the past.

300.   When the MSU Defendants made the material representation(s), they knew that they were false and/or made the material representation(s) recklessly, without any knowledge of their truth and as a positive assertion, in that they knew that Defendant MSU had previously received strikingly similar complaints of abuse by Defendant Nassar from other students and student athletes and knew that the appropriateness of his "treatment[s]" had been questioned in the past.

301.   The MSU Defendants made the material representation(s) with the intent that the material representation(s) should be acted upon by Plaintiffs, in that Plaintiffs:

a.   Should believe that the "treatments" were in fact "treatments;"

b.   Should believe that the "treatment[s]" were proper, appropriate, and legitimate;

c.   Should not believe that they had been sexually assaulted;

d.   Should not question and/or report the conduct to other authorities; and,

e.   Should not reasonably believe and not be aware of a possible cause of action that they have against Defendant Nassar and/or the MSU Defendants.

302.   Plaintiffs acted in reliance upon the material representation(s), in that Plaintiffs:

a.   Reasonably believed that the "treatments" were in fact "treatments;"

b.   Reasonably believed that the "treatments" were proper, appropriate, and legitimate;

c.   Reasonably did not believe that they had been sexually assaulted;

d.      Reasonably believed that they should continue the "treatment[s];"

e.      Did not believe that they should question and/or report the conduct to appropriate authorities; and,

f.      Did not reasonably believe that they had and were not aware of a possible cause of action that they had against Defendant Nassar and/or Defendant MSU.

303.    Plaintiffs thereby suffered injury, in that Plaintiffs:

a.      Could not stop the sexual assault(s);

b.      Continued to undergo the "treatment[s]" and sexual assault(s); and,

c.      Suffered discomfort, bleeding, infections, related physical manifestations thereof, sleep deprivation, physical illness, vomiting, severe emotional distress, shock, humiliation, fright, grief, embarrassment, loss of self-esteem, disgrace, loss of familial relationships, loss of enjoyment of life and will continue to suffer pain of mind and body, were prevented and will continue to be prevented from performing Plaintiffs' daily activities and obtaining the full enjoyment of life, and have sustained and continue to sustain loss of earnings and earning capacity, among other injuries more fully described below.

304.    The MSU Defendants concealed the fraud by making a fraudulent material representation(s) to Plaintiffs that was/were designed and/or planned to prevent inquiry and escape investigation and prevent subsequent discovery of his fraud, in that they made a material representation(s) to Plaintiffs involving a past or existing fact by:

a.      Making the statement that Defendant Nassar was an "Olympic doctor" and "knew what he was doing" in regard to performing appropriate "treatments;"

b.      Making the statement that Defendant Nassar was a "world-renowned doctor" and that "it was legitimate medical treatment," in regard to the legitimacy and appropriateness of the "treatments;"

c.      Making the statement that Defendant Nassar's conduct was "not sexual abuse," that he was a "world-renowned doctor;" and,

d.      Making the statement that Defendant Nassar's conduct and "treatment[s]" were "medically appropriate" and "[n]ot of a sexual nature" because the complainant

"didn't understand the "nuanced difference" between sexual assault and an appropriate medical procedure."

305.    The MSU Defendants concealed the fraud by affirmative acts that were designed and/or planned to prevent inquiry and escape investigation and prevent subsequent discovery of his fraud, in that they:

a.    Ignored, refused, and failed to inquire, question, and investigate the complaints and take action regarding Defendant Nassar's "treatments;"

b.    Did not create a policy to require adults, parents, chaperones, guardians, and/or caregiver's presence during an examination of a minor or female by a physician; and,

c.    Did not enforce the restrictions that had been put into place in 2014 by Defendant MSU restricting his examination and treatment of patients only with another person in the room.

306.    Plaintiffs did not know, could not have reasonably known, and were reasonably unaware of a possible cause of action that they had against Defendant Nassar and/or the MSU Defendants until the September 12, 2016 publication of a story regarding a complaint filed with Defendant MSU's Police Department, titled "Former USA Gymnastics doctor accused of Abuse," or thereafter, for the following reasons among others:

a.    Plaintiffs reasonably relied on the Fraud committed by Defendant Nassar by his material representations and concealment of the true nature of his "treatments[s]"and his actions;

b.    Plaintiffs were minors and/or young females at the time of the assaults and "treatments;"

c.    Plaintiffs did not know what a legitimate and appropriately performed intra-vaginal treatment was like because they had never experienced and/or had an intra-vaginal treatment before;

d.    Plaintiffs had never experienced and/or had an intra-vaginal treatment before because they had never been treated by a physician and/or therapist that performed

them;

e.  Plaintiffs did not know what a legitimate and appropriately performed pelvic, vaginal, anal, and/or breast exam was like because they had never experienced and/or had a pelvic, vaginal, anal, and/or breast exam before;

f.  Plaintiffs had never experienced and/or had a pelvic and/or vaginal exam before because pelvic and/or vaginal exams are not recommended and routinely performed until a female reaches at least the age of 18 years old, pursuant to longstanding recommendations in the literature, expert opinions, treatment guidelines, and position statement from the American Academy of Pediatrics, American Academy of Family Physicians, American Cancer Society, American College of Obstetricians and Gynecologists, American Society for Clinical Pathology, and American Society for Colposcopy and Cervical Pathology to name a few.

g.  Plaintiffs had never experienced and/or had a breast exam before because breast exams are not recommended and routinely performed until a female reaches at least the age of 21 years old, pursuant to longstanding recommendations in the literature, expert opinions, treatment guidelines, and position statement from the American Academy of Pediatrics, American Academy of Family Physicians, American Cancer Society, American College of Obstetricians and Gynecologists, American Society for Clinical Pathology;

h.  Because of these recommendations and never having had one of these treatments or exams, it was very difficult if not impossible for Plaintiffs to differentiate a legitimate and appropriately performed intra-vaginal treatment, pelvic, vaginal, anal, and/or breast exam from a sexual assault;

i.  Plaintiffs could not have possibly known because there were no parents, chaperones, guardians, caregivers, and/or other medical professionals in the room during the "treatments" to observe, question, and/or discover that his "treatments" were sexual assaults and inform Plaintiffs that they had been sexually assaulted and had a cause of action against Defendant Nassar;

j.  In the instances where a parent was present in the room, Defendant Nassar's actions to conceal the physical assaults from the view of the parents prevented the parents from discovering that his "treatments" were sexual assaults and informing Plaintiffs that they had been sexually assaulted and had a cause of action against Defendant Nassar;

k.  Based on Neuroscience, the prefrontal cortex of the brain, which we use to make decisions and distinguish right from wrong, is not fully formed until around the age

55

of 23;

l.    Based on Neuroscience, as the prefrontal cortex of the brain matures teenagers are able to make better judgments;

m.   Plaintiffs were intimidated by Defendant Nassar's notoriety and reputation and therefore believed his misrepresentations that the "treatment[s]" were legitimate and appropriate;

n.    Plaintiffs trusted Defendant Nassar due to his notoriety and reputation;

o.    Plaintiffs trusted Defendant Nassar because he groomed them to believe that his "treatments" were in fact legitimate "treatments;"

p.    Plaintiffs trusted and felt that Defendant Nassar was a friend because he gave Plaintiffs, at appointments, gifts such as t-shirts, pins, flags, leotards, and other items, some with USAG logos and others without, in order to gain their trust;

q.    Plaintiffs had no reason to believe or be aware that they could possibly sue or had a possible cause of action because they were minors and young females who were not knowledgeable or aware of the civil justice system;

r.    Plaintiffs had no reason to believe or be aware that they could possibly sue or had a possible cause of action because they were minors and young females who were not knowledgeable or aware of any remedy at law;

s.    Plaintiffs had no reason to believe or be aware that they could possibly sue or had a possible cause of action evidenced by the fact that so many other girls had been sexually assaulted by Defendant Nassar over the past few decades, none of them had a reason to believe or be aware that they could possibly sue or had a possible cause of action in the past; and none of them have ever sued him in the past;

t.    Plaintiffs were never told by Defendant Nassar that his conduct was sexual in nature and not legitimate and appropriate "treatment[s]" and to conceal the sexual conduct from their parents and others, unlike other victims of sexual abuse who are typically told by their perpetrators that their conduct is of a sexual nature and to conceal the sexual conduct from their parents and others;

u.    Plaintiffs were compelled by Defendant Nassar to undergo "treatment[s]" like other athletes if they wanted to continue being involved in their relevant sport therefore the "treatments" were legitimate and appropriate;

v.    Plaintiffs were minors and young athletes; therefore, they were easily suggestible;

w.   Plaintiffs had never previously heard about any allegations in the media regarding sexual assaults or misconduct by Defendant Nassar;

x.   Plaintiffs reasonably relied on the Fraud committed by Defendant MSU by their material representations and concealment of the true nature of Defendant Nassar's "treatments[s]" and his actions;

y.   Plaintiffs trusted Defendant MSU that they would protect Plaintiffs from harm and not hire, employee, and/or retain a physician that had, was, or would perform illegitimate and/or inappropriate "treatment[s]," engage in inappropriate conduct, and/or sexually assault patients, students, and/or athletes;

z.   Plaintiffs were never told by Defendant MSU that Defendant Nassar's conduct and "treatment[s]" were inappropriate and sexual assault, to the contrary Plaintiffs were told that Defendant Nassar's conduct and "treatment[s]" were appropriate and legitimate "treatment[s]," "not sexual abuse," "medically appropriate," and "[n]ot of a sexual nature" from a "world-renowned" and "Olympic doctor," who "knew what he was doing" and that Plaintiffs, because of their age and inexperience with intra-vaginal treatment, pelvic, vaginal, anal, and/or breast exams, "didn't understand the 'nuanced difference' between sexual assault and an appropriate medical procedure;"

aa.   Plaintiffs reasonably relied on Defendant MSU to protect them and Defendant MSU's statements; and,

bb.   Plaintiffs were compelled by Defendant MSU to undergo "treatment[s]" like other athletes if they wanted to continue being involved in their relevant sport therefore the "treatments" were legitimate and appropriate.

307.   The actions and inactions of the MSU Defendants and their agents and employees, as described in the preceding paragraphs, constituted Fraudulent Concealment.

308.   At all times pertinent to this action, Defendant Nassar was an agent, apparent agent, servant, and employee of Defendant MSU and operated within the scope of his employment and his Fraudulent Concealment is imputed to Defendant MSU.

309.   The actions and inactions of the sports medicine trainers, employees, staff, managers, supervisors, and directors of the MSU Defendants, as described in the preceding

paragraphs, constituted Fraudulent Concealment.

310.    At all times pertinent to this action, the sports medicine trainers, employees, staff, managers, supervisors, and directors of Defendant MSU were agents, apparent agents, servants, and employees of Defendant MSU and operated within the scope of their employment and their Fraudulent Concealment is imputed to Defendant MSU.

311.    At all times material hereto, Plaintiffs were entirely free of any negligence contributing to the injuries and damages hereinafter alleged.

**B.    DEFENDANT USA GYMNASTICS**

312.    Plaintiffs reallege and incorporate by reference the allegations contained in the previous paragraphs.

313.    Plaintiffs sought and received medical treatment from Defendant USAG and were in a special relationship with Defendant USAG due to its provision of medical treatment to its athletes.

314.    Given the special relationship, Defendant USAG had a duty to disclose and to warn and protect the athletes and patients who sought treatment at its sanctioned events and member gyms with its doctor.

315.    Plaintiffs incorporate by reference the Fraud claims made below and hereby allege that Defendant USAG committed Fraudulent Concealment by committing Fraud, as described in detail above and below, and concealing the existence of Plaintiffs' claims and that Plaintiffs had a cause of action against Defendant Nassar and/or Defendant USAG at the time his sexual assaults occurred by Defendant Nassar making a material representation(s) to Plaintiffs involving a past or existing fact by:

a.  Making the statement, explaining, that his acts and/or conduct were a "new procedure" which involved vaginal penetration;

b.  Making the statement, referring to his conduct, disguised as "treatment," as a pelvic adjustment;

c.  Making the statement, explaining, that his acts and/or conduct was "checking your sternum;"

d.  Making the statement, explaining, that his acts and/or conduct was doing a "breast exam;"

e.  Making the statement, explaining, that his acts and/or conduct was medical "treatment" for a legitimate medical purpose and that it was the same that he performed on Olympic athletes;

f.  Making the statement, explaining, that his acts and/or conduct was "attempting to manipulate [their] ribs;" and,

g.  Making a statement, explaining to Plaintiff and another medical professional that the position of his hand was in an appropriate place-when it was not-and while he was digitally penetrating Plaintiffs, all of which were made contemporaneously and/or shortly after the abrupt, sudden, quick, and unexpected sexual assaults by Defendant Nassar.

316.   The material representation(s) to Plaintiffs by Defendant Nassar were false, in that he was actually performing them for his own sexual gratification and pleasure evidenced by his observed arousal, flushed face, and closing of the eyes during the conduct.

317.   When Defendant Nassar made the material representation(s), he knew that they were false, in that he knew that the "treatment[s]" were not proper, appropriate, legitimate, and/or considered within standard of care by any physician of any specialty and/or sports therapist.

318.   Defendant USAG had knowledge of Nassar's criminal propensity of committing sexual abuse as early as 1998. This is confirmed by the following evidence:

a.  Upon information and belief, in 1998, Defendant USAG received a complaint about Larry Nassar's sexual abuse by a parent of Jane A71 Doe. The complaint was made

59

directly to US Olympic Gymnastics Head Coach, John Geddert, a long-time agent of USAG.

b.  Upon information and belief, the parent of Plaintiff Jane A71 Doe, also complained of Nassar's sexual abuse to other USAG coaches while Plaintiff Jane A71 Doe was engaged in gymnastics activities at the Twistars facility, which is a USAG registered gymnastics club.

c.  During Nassar's preliminary examination on May 12, 2017 in the 55th District Court in Ingham County, Michigan, a young woman testified regarding an instance of sexual assault that occurred at Twistars' facility in Dimondale, Michigan in approximately 2010 when she was fifteen years old. She testified that, "*Mostly all I remember is [Nassar] doing the treatment on me with his fingers in my vagina, massaging my back with a towel over my butt, and John [Geddert] walking in and making a joke that I guess my back really did hurt, and then I was uncomfortable because John [Geddert] was in there during that.*"

d.  Altogether, between 1999 and 2016, at least thirty-two (32) USAG gymnasts were sexually abused by Larry Nasser while participating in USAG-sanctioned events, at USAG's famed Karolyi Ranch, and at the USAG gymnastics club, Twistars. Upon information and belief, the living quarters and scheduling routines of these gymnasts were such that it was nearly impossible for USAG coaches, USAG trainers, and USAG agents to not know what Larry Nasser was doing.

319.  Defendant Nassar made the material representation(s) with the intent that the material representation(s) should be acted upon by Plaintiffs, in that Plaintiffs:

a.  Should believe that the "treatments" were in fact "treatments;"

b.  Should believe that the "treatment[s]" were proper, appropriate, and legitimate;

c.  Should not believe that they had been sexually assaulted; should not believe that they had been sexually assaulted so that he could prevent discovery of his sexual assaults;

d.  Should continue the "treatment[s]" so that he could continue to sexually assault them;

e.  Should not question and/or report the conduct to appropriate authorities; and,

f.  Should not reasonably believe and not be aware of a possible cause of action that they have against Defendant Nassar and/or Defendant USAG.

320.   Plaintiffs acted in reliance upon Defendant Nassar's material representation(s), in that Plaintiffs:

a.   Reasonably believed that the "treatments" were in fact "treatments;"

b.   Reasonably believed that the "treatments" were proper, appropriate, and legitimate;

c.   Reasonably did not believe that they had been sexually assaulted;

d.   Believed that they should continue the "treatment[s];"

e.   Did not believe that they should question and/or report the conduct to appropriate authorities; and did not reasonably believe that they had and were not aware of a possible cause of action that they had against Defendant Nassar and/or Defendant USAG.

321.   Plaintiffs thereby suffered injury, in that Plaintiffs:

a.   Could not stop the sexual assault;

b.   Continued to undergo the "treatment[s]" and sexual assault(s); and,

c.   Suffered discomfort, bleeding, infections, related physical manifestations thereof, sleep deprivation, physical illness, vomiting, severe emotional distress, shock, humiliation, fright, grief, embarrassment, loss of self-esteem, disgrace, loss of familial relationships, loss of enjoyment of life and will continue to suffer pain of mind and body, were prevented and will continue to be prevented from performing Plaintiffs' daily activities and obtaining the full enjoyment of life, and have sustained and continue to sustain loss of earnings and earning capacity, among other injuries more fully described below.

322.   Defendant Nassar concealed the fraud by making a fraudulent material representation(s) to Plaintiffs that was/were designed and/or planned to prevent inquiry and escape investigation and prevent subsequent discovery of his fraud, in that he made a material representation(s) to Plaintiffs involving a past or existing fact by:

a.   Making the statement, explaining, that his acts and/or conduct were a "new procedure" which involved vaginal penetration;

61

b.     Making the statement, referring to his conduct, disguised as "treatment," as a pelvic adjustment;

c.     Making the statement, explaining, that his acts and/or conduct was "checking your sternum;"

d.     Making the statement, explaining, that his acts and/or conduct was doing a "breast exam;"

e.     Making the statement, explaining, that his acts and/or conduct was "treatment" and that it was the same that he performed on Olympic athletes;

f.     Making the statement, explaining, that his acts and/or conduct was "attempting to manipulate [their] ribs;" and,

g.     Making a statement, explaining to Plaintiffs and another medical professional that the position of his hand was in an appropriate place-when it was not-and while he was digitally penetrating Plaintiff, all which were made contemporaneously and/or shortly after the abrupt, sudden, quick, and unexpected sexual assaults by Defendant Nassar.

323.    Defendant Nassar concealed the fraud by an affirmative act(s) that was/were designed and/or planned to prevent inquiry and escape investigation and prevent subsequent discovery of his fraud, in that he:

a.     Positioned himself in a manner in which parents or chaperones in the room could not see his conduct, so that he could conceal and prevent discovery of his conduct;

b.     Dismissed a medical professional from the room, during an examination of a plaintiff while he was digitally penetrating a plaintiff, who questioned the placement of his hands;

c.     Prevented other medical professionals, chaperones, parents, guardians, and/or caregivers from being in the room during examinations and treatments of Plaintiffs so that he could sexually assault Plaintiffs;

d.     Did not abide by or follow the standard and care which requires another medical professional, chaperone, parent, guardian, and/or caregiver be in the room during the examination and treatment of minors and female patients;

e. Did not abide by or follow Defendant USAG's Code of Ethics, Participant Welfare Policy, Safety/Risk Management Certification, principles in Gymnastics Risk Management Safety Course Handbook, and Prohibited Conduct policy, which he was a part of creating by not examining patients in the presence of a parent, chaperone, guardian, and/or caregiver; and,

f. Gave Plaintiff(s), at appointments, gifts such as t-shirts, pins, flags, leotards, and other items, some with USAG logos and others without, in order to gain their trust.

324.   The actions and inactions of Defendant Nassar, as described in the preceding paragraphs, constituted Fraudulent Concealment.

325.   At all times pertinent to this action, Defendant Nassar was an agent, apparent agent, servant, and employee of Defendant USAG and operated within the scope of his employment and his Fraudulent Concealment is imputed to Defendant USAG.

326.   At all times material hereto, Plaintiffs were entirely free of any negligence contributing to the injuries and damages hereinafter alleged.

### C.   DEFENDANTS TWISTARS & JOHN GEDDERT

327.   Plaintiffs reallege and incorporate by reference the allegations contained in the previous paragraphs.

328.   Plaintiffs sought and received medical treatment from Defendant Twistars and Geddert and were in a special relationship with Defendant Twistars and Geddert due to their provision of medical treatment to their athletes.

329.   Given the special relationship, Defendant Twistars and Geddert had a duty to disclose and to warn and protect the athletes and patients who sought treatment at its sanctioned events and facilities with its doctor.

330.   Plaintiffs incorporate by reference the Fraud claims made below and hereby allege

that Defendant Twistars and Defendant John Geddert committed Fraudulent Concealment by committing Fraud, as described in detail above and below, and concealing the existence of Plaintiffs' claims and that Plaintiffs had a cause of action against Defendant Nassar and/or Defendant Twistars and Defendant John Geddert at the time his sexual assaults occurred by Defendant Nassar making a material representation(s) to Plaintiffs involving a past or existing fact by:

a. Making the statement, explaining, that his acts and/or conduct were a "new procedure" which involved vaginal penetration;

b. Making the statement, referring to his conduct, disguised as "treatment," as a pelvic adjustment;

c. Making the statement, explaining, that his acts and/or conduct was "checking your sternum;"

d. Making the statement, explaining, that his acts and/or conduct was doing a "breast exam;"

e. Making the statement, explaining, that his acts and/or conduct was medical "treatment" for a legitimate medical purpose and that it was the same that he performed on Olympic athletes;

f. Making the statement, explaining, that his acts and/or conduct was "attempting to manipulate [their] ribs;" and,

g. Making a statement, explaining to Plaintiff and another medical professional that the position of his hand was in an appropriate place-when it was not-and while he was digitally penetrating Plaintiffs, all of which were made contemporaneously and/or shortly after the abrupt, sudden, quick, and unexpected sexual assaults by Defendant Nassar.

331. The material representation(s) to Plaintiffs by Defendant Nassar were false, in that he was actually performing them for his own sexual gratification and pleasure evidenced by his observed arousal, flushed face, and closing of the eyes during the conduct.

64

332. When Defendant Nassar made the material representation(s), he knew that they were false, in that he knew that the "treatment[s]" were not proper, appropriate, legitimate, and/or considered within standard of care by any physician of any specialty and/or sports therapist.

333. Defendant Nassar made the material representation(s) with the intent that the material representation(s) should be acted upon by Plaintiffs, in that Plaintiffs:

a.    Should believe that the "treatments" were in fact "treatments;"

b.    Should believe that the "treatment[s]" were proper, appropriate, and legitimate;

c.    Should not believe that they had been sexually assaulted; should not believe that they had been sexually assaulted so that he could prevent discovery of his sexual assaults;

d.    Should continue the "treatment[s]" so that he could continue to sexually assault them;

e.    Should not question and/or report the conduct to appropriate authorities; and,

f.    Should not reasonably believe and not be aware of a possible cause of action that they have against Defendant Nassar and/or Defendant Twistars or Defendant Geddert.

334. Plaintiffs acted in reliance upon Defendant Nassar's material representation(s), in that Plaintiffs:

a.    Reasonably believed that the "treatments" were in fact "treatments;"

b.    Reasonably believed that the "treatments" were proper, appropriate, and legitimate;

c.    Reasonably did not believe that they had been sexually assaulted;

d.    Believed that they should continue the "treatment[s];"

e.    Did not believe that they should question and/or report the conduct to appropriate authorities; and did not reasonably believe that they had and were not aware of a possible cause of action that they had against Defendant Nassar and/or Defendant Twistars or Defendant Geddert.

335. Plaintiffs thereby suffered injury, in that Plaintiffs:

65

a.    Could not stop the sexual assault;

b.    Continued to undergo the "treatment[s]" and sexual assault(s); and,

c.    Suffered discomfort, bleeding, infections, related physical manifestations thereof, sleep deprivation, physical illness, vomiting, severe emotional distress, shock, humiliation, fright, grief, embarrassment, loss of self-esteem, disgrace, loss of familial relationships, loss of enjoyment of life and will continue to suffer pain of mind and body, were prevented and will continue to be prevented from performing Plaintiffs' daily activities and obtaining the full enjoyment of life, and have sustained and continue to sustain loss of earnings and earning capacity, among other injuries more fully described below.

336.    Defendant Nassar concealed the fraud by making a fraudulent material representation(s) to Plaintiffs that was/were designed and/or planned to prevent inquiry and escape investigation and prevent subsequent discovery of his fraud, in that he made a material representation(s) to Plaintiffs involving a past or existing fact by:

a.    Making the statement, explaining, that his acts and/or conduct were a "new procedure" which involved vaginal penetration;

b.    Making the statement, referring to his conduct, disguised as "treatment," as a pelvic adjustment;

c.    Making the statement, explaining, that his acts and/or conduct was "checking your sternum;"

d.    Making the statement, explaining, that his acts and/or conduct was doing a "breast exam;"

e.    Making the statement, explaining, that his acts and/or conduct was medical "treatment" for a legitimate medical purpose and that it was the same that he performed on Olympic athletes;

f.    Making the statement, explaining, that his acts and/or conduct was "attempting to manipulate [their] ribs;" and,

g.    Making a statement, explaining to Plaintiffs and another medical professional that the position of his hand was in an appropriate place-when it was not-and while he was digitally penetrating Plaintiff, all which were made contemporaneously and/or

66

shortly after the abrupt, sudden, quick, and unexpected sexual assaults by Defendant Nassar.

337.   Defendant Nassar concealing the fraud by an affirmative act(s) that was/were designed and/or planned to prevent inquiry and escape investigation and prevent subsequent discovery of his fraud, in that he:

a.   Positioned himself in a manner in which parents or chaperones in the room could not see his conduct, so that he could conceal and prevent discovery of his conduct;

b.   Dismissed a medical professional from the room, during an examination of a plaintiff while he was digitally penetrating a plaintiff, who questioned the placement of his hands;

c.   Prevented other medical professionals, chaperones, parents, guardians, and/or caregivers from being in the room during examinations and treatments of Plaintiffs so that he could sexually assault Plaintiffs;

d.   Did not abide by or follow the standard and care which requires another medical professional, chaperone, parent, guardian, and/or caregiver be in the room during the examination and treatment of minors and female patients;

e.   Did not abide by or follow Defendant USAG's Code of Ethics, Participant Welfare Policy, Safety/Risk Management Certification, principles in Gymnastics Risk Management Safety Course Handbook, and Prohibited Conduct policy, or any similar policies established by Defendant Twistars or Defendant Geddert, by not examining patients in the presence of a parent, chaperone, guardian, and/or caregiver; and,

f.   Gave Plaintiff(s), at appointments, gifts such as t-shirts, pins, flags, leotards, and other items, some with USAG logos and others without, in order to gain their trust.

338.   The actions and inactions of Defendant Nassar, as described in the preceding paragraphs, constituted Fraudulent Concealment.

339.   At all times pertinent to this action, Defendant Nassar was an agent, apparent agent, servant, and employee of Defendant Twistars and Defendant Geddert and operated within the scope of his employment and his Fraudulent Concealment is imputed to Defendant Twistars

and Defendant Geddert.

340.   At all times material hereto, Plaintiffs were entirely free of any negligence contributing to the injuries and damages hereinafter alleged.

### D.   DEFENDANT NASSAR

341.   Plaintiffs reallege and incorporate by reference the allegations contained in the pervious paragraphs.

342.   Plaintiffs had a special relationship with Defendant Nassar given their physician-patient relationship.

343.   Given the special relationship, Defendant Nassar had an affirmative duty to disclose and to warn and protect athletes and patients who sought his medical treatment from sexual abuse, assault, and molestation.

344.   Plaintiffs incorporate by reference the Fraud claims made below and hereby allege that Defendant Nassar committed Fraudulent Concealment by committing Fraud, as described in detail above and below, and concealing the existence of Plaintiffs' claims and that Plaintiffs had a cause of action against Defendant Nassar and/or Defendant MSU at the time his sexual assaults occurred by Defendant Nassar making a material representation(s) to Plaintiffs involving a past or existing fact by:

   a.   Making the statement, explaining, that his acts and/or conduct were a "new procedure" which involved vaginal penetration;

   b.   Making the statement, referring to his conduct, disguised as "treatment," as a pelvic adjustment;

   c.   Making the statement, explaining, that his acts and/or conduct was "checking your sternum;"

d.   Making the statement, explaining, that his acts and/or conduct was doing a "breast exam;"

e.   Making the statement, explaining, that his acts and/or conduct was medical "treatment" for a legitimate medical purpose and that it was the same that he performed on Olympic athletes;

f.   Making the statement, explaining, that his acts and/or conduct was "attempting to manipulate [their] ribs;" and,

g.   Making a statement, explaining to Plaintiff and another medical professional that the position of his hand was in an appropriate place-when it was not-and while he was digitally penetrating Plaintiffs, all of which were made contemporaneously and/or shortly after the abrupt, sudden, quick, and unexpected sexual assaults by Defendant Nassar.

345.   The material representation(s) to Plaintiffs by Defendant Nassar were false, in that he was actually performing them for his own sexual gratification and pleasure evidenced by his observed arousal, flushed face, and closing of the eyes during the conduct.

346.   When Defendant Nassar made the material representation(s), he knew that they were false, in that he knew that the "treatment[s]" were not proper, appropriate, legitimate, and/or considered within standard of care by any physician of any specialty and/or sports therapist.

347.   Defendant Nassar made the material representation(s) with the intent that the material representation(s) should be acted upon by Plaintiffs, in that Plaintiffs:

a.   Should believe that the "treatments" were in fact "treatments;"

b.   Should believe that the "treatment[s]" were proper, appropriate, and legitimate;

c.   Should not believe that they had been sexually assaulted; should not believe that they had been sexually assaulted so that he could prevent discovery of his sexual assaults;

d.   Should continue the "treatment[s]" so that he could continue to sexually assault them;

e.   Should not question and/or report the conduct to appropriate authorities; and,

69

f.    Should not reasonably believe and not be aware of a possible cause of action that they have against Defendant Nassar and/or Defendant Twistars or Defendant Geddert.

348.    Plaintiffs acted in reliance upon Defendant Nassar's material representation(s), in that Plaintiffs:

a.    Reasonably believed that the "treatments" were in fact "treatments;"

b.    Reasonably believed that the "treatments" were proper, appropriate, and legitimate;

c.    Reasonably did not believe that they had been sexually assaulted;

d.    Believed that they should continue the "treatment[s];"

e.    Did not believe that they should question and/or report the conduct to appropriate authorities; and did not reasonably believe that they had and were not aware of a possible cause of action that they had against Defendant Nassar and/or Defendant Twistars or Defendant Geddert.

349.    Plaintiffs thereby suffered injury, in that Plaintiffs:

a.    Could not stop the sexual assault;

b.    Continued to undergo the "treatment[s]" and sexual assault(s); and,

c.    Suffered discomfort, bleeding, infections, related physical manifestations thereof, sleep deprivation, physical illness, vomiting, severe emotional  distress, shock, humiliation, fright, grief, embarrassment, loss of self-esteem, disgrace, loss of familial relationships, loss of enjoyment of life and will continue to suffer pain of mind and body, were prevented and will continue to be prevented from performing Plaintiffs' daily activities and obtaining the full enjoyment of life, and have sustained and continue to sustain loss of earnings and earning capacity, among other injuries more fully described below.

350.    Defendant Nassar concealed the fraud by making a fraudulent material representation(s) to Plaintiffs that was/were designed and/or planned to prevent inquiry and escape investigation and prevent subsequent discovery of his fraud, in that he made a material representation(s) to Plaintiffs involving a past or existing fact by:

70

a.  Making the statement, explaining, that his acts and/or conduct were a "new procedure" which involved vaginal penetration;

b.  Making the statement, referring to his conduct, disguised as "treatment," as a pelvic adjustment;

c.  Making the statement, explaining, that his acts and/or conduct was "checking your sternum;"

d.  Making the statement, explaining, that his acts and/or conduct was doing a "breast exam;"

e.  Making the statement, explaining, that his acts and/or conduct was medical "treatment" for a legitimate medical purpose and that it was the same that he performed on Olympic athletes;

f.  Making the statement, explaining, that his acts and/or conduct was "attempting to manipulate [their] ribs;" and,

g.  Making a statement, explaining to Plaintiffs and another medical professional that the position of his hand was in an appropriate place-when it was not-and while he was digitally penetrating Plaintiff, all which were made contemporaneously and/or shortly after the abrupt, sudden, quick, and unexpected sexual assaults by Defendant Nassar.

351.  Defendant Nassar concealing the fraud by an affirmative act(s) that was/were

designed and/or planned to prevent inquiry and escape investigation and prevent

subsequent discovery of his fraud, in that he:

a.  Positioned himself in a manner in which parents or chaperones in the room could not see his conduct, so that he could conceal and prevent discovery of his conduct;

b.  Dismissed a medical professional from the room, during an examination of a plaintiff while he was digitally penetrating a plaintiff, who questioned the placement of his hands;

c.  Prevented other medical professionals, chaperones, parents, guardians, and/or caregivers from being in the room during examinations and treatments of Plaintiffs so that he could sexually assault Plaintiffs;

d.  Did not abide by or follow the standard and care which requires another medical

71

professional, chaperone, parent, guardian, and/or caregiver be in the room during the examination and treatment of minors and female patients;

e.    Did not abide by or follow Defendant USAG's Code of Ethics, Participant Welfare Policy, Safety/Risk Management Certification, principles in Gymnastics Risk Management Safety Course Handbook, and Prohibited Conduct policy, or any similar policies established by Defendant Twistars or Defendant Geddert, by not examining patients in the presence of a parent, chaperone, guardian, and/or caregiver; and,

f.    Gave Plaintiff(s), at appointments, gifts such as t-shirts, pins, flags, leotards, and other items, some with USAG logos and others without, in order to gain their trust.

352.    The actions and inactions of Defendant Nassar, as described in the preceding paragraphs, constituted Fraudulent Concealment.

353.    At all times pertinent to this action, Defendant Nassar was an agent, apparent agent, servant, and employee of Defendant MSU, USAG, Twistars and Defendant Geddert and operated within the scope of his employment and his Fraudulent Concealment is imputed to Defendants MSU, USAG, Twistars and Defendant Geddert.

354.    At all times material hereto, Plaintiffs were entirely free of any negligence contributing to the injuries and damages hereinafter alleged.

**CLAIMS AGAINST MICHIGAN STATE UNIVERSITY DEFENDANTS**

**COUNT ONE**

**VIOLATION OF TITLE IX OF THE EDUCATION ACT OF 1972, 20 U.S.C. § 1681 *et seq***
**(Against MSU Defendants)**

355.    Plaintiffs reallege and incorporate by reference the allegations contained in the previous paragraphs.

356.    Title IX, 20 U.S.C. § 1681(a) provides in pertinent part:

*"No person in the United States shall, on the basis of sex, be excluded from*

72

*participation in, be denied the benefits of, or be subjected to discrimination under
any education program or activity receiving Federal financial assistance. . ."*

357.    "Title IX also protects third parties from sexual harassment or violence in a

school's education programs and activities."

358.    Under Title IX, sexual harassment is any type of unwelcome conduct of a sexual

nature. "It includes unwelcome sexual advances, requests for sexual favors, and other verbal,

nonverbal, or physical conduct of a sexual nature."

359.    Plaintiffs are "persons" within the meaning of 20 U.S.C. §1681(a).

360.    Defendant MSU receives financial assistance for its education program and is

therefore subject to the provisions of Title IX of the Education Act of 1972, 20 U.S.C. §1681, *et

seq.*

361.    The U.S. Department of Education's Office of Civil Rights has explained that Title

IX covers all programs of a school, and extends to sexual harassment and assault by employees,

students, and third parties.

362.    Defendant Nassar's actions and conduct were carried out under one of Defendant

MSU's programs, which provides medical treatment and medical care to students, including

student athletes, and members of the general public.

363.    Defendant Nassar's sexual assault, battery, molestation, and harassment of

Plaintiffs, including the massaging of breasts, thighs, buttocks, and vaginal areas, and

nonconsensual digital vaginal and anal penetration, constitutes sexual discrimination and

harassment under Title IX.

364.    Defendant Nassar's sexual assault, battery, molestation, and harassment of Larissa

73

Boyce, Christie Achenbach, and Tiffany Thomas Lopez constituted sexual discrimination and harassment under Title IX.

365.   Pursuant to Title IX, Defendant MSU is obligated and required to investigate all allegations of sexual assault, battery, molestation, and harassment, including allegations that sexual assault, battery, molestation, and harassment has been committed by an employee, student, or third party.

366.   Defendant MSU owed Plaintiffs duties under Title IX, which duties included not to engage in and be deliberately indifferent to known sexual assault, battery, molestation, harassment, and other sexual misconduct.

367.   Upon information and belief, an "appropriate person" at MSU, within the meaning of Title IX, including but not limited to, Kathie Klages, Kelli Bert, Lianna Hadden, Destiny Teachnor-Hauk, Gary Stollak, and other trainers and coaches, had actual and constructive notice of sexual assault, battery, molestation, and harassment committed by Defendant Nassar in 1997/1998, 1999, 2000, 2001/2002, 2004 and 2014, as described herein this Complaint.

368.   The MSU Defendants failed to carry out their duties to investigate and take corrective action, as well as to make appropriate recommendations, including informed consent, under Title IX following the complaints of sexual assault, as described herein.

369.   Despite the complaints and concerns conveyed to Defendant MSU employees, agents, and/or representatives as described herein, allegations went unaddressed, which violated reporting policies and procedures and Title IX and was done in a manner that was reckless, grossly negligent, and deliberately indifferent.

370.   The MSU Defendants acted with indifference and in a clearly unreasonable

74

manner by failing to respond to the allegations of sexual assault, abuse, and molestation in light of the known circumstances, Defendant Nassar's conduct toward female athletes, and his access to young girls and young women.

371.   The MSU Defendants' deliberate indifference is further confirmed by the Department of Education's investigation into MSU's handling of sexual assault and relationship violence allegations, which revealed:

   a.   That the MSU Defendants' failure to adequately respond to allegations of sexual assault created a sexually hostile environment and affected numerous students and staff on MSU's campus;

   b.   That the MSU Defendants' failure to address complaints of sexual violence in a prompt and equitable manner caused and may have contributed to a continuation of the sexually hostile environment.

372.   The MSU Defendants' responses were clearly unreasonable as Defendant Nassar continued to sexually assault female athletes and other individuals until he was discharged from the University in 2016.

373.   MSU Defendants had actual and constructive knowledge of, but were recklessly and deliberately indifferent to, Defendant Nassar's sexual assault, battery, molestation, and harassment in between 1997 and/or 1998 and 2016.

374.   Defendant MSU's failure to investigate and take corrective actions to complaints of Defendant Nassar's sexual assault, battery, molestation, and harassment in 1997/1998, 1999, 2000, 2001/2002, 2004, and 2014 led to others, including Plaintiffs, being sexually assaulted, battered, molested, and harassed by Defendant Nassar.

375.   The MSU Defendants were notified again in 2014 of Defendant Nassar's conduct when Amanda Thomashow reported she had an appointment with Defendant Nassar to address

75

hip pain and was sexually abused and molested by Defendant Nassar when he cupped her buttocks, massaged her breast and vaginal area, and he became sexually aroused.

376.    Amanda Thomashow reported to Defendant MSU facts which were omitted or withheld from the investigative report including but not limited to the following:

a.    Defendant Nassar was sexually aroused while touching her;

b.    The appointment with Defendant Nassar did not end until she physically removed his hands from her body.

377.    Three months after initiating an investigation, in July 2014, Amanda Thomashow's complaints were dismissed and Defendant MSU determined she didn't understand the "nuanced difference" between sexual assault and an appropriate medical procedure and deemed Defendant Nassar's conduct "medically appropriate" and "not of a sexual nature."

378.    In addition, Kristine Moore produced two different versions of the report in response to the July 2014 investigation—one version was sent to Amanda Thomashow and a different version was sent to Defendant Nassar and other MSU personnel.

379.    The version of the report that Kristine Moore sent to Amanda Thomashow contained the following conclusion:

> We cannot find that the conduct was of a sexual nature.  Thus, it did not violate the Sexual Harassment Policy.  However, we find the claim helpful in that it allows us to examine certain practices at the MSU Sports Medicine Clinic.

380.    The other version of the report that Kristine Moore produced for Defendant MSU that was not provided to Amanda Thomashow contained the following conclusion:

> We cannot find that the conduct was of a sexual nature.  Thus, it did not violate the Sexual Harassment Policy.  However, we find the claim helpful in that it brought to light some significant problems that the practice

will want to address.

We should find whether medically sound or not, the failure to adequately explain procedures such as these invasive, sensitive procedures, is opening the practice up to liability and is exposing patients to unnecessary trauma based on the possibility of perceived inappropriate sexual misconduct. In addition, we find that the failure to obtain consent from patients prior to the procedure is likewise exposing the practice to liability. If procedures can be performed skin-to-skin or over clothes in the breast or pelvic floor area, it would seem patients should have the choice between the two. Having a resident, nurse or someone in room during a sensitive procedure protects doctors and provides patients with peace of mind. If "touching is what the DO's do" and that is not commonly known, perhaps the practice will want to consider a disclaimer or information sheet with that information provided to the patient up front.

Finally, we believe the practice should consider whether its procedure for intake of complaints about physicians' behavior is adequate. Ms. Thomashow claims she tried to file a complaint with the front desk receptionist, telling her that she was cancelling her appointment because she felt "violated." Whether this triggers a reporting protocol should be examined by the practice.

381. The substantial difference in the two reports supports Defendant MSU's deliberate indifference to sexual assaults on its campus because the differences in the versions of the reports evidences an attempt to diminish the sexual abuse experienced by Amanda Thomashow.

382. Following the 2014 investigation, Defendant Nassar became subject to new institutional guidelines, including requirements that Defendant Nassar minimize or eliminate skin-to-skin contact and to have a chaperone in the room.

383. Defendant Strampel conceded to law enforcement that these institutional guidelines were illusory because no efforts were made to implement or enforce them.

384. As a result, Defendant MSU took no protective steps to reduce opportunities for future harassment and hid the full results of the investigation from Amanda Thomashow, which

caused countless other women and girls to be sexually assaulted by Defendant Nassar.

385.   The MSU Defendants failed to adequately supervise or otherwise ensure Defendant Nassar complied with the newly imposed institutional guidelines even though the MSU Defendants had actual knowledge that Defendant Nassar posed a substantial risk of additional sexual abuse of the females whom he had unfettered access.

386.   Defendant MSU's deliberate indifference before, during, and after the sexual assault, battery, molestation, and harassment of Plaintiffs was in violation of Title IX of the Education Amendments of 1972, 20 U.S.C. § 1681, *et seq.*

387.   Defendant MSU's failure to properly and appropriately investigate and take corrective action for the 1997/1998, 1999, 2000, 2001/2002, 2004, and 2014 complaints of Defendant Nassar's sexual assault, battery, molestation, and harassment resulted in Plaintiffs being subject to further sexual assault, battery, molestation, harassment, and a sexually hostile environment.

388.   The MSU Defendants' failure to promptly and appropriately investigate and remedy and respond to the sexual assaults after they received notice subjected Plaintiffs to further harassment and a sexually hostile environment, effectively denying them access to educational opportunities at MSU, including medical care.

389.   Defendant MSU's responses to the complaints 1997/1998, 1999, 2000, 2001/2002, 2004, and 2014 were clearly unreasonable as Defendant Nassar continued to sexually assault young females until he was discharged from the University in 2016.

390.   The MSU Defendants failed to offer counseling services to current or former patients of Defendant Nassar, including Plaintiffs.

391.     As a direct and proximate result of the MSU Defendants' actions and inactions, Plaintiffs have suffered and continue to suffer pain of mind and body, mental anguish, shock, emotional distress, physical manifestations of emotional distress, embarrassment, loss of self-esteem, disgrace, fright, grief, humiliation, enjoyment of life, were prevented and will continue to be prevented from performing daily activities and obtaining the full enjoyment of life, and have sustained and continue to sustain loss of earning and loss of earning capacity.

392.     In the alternative, the actions or inaction of the MSU Defendants was deliberately indifferent or so reckless as to demonstrate a substantial lack of concern for whether an injury would result to Plaintiffs and constitutes gross negligence that is the proximate cause of Plaintiffs' damages. Plaintiffs have suffered and continue to suffer pain and suffering, pain of mind and body, shock, emotional distress, physical manifestations of emotional distress, embarrassment, loss of self-esteem, disgrace, fright, grief, humiliation, loss of enjoyment of life, post-traumatic life stress disorder resulting in physically manifested injuries including anxiety, depressions, sleep disorders, nightmares, psychological injuries, and physical injuries. Plaintiffs were prevented and will continue to be prevented from performing Plaintiffs' daily activities and obtaining full enjoyment of life, and have sustained and continue to sustain loss of earnings and earning capacity.

**COUNT TWO**

**SEX DISCRIMINATION**
**42 U.S.C. § 18116, *et seg* (PATIENT PROTECTION AND AFFORDABLE CARE ACT § 1557)**
**(Against Defendant MSU and Defendant MSU Board of Trustees)**

393.     Plaintiffs reallege and incorporate by reference the allegations contained in the previous paragraphs.

79

394.   Section 1557 of the Patient Protection and Affordable Care Act, which is codified at 42 U.S.C. § 18116, provides that:

> Except as otherwise provided for in this title (or an amendment made by this title), an individual shall not, on the ground prohibited under . . . title IX of the Education Amendments of 1972 (20 U.S.C. 1681 et seq.) . . . be excluded from participation in, be denied the benefits of, or be subjected to discrimination under, any health program or activity, any part of which is receiving Federal financial assistance, including credits, subsidies, or contracts of insurance, or under any program or activity that is administered by an Executive Agency or any entity established under this title (or amendments). The enforcement mechanisms provided for and available under title IX shall apply for purposes of violations of this subsection.

395.   Title IX of the Education Amendments of 1972, 20 U.S.C. § 1681 et seq. prohibits sex discrimination in programs that receive federal financial assistance.

396.   Plaintiffs have a right under 42 U.S.C. § 18116 to receive health care services free from discrimination on the basis of sex.

397.   Plaintiffs are "individuals" within the meaning of 42 U.S.C. § 18116.

398.   Defendant MSU receives federal financial assistance within the meaning of 42 U.S.C. § 18116 because it receives federal financial assistance such as credits, subsidies, or contracts of insurance.

399.   Defendants MSU and MSU Trustees employed the services of Defendant Nassar, doctors, and other professional and non-professional health care providers who cared for Plaintiffs and held themselves out to the public as competent, careful, and experienced in the care and treatment of patients.

400.   Plaintiffs sought medical care from Defendant Nassar at the MSU Sports Medicine Clinic, Jenison Fieldhouse, Breslin Center, and other locations for a myriad of injuries as identified in each Plaintiffs' specific allegations.

401.   Plaintiffs expected to receive medical care for their injuries without being sexually assaulted and without fear of sexual harassment or assault.

402.   Defendant Nassar's conduct and actions toward Plaintiffs, that being nonconsensual digital vaginal and anal penetration, touching of Plaintiffs vaginal area, touching of Plaintiffs breasts, and other sexual touching as described herein this Complaint constitutes sex discrimination under Title IX and 42 U.S.C. § 18116, and otherwise denied each individual Plaintiff the benefits of appropriate medical care.

403.   Defendants MSU and MSU Trustees, and Defendants Strampel, Kovan, Dietzel, Teachnor-Hauk, and Klages knew or should have known of Nassar's abuse yet failed to take corrective action.

404.   Defendant MSU and MSU Trustees are vicariously and/or contractually liable for the actions of its principles, employees, agents, and representatives.

405.   Defendants MSU, MSU Trusteed, Strampel, Kovan, Dietzel, and Klages supervised Nassar and/or were in a position to take appropriate action upon learning of concerns of misconduct as early as 1997.

406.   Defendants MSU, MSU Trustees, Strampel, Kovan, Dietzel, and Klages are directly liable for their failure to train, educate, and supervise.

407.   Defendants MSU, MSU Trustees, Strampel, Kovan, Dietzel, and Klages failed to properly train and supervise Nassar related to his treatment of Plaintiffs and with respect to promulgating and enforcing policies and procedure related to patient safety (*e.g.* use of gloves; consent; chaperones, etc.).

408.   Because of Defendants inaction and deliberate indifference, Defendants forced

Plaintiffs to endure unnecessary pain, trauma, humiliation, and duress.

409.    Because of Plaintiffs' sex, Defendants treated Plaintiffs with a lack of care, dignity, and respect.

410.    The conduct of Defendants MSU and MSU Trustees described above constitutes sex discrimination against Plaintiffs.

411.    Defendants MSU and MSU Trustees perpetrated this discrimination with malice, deliberate disregard for, or deliberate or reckless indifference to Plaintiffs' rights.

412.    The MSU Defendants' failure to promptly and appropriately investigate and remedy and respond to the sexual assaults after they received repeated notice of Defendant Nassar's wrongdoing subjected Plaintiffs and countless others to further sexual harassment and sexual assaults as well as a sexually hostile environment-effectively denying them all access to any health program or activity at MSU and effectively denying them the benefits of appropriate medical care.

413.    As a direct and proximate result of the MSU Defendants' actions and inactions, Plaintiffs have suffered and continue to suffer pain of mind and body, mental anguish, shock, emotional distress, physical manifestations of emotional distress, embarrassment, loss of self-esteem, disgrace, fright, grief, humiliation, enjoyment of life, were prevented and will continue to be prevented from performing daily activities and obtaining the full enjoyment of life, and have sustained and continue to sustain loss of earning and loss of earning capacity.

414.    In the alternative, the actions or inaction of the MSU Defendants was deliberately indifferent or so reckless as to demonstrate a substantial lack of concern for whether an injury would result to Plaintiffs and constitutes gross negligence that is the proximate cause of

82

Plaintiffs' damages. Plaintiffs have suffered and continue to suffer pain and suffering, pain of mind and body, shock, emotional distress, physical manifestations of emotional distress, embarrassment, loss of self-esteem, disgrace, fright, grief, humiliation, loss of enjoyment of life, post-traumatic stress disorder resulting in physically manifested injuries including anxiety, depressions, sleep disorders, nightmares, psychological injuries, and physical injuries. Plaintiffs were prevented and will continue to be prevented from performing Plaintiffs' daily activities and obtaining the full enjoyment of life, and have sustained and continue to sustain loss of earnings and earning capacity.

## COUNT THREE

### VIOLATION OF CIVIL RIGHTS, 42 U.S.C. § 1983
**(Against Defendant Klages, Defendant Strampel, Defendant Dietzel, Defendant Kovan, Defendant Lemmen, Defendant Teachnor-Hauk, Defendant Stollak, and Defendant Nassar)**

415.    Plaintiffs reallege and incorporate by reference the allegations contained in the previous paragraphs.

416.    Plaintiffs, as females, are members of a protected class under the Equal Protection Clause of the Fourteenth Amendment to the United States Constitution.

417.    Plaintiffs enjoy the constitutionally protected Due Process right to be free from the invasion of bodily integrity through sexual assault, battery, molestation, and harassment under the Fourteenth Amendment to the United States Constitution.

418.    At all times pertinent hereto, Defendants Klages, Strampel, Kovan, Dietzel, Lemmen, Teachnor-Hauk, Stollak and Nassar were acting under color of law, to wit, under color

83

of statutes, ordinances, regulations, policies, customs, and usages of the State of Michigan and/or Defendant Michigan State University.

419.   The acts as alleged above amount to a violation of these clearly established constitutionally protected rights, of which reasonable persons in the MSU Defendants' position should have known.

420.   Defendants Klages, Strampel, Dietzel, and Kovan had, at all times pertinent hereto, the ultimate responsibility and authority to train and supervise their employees, agents, and representatives, in the appropriate manner of detecting, reporting, and preventing sexual abuse, assault, and molestation and as a matter of acts, custom, policy, and/or practice failed to do so with deliberate indifference.

421.   At all times pertinent hereto, Defendants Strampel, Dietzel, and Kovan acted in a supervisory role to Defendant Nassar through their roles at the MSU Sports Medicine Clinic, MSU's College of Osteopathic Medicine, and other affiliated MSU departments or institutions.

422.   At all times pertinent hereto, Defendant Klages, as the head coach of the MSU Women's Gymnastics Team, acted in a supervisory role to Defendant Nassar while he was acting as team physician to the MSU Women's Gymnastics Team.

423.   As a matter of custom, policy, and/or practice, Defendant Klages had the ultimate responsibility and authority to investigate complaints from her athletes that involved allegations of impropriety or sexual assault by her team physician.

424.   As a matter of custom, policy, and/or practice, Defendants Klages, Strampel, Dietzel, and Kovan had and have the ultimate responsibility and authority to investigate complaints against their employees, agents, and representatives from all individuals including,

84

but not limited to students, visitors, faculty, staff, or other employees, agents, and/or representatives, and failed to do so with deliberate indifference.

425.    Defendant Lemmen's actions in assisting to exonerate Defendant Nassar from wrongdoing in response to the 2014 Title IX investigation and Defendant Lemmen's removal of Defendant Nassar's patient medical records from the MSU Sports Medicine Clinic at Defendant Nassar's request demonstrate the existence of an agreement or conspiracy between Defendant Nassar and Defendant Lemmen to deprive Plaintiffs of their constitutional rights.

426.    Defendant Teachnor-Hauk's actions in assisting to exonerate Defendant Nassar from wrongdoing in response to the 2014 Title IX investigation, her statements to discourage Tiffany Thomas Lopez from pursuing further action against Defendant Nassar, and her statements to law enforcement denying the existence of an agreement or conspiracy between Defendant Nassar and Defendant Teachnor-Hauk to deprive Plaintiffs of their constitutional rights.

427.    Defendants Klages, Strampel, Dietzel, Lemmen, Kovan, Teachnor-Hauk, Stollak, and Nassar had a duty to prevent sexual assault, abuse, and molestation of MSU's patients, athletes, and other members of the public who utilize MSU's resources, those duties arising under the above-referenced constitutional rights.

428.    Defendant MSU's internal policies provide that "[a]ll University employees are expected to promptly report sexual misconduct or relationship violence that they observe or learn about and that involves a member of the University community (faculty, staff or student) or occurred at a University event or on University property." They further provide that "[t]he employee must report all relevant details about the alleged relationship violence or sexual

misconduct that occurred on campus or at a campus-sponsored event."

429.    This policy was violated in or around 1997 and/or 1998 when Larissa Boyce and Jane B8 Doe reported sexual assault, abuse, and molestation by Defendant Nassar to Defendant Kathie Klages, and Defendant Klages refused to report the incident and instead intimidated, humiliated, and embarrassed Larissa Boyce and Jane B8 Doe.

430.    Defendant Klages's violation of the policy by refusing to take any action in response to legitimate and credible claims of sexual assault by Larissa Boyce and Jane B8 Doe resulted in Plaintiffs' continued violations of their constitutional rights, including their Due Process right to bodily integrity, which includes the right to be free from sexual assaults.

431.    Defendant Klages's actions as alleged above also demonstrate the existence of an agreement or conspiracy between Defendant Nassar and Defendant Klages to deprive Plaintiffs of their constitutional rights.

432.    Defendant MSU's aforementioned internal policies were violated in or around 1999 when Christie Achenbach reported sexual assault, abuse, and molestation by Defendant Nassar to MSU representatives including trainers and coaches, including Kelli Bert, and no action was taken to address her complaints.

433.    Defendant MSU's aforementioned internal policies were violated in and around 2000 when Tiffany Thomas Lopez reported sexual assault, abuse, and molestation by Defendant Nassar to Defendant Teachnor Hauk and other MSU representatives, including trainers, and no action was taken to address her complaints.

434.    Defendant MSU's aforementioned internal policies were violated in and around 2001/2002 when Jennifer Rood Bedford reported sexual assault, abuse, and molestation by

Defendant Nassar to Lianna Hadden and other MSU representatives, including trainers, and no action was taken to address her complaints.

435.    At all relevant times, Defendant MSU had a policy requiring MSU employees to immediately report suspected child abuse, sexual assault, and child pornography.[22]

436.    Defendant Klages violated this policy in or around 1997/1998.

437.    Defendant Teachnor-Hauk violated this policy in or around 2000.

438.    Defendant Stollak violated this policy in or around 2004.

439.    Defendants Klages, Strampel, Dietzel, Lemmen, Kovan, Stollak, and Teachnor-Hauk failed to adequately and properly investigate the complaints of Plaintiffs or other similarly situated individuals including but not limited to failing to:

    a.  Perform a thorough investigation into improper conduct by Defendant Nassar with Plaintiffs after receiving complaints in 1997/1998, 1999, 2000, 2001/2002, 2004, and 2014;

    b.  Thoroughly review and investigate all policies, practices, procedures, and training materials related to the circumstances surrounding the conduct of Defendant Nassar;

    c.  Recognize sexual assault when reported in 2014 and permitted university officials to deem sexual assault as "medically appropriate" and "not of a sexual nature;" and

    d.  Ensure all institutional guidelines issued following the 2014 investigation into Defendant Nassar's conduct were satisfied.

---

[22] *See*, President Lou Anna Simon reminds Michigan State employees of obligation to report sexual assault, Brandon Howell, August 17, 2012, available at, http://www.mlive.com/lansing-news/index.ssf/2012/08/president_lou_anna_k_simon_rem.html, Last accessed Feb. 17, 2018 ("Simon writes in the email …'I write to remind University employees about the reporting protocols for suspected child abuse, child pornography, and allegations of sexual assault.' Jason Cody, a spokesperson for the university said the protocols outlined in Simon's email "long have been in place for employees.")

440.    As indicated in the U.S. Department of Education Office of Civil Rights report, the MSU Defendants had a culture that permitted a sexually hostile environment to exist affecting numerous individuals on Defendant MSU's campus, including Plaintiffs.

441.    Also indicated in the report was Defendant MSU's custom, practice, and/or policy of failing to address complaints of sexual harassment, including sexual violence in a prompt and equitable manner which caused and may have contributed to a continuation of the sexually hostile environment.

442.    By failing to prevent the aforementioned sexual assault, abuse, and molestation upon Plaintiffs, and by failing to appropriately respond to numerous reports of Defendant Nassar's sexual assault, abuse, and molestation in a manner that was so clearly unreasonable it amounted to deliberate indifference, Defendants Klages, Strampel, Dietzel, Lemmen, Teachnor-Hauk, Stollak, and Kovan are liable to Plaintiffs pursuant to 42 U.S.C. § 1983.

443.    Defendants Klages, Strampel, Dietzel, Lemmen, Teachnor-Hauk, Kovan, and Stollak are also liable to Plaintiffs under 42 U.S.C. § 1983 for maintaining customs, policies, and practices which deprived Plaintiffs of rights secured by the Fourteenth Amendment to the United States Constitution in violation of 42 U.S.C. § 1983.

444.    Defendants Klages, Strampel, Dietzel, Lemmen, Teachnor-Hauk, Stollak, and Kovan tolerated, authorized and/or permitted a custom, policy, practice or procedure of insufficient supervision and failed to adequately screen, counsel, or discipline Defendant Nassar, with the result that Defendant Nassar was allowed to violate the constitutional rights of persons such as Plaintiffs with impunity.

88

445.    As a direct and proximate result of Defendants Klages, Strampel, Dietzel,

Lemmen, Teachnor-Hauk, Kovan, Stollak, and Defendant Nassar's actions and/or inactions,

Plaintiffs have suffered and continue to suffer pain of mind and body, mental anguish, shock,

emotional distress, physical manifestations of emotional distress, embarrassment, loss of self-

esteem, disgrace, fright, grief, humiliation, enjoyment of life, were prevented and will continue to

be prevented from performing daily activities and obtaining the full enjoyment of life, and have

sustained and continue to sustain loss of earning and loss of earning capacity.

446.    In the alternative, the actions or inactions of Defendants Klages, Strampel,

Dietzel, Lemmen, Teachnor-Hauk, Stollak, and Kovan were so reckless as to demonstrate a

substantial lack of concern for whether an injury would result to Plaintiffs and constitutes gross

negligence that is the proximate cause of Plaintiffs' damages. Plaintiffs have suffered and

continue to suffer pain and suffering, pain of mind and body, shock, emotional distress, physical

manifestations of emotional distress, embarrassment, loss of self-esteem, disgrace, fright, grief,

humiliation, loss of enjoyment of life, post-traumatic stress disorder resulting in physically

manifested injuries including anxiety, depressions, sleep disorders, nightmares, psychological

injuries, and physical injuries. Plaintiffs were prevented and will continue to be prevented from

performing Plaintiffs' daily activities and obtaining the full enjoyment of life, and have sustained

and continue to sustain loss of earnings and earning capacity.

## COUNT FOUR

### FAILURE TO TRAIN AND SUPERVISE, 42 U.S.C. § 1983
### (Against Defendants Klages, Strampel, Deitzel, and Kovan)

447.    Plaintiffs reallege and incorporate by reference the allegations contained in the

previous paragraphs.

448.   Defendants Klages, Strampel, Dietzel, and Kovan had, at all times pertinent hereto, the ultimate responsibility and authority to train and supervise their employees, agents, and/or representatives, including Defendant Nassar and all faculty and staff, regarding their duties toward students, faculty, staff, and visitors.

449.   Defendants Klages, Strampel, Dietzel, and Kovan failed to train and supervise its employees, agents, and/or representatives, including all faculty and staff, regarding the following duties:

    a.   Perceive, report, and stop inappropriate sexual conduct on campus;

    b.   Provide diligent supervision over student-athletes and other individuals;

    c.   Report suspected incidents of sexual abuse or sexual assault;

    d.   Ensure the safety of all students, faculty, staff, and visitors to Defendant MSU's campuses premises;

    e.   Provide a safe environment for all students, faculty, staff, and visitors to Defendant MSU's premises free from sexual harassment; and,

    f.   Properly train faculty and staff to be aware of their individual responsibility for creating and maintaining a safe environment.

450.   The above list of duties is not exhaustive.

451.   Defendants Klages, Strampel, Dietzel, and Kovan failed to adequately train coaches, trainers, medical staff, and others regarding the aforementioned duties which led to violations of Plaintiffs' rights.

452.   As a result, Defendants Klages, Strampel, Dietzel, and Kovan deprived Plaintiffs of rights, including those described herein, secured by the Fourteenth Amendment to the United

States Constitution in violation of 42 U.S.C. §1983.

453.   As a direct and proximate result of Defendants Klages, Strampel, Dietzel, and Kovan's actions and/or inactions, Plaintiffs have suffered and continue to suffer pain of mind and body, mental anguish, shock, emotional distress, physical manifestations of emotional distress, embarrassment, loss of self-esteem, disgrace, fright, grief, humiliation, enjoyment of life, were prevented and will continue to be prevented from performing daily activities and obtaining the full enjoyment of life, and have sustained and continue to sustain loss of earning and loss of earning capacity.

454.   In the alternative, the actions or inactions of the Defendants Klages, Strampel, Dietzel, and Kovan were so reckless as to demonstrate a substantial lack of concern for whether an injury would result to Plaintiffs and constitutes gross negligence that is the proximate cause of Plaintiffs' damages. Plaintiffs have suffered and continue to suffer pain and suffering, pain of mind and body, shock, emotional distress, physical manifestations of emotional distress, embarrassment, loss of self-esteem, disgrace, fright, grief, humiliation, loss of enjoyment of life, post-traumatic stress disorder resulting in physically manifested injuries including anxiety, depressions, sleep disorders, nightmares, psychological injuries, and physical injuries. Plaintiffs were prevented and will continue to be prevented from performing Plaintiffs' daily activities and obtaining the full enjoyment of life, and have sustained and continue to sustain loss of earnings and earning capacity.

## COUNT FIVE

### GROSS NEGLIGENCE – MCL 691.1407(2)(c)
**(Against the MSU Defendants and Defendant Nassar)**

91

455.   Plaintiffs reallege and incorporate by reference the allegations contained in the previous paragraphs.

456.   The MSU Defendants owed Plaintiffs a duty of due care to ensure their safety and freedom from sexual assault, abuse, and molestation while interacting with their employees, representatives, and/or agents, including Defendant Nassar.

457.   Defendant Nassar owed Plaintiffs a duty to use due care in providing medical treatment as an employee, agent, and/or representative of the MSU Defendants.

458.   A special, confidential, and fiduciary relationship was created between Plaintiffs and Defendant Nassar when Plaintiffs sought medical treatment from Defendant Nassar in the course of his employment, agency, and/or representation of the MSU Defendants, resulting in Defendant Nassar owing Plaintiffs a duty to use due care.

459.   A special, confidential, and fiduciary relationship was created and existed at all times pertinent hereto between the MSU Defendants and Defendant Nassar, as described herein this Complaint, resulting in the MSU Defendants owing Plaintiffs a duty to use due care.

460.   The MSU Defendants and their employees, agents, and/or representatives had a duty to report suspected sexual abuse.

461.   The MSU Defendants had notice of complaints of a sexual nature related to Defendant Nassar's purported treatment with young girls and women through Defendant MSU employees, agents, and/or representatives as early as 1997/1998, again in 1999, again in 2000, again in 2001/2002, again in 2004, and again in 2014, as described herein this Complaint.

462.   The MSU Defendants and their employees, agents, and/or representatives failed

to report sexual abuse about which they knew or should have known in 1997/1998, 1999, 2000, 2001/2002, 2004, and 2014, as described herein this Complaint.

463.   The MSU Defendants' failure to adequately train and supervise Defendant Nassar, especially after the MSU Defendants knew or should have known of complaints regarding Defendant Nassar's conduct, was so reckless as to demonstrate a substantial lack of concern for whether injury resulted to Plaintiffs.

464.   Defendant Nassar's conduct in sexually assaulting, abusing, and molesting Plaintiffs in the course of his employment, agency, and/or representation of the MSU Defendants under the guise of proper medical treatment was so reckless as to demonstrate a substantial lack of concern for whether injury resulted to Plaintiffs.

465.   Defendant Nassar's conduct in sexually assaulting, abusing, and molesting Plaintiffs in the course of his employment, agency, and/or representation of the MSU Defendants and under the guise of rendering "medical treatment" was so reckless as to demonstrate a substantial lack of concern for whether injury would result to Plaintiffs.

466.   The MSU Defendants' conduct and the conduct of their individual employees and agents demonstrated a willful disregard for precautions to ensure Plaintiffs' safety.

467.   The MSU Defendants knew or should have known of complaints pertaining to Defendant Nassar's nonconsensual sexual touching and assaults that occurred under the guise of medical treatment.

468.   The MSU Defendants' conduct demonstrated a willful disregard for substantial risks to Plaintiffs.

469.   The MSU Defendants breached duties owed to Plaintiffs and were grossly

93

negligent when they conducted themselves in the manner described herein this Complaint. These acts by the MSU Defendants were committed with reckless disregard to Plaintiffs' safety, health, constitutional and/or statutory rights, and with substantial lack of concern to whether injury resulted to Plaintiffs.

470.    The MSU Defendants failed to warn or advise current and former patients of Defendant Nassar, including Plaintiffs, that allegations could surface that in fact the treatments that the patients received was not medical treatment at all but was potentially sexual assault.

471.    The MSU Defendants failed to offer counseling services to current of former patients of Defendant Nassar, including Plaintiffs.

472.    As a direct and proximate result of the MSU Defendants' and Defendant Nassar's actions and/or inactions, Plaintiffs have suffered and continue to suffer pain of mind and body, mental anguish, shock, emotional distress, physical manifestations of emotional distress, embarrassment, loss of self-esteem, disgrace, fright, grief, humiliation, enjoyment of life, were prevented and will continue to be prevented from performing daily activities and obtaining the full enjoyment of life, and have sustained and continue to sustain loss of earning and loss of earning capacity.

473.    As a direct and/or proximate result of Defendants' gross negligence, Plaintiffs have suffered and continue to suffer pain and suffering, pain of mind and body, shock, emotional distress, physical manifestations of emotional distress, embarrassment, loss of self-esteem, disgrace, fright, grief, humiliation, loss of enjoyment of life, post-traumatic stress disorder resulting in physically manifested injuries including anxiety, depressions, sleep disorders, nightmares, psychological injuries, and physical injuries. Plaintiffs were prevented and will

94

continue to be prevented from performing Plaintiffs' daily activities and obtaining the full enjoyment of life, and have sustained and continue to sustain loss of earnings and earning capacity.

## COUNT SIX

### NEGLIGENCE
**(Against the MSU Defendants and Defendant Nassar)**

474.    Plaintiffs reallege and incorporate by reference the allegations contained in the previous paragraphs.

475.    The MSU Defendants owed Plaintiffs a duty to use ordinary care to ensure their safety and freedom from sexual assault, abuse, and molestation while interacting with their employees, agents, and/or representatives, including Defendant Nassar.

476.    Defendant Nassar owed Plaintiffs a duty to use ordinary care in providing medical treatment as an employee, agent, and/or representative of the MSU Defendants.

477.    A special, confidential, and fiduciary relationship was created between Plaintiffs and Defendant Nassar when Plaintiffs sought medical treatment from Defendant Nassar in the course of his employment, agency, and/or representation of the MSU Defendants, resulting in Defendant Nassar owing Plaintiffs a duty to use ordinary care in his undertakings.

478.    A special, confidential, and fiduciary relationship was created and existed at all times pertinent hereto between the MSU Defendants and Defendant Nassar, as described herein this Complaint, resulting in the MSU Defendants owing Plaintiffs a duty to use ordinary care in their undertakings.

479.    The MSU Defendants and their employees, agents, and/or representatives had a

95

duty to report suspected sexual abuse.

480.   The MSU Defendants had notice of complaints of a sexual nature related to Defendant Nassar's purported treatment with young girls and women through Defendant MSU employees, agents, and/or representatives as early as 1997/1998, again in 1999, again in 2000, again in 2001/2002, again in 2004, and again in 2014, as described herein this Complaint.

481.   The MSU Defendants and their employees, agents, and/or representatives failed to report sexual abuse about which they knew or should have known in 1997/1998, 1999, 2000, 2001/2002, 2004, and 2014, as described herein this Complaint.

482.   The MSU Defendants knew or should have known of the foreseeability of sexual abuse with respect to youth and collegiate sports.

483.   The MSU Defendants' failure to properly address, investigate, and remedy complaints against Defendant Nassar's conduct was a breach of the duty to use ordinary care.

484.   Defendant Nassar's conduct in sexually assaulting, battering, molesting, and harassing Plaintiffs in the course of his employment, agency, and/or representation of the MSU Defendants under the guise of proper medical treatment was a breach of the duty to use ordinary care.

485.   The MSU Defendants' failure to adequately train and supervise Defendant Nassar breached the duty of ordinary care.

486.   The MSU Defendants failed to warn or advise current and former patients of Defendant Nassar, including Plaintiffs, that allegations could surface that in fact the treatments that the patients received was not medical treatment at all but was potentially sexual assault.

487.    The MSU Defendants failed to offer counseling services to current of former patients of Defendant Nassar, including Plaintiffs.

488.    As a direct and proximate result of Defendants' conduct, actions and/or inactions, Plaintiffs have suffered and continue to suffer pain of mind and body, mental anguish, shock, emotional distress, physical manifestations of emotional distress, embarrassment, loss of self-esteem, disgrace, fright, grief, humiliation, enjoyment of life, were prevented and will continue to be prevented from performing daily activities and obtaining the full enjoyment of life, and have sustained and continue to sustain loss of earning and loss of earning capacity.

489.    In the alternative, the actions or inaction of the Defendants was so reckless as to demonstrate a substantial lack of concern for whether an injury would result to Plaintiffs and constitutes gross negligence that is the proximate cause of Plaintiffs' damages.  Plaintiffs have suffered and continue to suffer pain and suffering, pain of mind and body, shock, emotional distress, physical manifestations of emotional distress, embarrassment, loss of self-esteem, disgrace, fright, grief, humiliation, loss of enjoyment of life, post-traumatic stress disorder resulting in physically manifested injuries including anxiety, depressions, sleep disorders, nightmares, psychological injuries, and physical injuries.  Plaintiffs were prevented and will continue to be prevented from performing Plaintiffs' daily activities and obtaining the full enjoyment of life, and have sustained and continue to sustain loss of earnings and earning capacity.

## COUNT SEVEN

### VICARIOUS LIABILITY
**(Against the MSU Defendants)**

97

490.   Plaintiffs reallege and incorporate by reference the allegations contained in the previous paragraphs.

491.   Vicarious liability is indirect responsibility imposed by operation of law where an employer is bound to keep its employees within their proper bounds and is responsible if it fails to do so.

492.   Vicarious liability essentially creates agency between the principal and its agent so that the principal is held to have done what the agent has done.

493.   The MSU Defendants employed and/or held Defendant Nassar out to be its employee, agent, and/or representative from approximately 1996 to 2016.

494.   Defendant MSU's website contains hundreds of web pages portraying Defendant Nassar as a distinguished member of Defendant MSU's College of Osteopathic Medicine, Division of Sports Medicine.

495.   A special, confidential, and fiduciary relationship was created and existed at all times pertinent hereto between the MSU Defendants and Defendant Nassar, as described herein this Complaint, resulting in The MSU Defendants owing Plaintiffs a duty to prevent them from Defendant Nassar's sexual assault, battery, molestation, and discrimination.

496.   The MSU Defendants are vicariously liable for the actions of Defendant Nassar, as described above, that were performed during the course of his employment, agency, and/or representation with the MSU Defendants and while he had unfettered access to young female athletes and patients on Defendant MSU's campus and premises through its College of Osteopathic Medicine and Division of Sports Medicine.

497.   The MSU Defendants had actual and/or constructive knowledge of Defendant

Nassar's propensity for sexually assaulting, battering, molesting, and harassing females on several occasions under the guise of medical treatment and during the course of his employment, agency, and/or representation with the MSU Defendants, beginning in 1997 and/or 1998, as described herein this Complaint.

498.   The MSU Defendants had actual and/or constructive knowledge of Defendant Nassar's propensity for sexually assaulting, battering, molesting, and harassing his patients and other females under the guise of medical treatment and during the course of his employment, agency, and/or representation with the MSU Defendants, and took no action to prevent such conduct.

499.   It was reasonably foreseeable that Defendant Nassar would continue to sexually assault, batter, molest, and harass females under the guise of medical treatment during the course of his employment, agency, and/or representation with the MSU Defendants, with the actual and/or constructive knowledge the MSU Defendants had of such conduct.

500.   As a direct and proximate result of Defendant Nassar's actions carried out in the course of his employment, agency, and/or representation of the MSU Defendants, Plaintiffs have suffered and continue to suffer pain of mind and body, mental anguish, shock, emotional distress, physical manifestations of emotional distress, embarrassment, loss of self-esteem, disgrace, fright, grief, humiliation, enjoyment of life, were prevented and will continue to be prevented from performing daily activities and obtaining the full enjoyment of life, and have sustained and continue to sustain loss of earning and loss of earning capacity.

501.   In the alternative, the actions or inactions of the Defendants were so reckless as to demonstrate a substantial lack of concern for whether an injury would result to Plaintiffs and

99

constitutes gross negligence that is the proximate cause of Plaintiffs' damages. Plaintiffs have suffered and continue to suffer pain and suffering, pain of mind and body, shock, emotional distress, physical manifestations of emotional distress, embarrassment, loss of self-esteem, disgrace, fright, grief, humiliation, loss of enjoyment of life, post-traumatic stress disorder resulting in physically manifested injuries including anxiety, depressions, sleep disorders, nightmares, psychological injuries, and physical injuries. Plaintiffs were prevented and will continue to be prevented from performing Plaintiffs' daily activities and obtaining the full enjoyment of life, and have sustained and continue to sustain loss of earnings and earning capacity.

## COUNT EIGHT

### EXPRESS/IMPLIED AGENCY
**(Against the MSU Defendants)**

502.    Plaintiffs reallege and incorporate by reference the allegations contained in the previous paragraphs.

503.    An agent is a person who is authorized by another to act on its behalf.

504.    The MSU Defendants intentionally and/or negligently made representations that Defendant Nassar was their employee, agent, and/or representative.

505.    On the basis of those representations, Plaintiffs reasonably believed that Defendant Nassar was acting as an employee, agent, and/or representative of the MSU Defendants.

506.    Plaintiffs were injured as a result of Defendant Nassar's sexual assault, abuse, and molestation, as described above. These acts were performed during the course of

100

Defendant Nassar's employment, agency, and/or representation with the MSU Defendants while he had access to young females patients and athletes.

507.    Plaintiffs were injured because they relied on the MSU Defendants to provide employees, agents, and representatives who exercise reasonable skill and care.

508.    As a direct and proximate result of Defendant Nassar's actions carried out in the course of his employment, agency, and/or representations of the MSU Defendants, Plaintiffs have suffered and continue to suffer pain of mind and body, mental anguish, shock, emotional distress, physical manifestations of emotional distress, embarrassment, loss of self-esteem, disgrace, fright, grief, humiliation, enjoyment of life, were prevented and will continue to be prevented from performing daily activities and obtaining the full enjoyment of life, and have sustained and continue to sustain loss of earning and loss of earning capacity.

509.    In the alternative, the actions or inactions of the MSU Defendants were so reckless as to demonstrate a substantial lack of concern for whether an injury would result to Plaintiffs and constitutes gross negligence that is the proximate cause of Plaintiffs' damages. Plaintiffs have suffered and continue to suffer pain and suffering, pain of mind and body, shock, emotional distress, physical manifestations of emotional distress, embarrassment, loss of self-esteem, disgrace, fright, grief, humiliation, loss of enjoyment of life, post-traumatic stress disorder resulting in physically manifested injuries including anxiety, depressions, sleep disorders, nightmares, psychological injuries, and physical injuries. Plaintiffs were prevented and will continue to be prevented from performing Plaintiffs' daily activities and obtaining the full enjoyment of life, and have sustained and continue to sustain loss of earnings and earning capacity.

## COUNT NINE

### NEGLIGENT SUPERVISION
### (Against MSU Defendants)

510.     Plaintiffs reallege and incorporate by reference the allegations contained in the previous paragraphs.

511.     The MSU Defendants had a duty to provide reasonable supervision of their employee, agent, and/or representative, Defendant Nassar, while he was in the course of his employment, agency, and/or representation with the MSU Defendants and while he interacted with young females, including Plaintiffs.

512.     Given the known sexual abuse in youth intercollegiate sports and gymnastics, it was reasonably foreseeable that Defendant Nassar, who had prior allegations against him, had and/or would sexually abuse young females, including Plaintiffs, unless properly supervised.

513.     The MSU Defendants by and through their employees, agents, representatives, managers, and/or assigns, such as Defendant Kathie Klages, President Simon, President McPherson, Defendant Strampel, or Defendant Kovan, knew or reasonably should have known of Defendant Nassar's conduct and/or that Defendant Nassar was an unfit employee, agent, and/or representative because of his sexual interest in children.

514.     The MSU Defendants breached their duty to provide reasonable supervision of Defendant Nassar, and permitted Defendant Nassar, who was in a position of trust and authority, to commit acts against Plaintiffs.

515.     The aforementioned sexual assault, abuse, and molestation occurred while Plaintiffs and Defendant Nassar were on the premises of Defendant MSU and while Defendant

Nassar was in the course of his employment, agency, and/or representation with the MSU Defendants.

516.    The MSU Defendants tolerated, authorized, and/or permitted a custom, policy, practice, or procedure of insufficient supervision and failed to adequately screen, counsel, or discipline such individuals, resulting in the allowance of Defendant Nassar to violate the rights of persons such as Plaintiffs with impunity.

517.    The MSU Defendants failed to warn or advise current and former patients of Defendant Nassar, including Plaintiffs, that allegations surfaced that in fact the treatments that the patients received were not medical treatment at all but were potentially sexual assaults.

518.    As a direct and proximate result of the MSU Defendants' failure to adequately supervise, Plaintiffs have suffered and continue to suffer pain of mind and body, mental anguish, shock, emotional distress, physical manifestations of emotional distress, embarrassment, loss of self-esteem, disgrace, fright, grief, humiliation, enjoyment of life, were prevented and will continue to be prevented from performing daily activities and obtaining the full enjoyment of life, and have sustained and continue to sustain loss of earning and loss of earning capacity.

519.    In the alternative, the MSU Defendants' failure to supervise was so reckless as to demonstrate a substantial lack of concern for whether an injury would result to Plaintiffs and constitutes gross negligence that is the proximate cause of Plaintiffs' damages. Plaintiffs have suffered and continue to suffer pain and suffering, pain of mind and body, shock, emotional distress, physical manifestations of emotional distress, embarrassment, loss of self-esteem, disgrace, fright, grief, humiliation, loss of enjoyment of life, post-traumatic stress disorder

resulting in physically manifested injuries including anxiety, depressions, sleep disorders, nightmares, psychological injuries, and physical injuries. Plaintiffs were prevented and will continue to be prevented from performing Plaintiffs' daily activities and obtaining the full enjoyment of life, and have sustained and continue to sustain loss of earnings and earning capacity.

## COUNT TEN

### NEGLIGENT FAILURE TO WARN OR PROTECT
**(Against the MSU Defendants**)

520.     Plaintiffs reallege and incorporate by reference the allegations contained in the previous paragraphs.

521.     The MSU Defendants knew or should have known that Defendant Nassar posed a risk of harm to Plaintiffs and/or others in Plaintiffs' situation.

522.     The MSU Defendants knew or should have known that Defendant Nassar committed sexual assault, abuse, and molestation and/or was continuing to engage in such conduct.

523.     As early as 1997 and/or 1998, the MSU Defendants had direct and/or constructive knowledge of Defendant Nassar's dangerous conduct and failed to respond reasonably and responsibly.

524.     The MSU Defendants had a duty to warn or protect Plaintiffs and others in Plaintiffs' situation against the risk of injury by Defendant Nassar.

525.     The special, trusting, confidential, and fiduciary relationship between the MSU Defendants and Defendant Nassar, as an employee, agent, and/or representative of the MSU

104

Defendants, created a duty for the MSU Defendants to disclose information regarding Defendant Nassar's sexual conduct.

526.   The MSU Defendants breached the duty owed to Plaintiffs by failing to warn Plaintiffs and/or by failing to take reasonable steps to protect Plaintiffs from Defendant Nassar.

527.   The MSU Defendants breached the duties to protect owed to Plaintiffs by failing to:

a.   Respond to allegations of sexual assault, abuse, and molestation;

b.   Detect and/or uncover evidence of sexual assault, abuse, and molestation; and

c.   Investigate, adjudicate, and terminate Defendant Nassar's employment with Defendant MSU prior to 2016.

528.   The MSU Defendants violated Plaintiffs' rights by failing to adequately screen, counsel, and/or discipline Defendant Nassar for physical and/or mental conditions that might have rendered him unfit to discharge the duties and responsibilities of a physician at an educational institution, resulting in a violation of Plaintiffs' rights.

529.   The MSU Defendants willfully refused to notify, give adequate warning, and implement appropriate safeguards to protect Plaintiffs from Defendant Nassar's conduct.

530.   As a direct and proximate result of the MSU Defendants' failure to warn or protect, Plaintiffs have suffered and continue to suffer pain of mind and body, mental anguish, shock, emotional distress, physical manifestations of emotional distress, embarrassment, loss of self-esteem, disgrace, fright, grief, humiliation, enjoyment of life, were prevented and will continue to be prevented from performing daily activities and obtaining the full enjoyment of life, and have sustained and continue to sustain loss of earning and loss of earning capacity.

531.    In the alternative, the MSU Defendants' failure to warn or protect was so reckless as to demonstrate a substantial lack of concern for whether an injury would result to Plaintiffs and constitutes gross negligence that is the proximate cause of Plaintiffs' damages.  Plaintiffs have suffered and continue to suffer pain and suffering, pain of mind and body, shock, emotional distress, physical manifestations of emotional distress, embarrassment, loss of self-esteem, disgrace, fright, grief, humiliation, loss of enjoyment of life, post-traumatic stress disorder resulting in physically manifested injuries including anxiety, depressions, sleep disorders, nightmares, psychological injuries, and physical injuries. Plaintiffs were prevented and will continue to be prevented from performing Plaintiffs' daily activities and obtaining the full enjoyment of life, and have sustained and continue to sustain loss of earnings and earning capacity.

## COUNT ELEVEN

### NEGLIGENT FAILURE TO TRAIN OR EDUCATE
**(Against the MSU Defendants)**

532.    Plaintiffs reallege and incorporate by reference the allegations contained in the previous paragraphs.

533.    The MSU Defendants had a duty to take reasonable protective measures to protect Plaintiffs and others in Plaintiffs' situation against the risk of injury by Defendant Nassar, including the duty to train or educate Plaintiffs and other individuals in Plaintiffs situation, about how to avoid a risk of sexual assault and/or sexual abuse by Defendant Nassar.

534.    The MSU Defendants breached the duty owed to Plaintiffs to take reasonable protective measures to protect Plaintiffs, and other patients of Defendant Nassar, by failing to

properly train or educate Plaintiffs and other individuals in Plaintiffs situation, about how to avoid a risk of sexual assault and/or sexual abuse by Defendant Nassar.

535.    The MSU Defendants had a duty to train and educate Defendant Nassar in a reasonable manner in regards to Defendant Nassar's treatment of females in his capacity as an employee, agent, and/or representative of the MSU Defendants.

536.    The MSU Defendants breached the duty owed to Plaintiffs by failing to properly train or educate Defendant Nassar in a reasonable manner in regards to Defendant Nassar's treatment of females in his capacity as an employee, agent, and/or representative of the MSU Defendants

537.    The MSU Defendants failed to implement reasonable safeguards to:

a.      Prevent acts of sexual assault, abuse, and molestation by Defendant Nassar; and

b.      Avoid placing Defendant Nassar in positions where he would have unsupervised contact and interaction with Plaintiffs and other young women.

538.    As a direct and proximate result of the MSU Defendants' failure to train or educate, Plaintiffs have suffered and continue to suffer pain of mind and body, mental anguish, shock, emotional distress, physical manifestations of emotional distress, embarrassment, loss of self-esteem, disgrace, fright, grief, humiliation, enjoyment of life, were prevented and will continue to be prevented from performing daily activities and obtaining the full enjoyment of life, and have sustained and continue to sustain loss of earning and loss of earning capacity.

539.    In the alternative, the MSU Defendants' failure to train or educate was so reckless as to demonstrate a substantial lack of concern for whether an injury would result to Plaintiffs and constitutes gross negligence that is the proximate cause of Plaintiffs' damages. Plaintiffs

107

have suffered and continue to suffer pain and suffering, pain of mind and body, shock, emotional distress, physical manifestations of emotional distress, embarrassment, loss of self-esteem, disgrace, fright, grief, humiliation, loss of enjoyment of life, post-traumatic stress disorder resulting in physically manifested injuries including anxiety, depressions, sleep disorders, nightmares, psychological injuries, and physical injuries. Plaintiffs were prevented and will continue to be prevented from performing Plaintiffs' daily activities and obtaining the full enjoyment of life, and have sustained and continue to sustain loss of earnings and earning capacity.

## COUNT TWELVE

### NEGLIGENT RETENTION
**(Against the MSU Defendants)**

540.　Plaintiffs reallege and incorporate by reference the allegations contained in the previous paragraphs.

541.　The MSU Defendants owed a duty to Plaintiffs and others in Plaintiffs' situation when credentialing, hiring, retaining, screening, checking, regulating, monitoring, and supervising employees, agents, and/or representatives to exercise ordinary care.

542.　The MSU Defendants breached the duties owed to Plaintiffs by failing to adequately investigate, report, and address complaints about Defendant Nassar's conduct, which the MSU Defendants knew or should have known.

543.　The MSU Defendants breached the duties owed to Plaintiffs when the MSU Defendants retained Defendant Nassar as an employee, agent, and/or representative after the MSU Defendants discovered or should have reasonably discovered Defendant Nassar's

conduct, which reflected a propensity for sexual misconduct.

544.    The MSU Defendants' failure to act in accordance with the standard of care resulted in Defendant Nassar gaining access to and sexually assaulting and/or sexually abusing Plaintiffs and an unknown number of other individuals.

545.    The aforementioned conduct of the MSU Defendants in credentialing, hiring, retaining, screening, checking, regulating, monitoring, and supervising of Defendant Nassar created a foreseeable risk of harm to Plaintiffs and other minors and young adults.

546.    As a direct and proximate result of the MSU Defendants' actions in retaining Defendant Nassar, Plaintiffs have suffered and continue to suffer pain of mind and body, mental anguish, shock, emotional distress, physical manifestations of emotional distress, embarrassment, loss of self-esteem, disgrace, fright, grief, humiliation, enjoyment of life, were prevented and will continue to be prevented from performing daily activities and obtaining the full enjoyment of life, and have sustained and continue to sustain loss of earning and loss of earning capacity.

547.    In the alternative, the MSU Defendants' actions in retaining Defendant Nassar were so reckless as to demonstrate a substantial lack of concern for whether an injury would result to Plaintiffs and constitutes gross negligence that is the proximate cause of Plaintiffs' damages. Plaintiffs have suffered and continue to suffer pain and suffering, pain of mind and body, shock, emotional distress, physical manifestations of emotional distress, embarrassment, loss of self-esteem, disgrace, fright, grief, humiliation, loss of enjoyment of life, post-traumatic stress disorder resulting in physically manifested injuries including anxiety, depressions, sleep disorders, nightmares, psychological injuries, and physical injuries. Plaintiffs were prevented

and will continue to be prevented from performing Plaintiffs' daily activities and obtaining the full enjoyment of life, and have sustained and continue to sustain loss of earnings and earning capacity.

## COUNT THIRTEEN

### FRAUD AND MISREPRESENTATION
### (Against the MSU Defendants)

548.    Plaintiffs reallege and incorporate by reference the allegations contained in the previous paragraphs.

549.    From approximately 1996 to September 2016, the MSU Defendants represented to Plaintiffs and the public that Defendant Nassar was a competent, safe, and highly regarded physician.

550.    By representing that Defendant Nassar was a team physician and an athletic physician at Defendant MSU and a National Team Physician with Defendant USAG, the MSU Defendants represented to Plaintiffs and the public that Defendant Nassar was safe, trustworthy, and of high moral and ethical repute and that Plaintiffs and the public need not worry about being harmed by Defendant Nassar.

551.    The aforementioned representations were false when they were made because Defendant Nassar had and was continuing to sexually assault, abuse, and molest an unknown number of patients, including Plaintiffs, and other individuals.

552.    The MSU Defendants knew the aforementioned representations regarding Defendant Nassar were false because there had been previous complaints in 1997/1998, 1999, 2000, 2001/2002, 2004, and 2014 to Defendant MSU employees, agents, and/or

representatives about Defendant Nassar's sexual assault, battery, molestation, and harassment.

553.   Although Defendant MSU had been informed of Defendant Nassar's conduct, the MSU Defendants failed to investigate, remedy, or in any way address the 1997/1998, 1999, 2000,  2001/2002, 2004, and 2014 complaints against Defendant Nassar.

554.   The MSU Defendants continued to hold out and portray Defendant Nassar as a competent and safe physician.

555.   Plaintiffs relied on the MSU Defendants' portrayal of Defendant Nassar when they sought his medical treatment for their injuries.

556.   Plaintiffs and other members of the public relied on the assertions of the MSU Defendants and several other young females continued to seek medical treatment from Defendant Nassar in the wake of known concerns and dangers.

557.   Defendant Nassar was permitted to continue employment and sexually assault, abuse, and molest an unknown number of other individuals, despite Plaintiff Amanda Thomashow's 2014 complaint against Defendant Nassar to Kristine M. Moore, Assistant Director for Institutional Equity at the MSU Office for Inclusion and Intercultural Initiatives.

558.   The MSU Defendants disregarded Plaintiff Amanda Thomashow's 2014 complaint because of Defendant MSU's culture which included existence of a sexually hostile environment on Defendant MSU's campus and premises and the University's failure to address complaints of sexual harassment, including sexual violence in a prompt and equitable manner which in turn caused and may have contributed to a continuation of the sexually hostile environment, Defendant Nassar was permitted to continue employment and sexually abuse,

assault, and molest Plaintiffs and an unknown number of other individuals.

559.   The MSU Defendants intentionally withheld material opinions, findings, evidence, and conclusions from Plaintiff Amanda Thomashow and other Plaintiffs in regards to the findings of Plaintiff Amanda Thomashow's Title IX investigation conducted in 2014, as described here in this Complaint.

560.   Between the time of Plaintiff Amanda Thomashow's 2014 complaint and 2016, the MSU Defendants continued to portray Defendant Nassar as a safe and competent physician.

561.   The MSU Defendants, by and through their representatives, also affirmatively took steps to attempt to dissuade Plaintiff Amanda Thomashow from speaking with police about her complaints against Defendant Nassar.

562.   The MSU Defendants, by and through their representatives, also affirmatively took steps to attempt to dissuade other potential victims of Defendant Nassar from speaking with police or the media by advising the potential victims to respond "No comment" to any requests by media or police.

563.   These actions of MSU Defendants, including the disregard of Plaintiff Amanda Thomashow's complaints, were purportedly done as an attempt to hide the known instances of sexual abuse committed by Defendant Nassar.

564.   As a result of Plaintiffs' and the public's reliance on the MSU Defendants' fraudulent misrepresentations regarding Defendant Nassar, Plaintiffs and others in Plaintiffs' situation were sexually assaulted, abused, and molested by Defendant Nassar during appointments.

565.   As a direct and proximate result of the MSU Defendants' actions and knowingly

false representations, Plaintiffs have suffered and continue to suffer pain of mind and body, mental anguish, shock, emotional distress, physical manifestations of emotional distress, embarrassment, loss of self-esteem, disgrace, fright, grief, humiliation, enjoyment of life, were prevented and will continue to be prevented from performing daily activities and obtaining the full enjoyment of life, and have sustained and continue to sustain loss of earning and loss of earning capacity.

566.    In the alternative, the actions or inaction of the Defendants was so reckless as to demonstrate a substantial lack of concern for whether an injury would result to Plaintiffs and constitutes gross negligence that is the proximate cause of Plaintiffs' damages. Plaintiffs have suffered and continue to suffer pain and suffering, pain of mind and body, shock, emotional distress, physical manifestations of emotional distress, embarrassment, loss of self-esteem, disgrace, fright, grief, humiliation, loss of enjoyment of life, post-traumatic stress disorder resulting in physically manifested injuries including anxiety, depressions, sleep disorders, nightmares, psychological injuries, and physical injuries. Plaintiffs were prevented and will continue to be prevented from performing Plaintiffs' daily activities and obtaining the full enjoyment of life, and have sustained and continue to sustain loss of earnings and earning capacity.

## COUNT FOURTEEN

## VIOLATIONS OF THE ELLIOT-LARSEN CIVIL RIGHTS ACT, MCL 37.2101
### (Against MSU Defendants and Defendant Nassar)

567.    Plaintiffs reallege and incorporate by reference the allegations contained in the previous paragraphs.

113

568.    The Elliot-Larsen Civil Rights Act ("Elliot-Larsen") prohibits discrimination based on sex.  MCL 37.2102.

569.    "Discrimination because of sex includes sexual harassment." MCL 37.2103(i).

570.    "Sexual harassment means unwelcome sexual advances, requests for sexual favors, and other verbal or physical conduct or communication of a sexual nature."  MCL 37.2103 (i).

571.    Elliot-Larsen protects against sexual harassment in educational institutions.

572.    MSU is an educational institution pursuant to MCL 37.2401.

573.    An educational institution shall not "discriminate against an individual in the full utilization of or benefit from the institution, or the services, activities, or programs provided by the institution because of . . . sex." MCL 37.2401(a).

574.    Elliot-Larsen also protects against sexual harassment in places of public accommodation. MCL 37.2302.  Under this section, an individual shall not be denied "full and equal enjoyment of the goods, services, facilities, privileges, advantages, or accommodations of a place of public accommodation or public service because of . . . sex." MCL 37.2302(a).

575.    MSU is a "place of public accommodation" because its "services, facilities, privileges, advantages, or accommodations are extended, offered, sold, or otherwise made available to the public." MCL 37.2301(a).

576.    Plaintiffs are "persons" within the meaning of MCL 37.2103(g).

577.    Nassar's actions and conduct were carried out under one of MSU's programs, which provides medical treatment to students, athletes, and the general public, wherein

MSU, through MSU Sport Medicine Clinic, solicits and markets to people like Plaintiffs, and places Plaintiffs within the University community.

578.   Nassar's actions and conduct toward Plaintiffs denied them the full and equal enjoyment of MSU's services at a place of public accommodation, in violation of Elliot-Larson.

579.   Nassar's actions and conduct toward Plaintiffs of nonconsensual sexual assault, battery, and molestation, which includes unconsented touching and rubbing of Plaintiffs' genitalia, breasts, buttocks, thighs, and unconsented digital penetration of Plaintiffs' vagina and anus, constitutes sex discrimination under Elliot-Larsen.

580.   As a direct and proximate result of the Defendants' actions and/or inactions, Plaintiffs have suffered and continue to suffer pain of mind and body, mental anguish, shock, emotional distress, physical manifestations of emotional distress, embarrassment, loss of self-esteem, disgrace, fright, grief, humiliation, enjoyment of life, were prevented and will continue to be prevented from performing daily activities and obtaining the full enjoyment of life, and have sustained and continue to sustain loss of earning and loss of earning capacity.

581.   In the alternative, the actions or inaction of the Defendants was so reckless as to demonstrate a substantial lack of concern for whether an injury would result to Plaintiffs and constitutes gross negligence that is the proximate cause of Plaintiffs' damages. Plaintiffs have suffered and continue to suffer pain and suffering, pain of mind and body, shock, emotional distress, physical manifestations of emotional distress, embarrassment, loss of self-esteem, disgrace, fright, grief, humiliation, loss of enjoyment of life, post-traumatic stress disorder resulting in physically manifested injuries including anxiety, depressions, sleep disorders,

115

nightmares, psychological injuries, and physical injuries. Plaintiffs were prevented and will continue to be prevented from performing Plaintiffs' daily activities and obtaining the full enjoyment of life, and have sustained and continue to sustain loss of earnings and earning capacity.

## CLAIMS AGAINST USA GYMNASTICS

### COUNT FIFTEEN

#### GROSS NEGLIGENCE
**(Plaintiffs Abigail Mealy, Amanda Mealy and Meaghan Ashcraft against Defendant USAG and Defendant Nassar)**

582.   Plaintiffs incorporate by reference the allegations contained in the previous paragraphs.

583.   A special, confidential, and fiduciary relationship was created between Plaintiffs and Defendant Nassar when Plaintiffs sought medical treatment from Defendant Nassar, acting in the course of his employment, agency, and/or representation of Defendant USAG, and resulting in Defendant Nassar owing Plaintiffs a duty to use due care.

584.   Plaintiffs Abigail Mealy, Amanda Mealy and Meaghan Ashcraft are or were members of USAG and participated in USAG sanctioned events.

585.   Plaintiffs were knowledgeable of USAG and considered it to be a prestigious organization.  In some cases, Plaintiffs were referred to Defendant Nassar through USAG affiliations.

586.   Defendant Nassar owed Plaintiffs a duty to use due care in providing medical treatment as an employee, agent, and/or representative of Defendant USAG.

587.   Defendant USAG owed the public and Plaintiffs a duty to use due care to ensure

their safety and freedom from sexual assault, abuse, and molestation while interacting with its employees, representatives, and/or agents, including Defendant Nassar.

588.    Defendant USAG knew or should have known of complaints pertaining to Defendant Nassar's nonconsensual sexual touching and assaults that occurred under the guise of medical treatment.

589.    Defendant Nassar's conduct in sexually assaulting, abusing, and molesting Plaintiffs in the course of his employment, agency, and/or representation of Defendant USAG under the guise of proper medical treatment was so reckless as to demonstrate a substantial lack of concern for whether injury resulted to Plaintiffs.

590.    Defendant USAG's failure to adequately supervise Defendant Nassar was so reckless as to demonstrate a substantial lack of concern for whether injury resulted to Plaintiffs.

591.    Defendant USAG's conduct demonstrated a willful disregard for precautions to ensure Plaintiffs' safety.

592.    Defendant USAG's conduct demonstrated a willful disregard for substantial risks to Plaintiffs.

593.    Defendant USAG breached its duties owed to Plaintiffs and was grossly negligent when it conducted itself in the manner described above, including, but not limited to, failing to notify Defendant MSU about the reasons for Defendant Nassar's separation from Defendant USAG in 2015 and, more broadly, the issues surrounding sexual abuse and warning signs and reporting requirements.

594.    These acts by Defendant USAG were committed with reckless disregard to Plaintiffs' safety, health, constitutional and/or statutory rights, and with substantial lack of

concern to whether injury resulted to Plaintiffs.

595.    As a direct and proximate result of Defendant USAG's and Defendant Nassar's actions and/or inactions, Plaintiffs have suffered and continue to suffer pain of mind and body, mental anguish, shock, emotional distress, physical manifestations of emotional distress, embarrassment, loss of self-esteem, disgrace, fright, grief, humiliation, enjoyment of life, were prevented and will continue to be prevented from performing daily activities and obtaining the full enjoyment of life, and have sustained and continue to sustain loss of earning and loss of earning capacity.

596.    In the alternative, the actions or inactions of Defendant USAG and Defendant Nassar were so reckless as to demonstrate a substantial lack of concern for whether an injury would result to Plaintiffs and constitutes gross negligence that is the proximate cause of Plaintiffs' damages. Plaintiffs have suffered and continue to suffer pain and suffering, pain of mind and body, shock, emotional distress, physical manifestations of emotional distress, embarrassment, loss of self-esteem, disgrace, fright, grief, humiliation, loss of enjoyment of life, post-traumatic stress disorder resulting in physically manifested injuries including anxiety, depressions, sleep disorders, nightmares, psychological injuries, and physical injuries. Plaintiffs were prevented and will continue to be prevented from performing Plaintiffs' daily activities and obtaining the full enjoyment of life, and have sustained and continue to sustain loss of earnings and earning capacity.

## COUNT SIXTEEN

### NEGLIGENCE
**(Plaintiffs Abigail Mealy and Amanda Mealy against Defendant USAG and Defendant Nassar)**

597.   Plaintiffs reallege and incorporate by reference the allegations contained in the previous paragraphs.

598.   A special, confidential, and fiduciary relationship was created between Plaintiffs and Defendant Nassar when Plaintiffs sought medical treatment from Defendant Nassar in the course of his employment, agency, and/or representation of Defendant USAG, resulting in Defendant Nassar owing Plaintiffs a duty to use ordinary care.

599.   Defendant Nassar owed Plaintiffs a duty to use ordinary care in providing medical treatment.

600.   Defendant USAG owed the public and Plaintiffs a duty to use ordinary care to ensure their safety and freedom from sexual assault, abuse, and molestation while interacting with their employees, agents, and/or representatives, including Defendant Nassar.

601.   Defendant Nassar's conduct in sexually assaulting, abusing, and molesting Plaintiffs in the course of his employment, agency, and/or representation of Defendant USAG under the guise of proper medical treatment was a breach of the duty to use ordinary care.

602.   Defendant USAG's failure to adequately train and supervise Defendant Nassar breached the duty of ordinary care.

603.   Defendant USAG's failure to properly investigate, address, and remedy complaints regarding Defendant Nassar's conduct was a breach of the duty to use ordinary care.

604.   Defendant USAG's failure to inform the public, including individuals Defendant USAG had referred to Defendant Nassar for treatment, of the allegations leading to Defendant

Nassar's separation for Defendant USAG was a breach of the duty to use ordinary care.

605.    Defendant Nassar's conduct in sexually assaulting, abusing, and molesting Plaintiffs was a breach of the duty to use ordinary care.

606.    As a direct and proximate result of Defendant USAG's and Defendant Nassar's actions and/or inactions, Plaintiffs have suffered and continue to suffer pain of mind and body, mental anguish, shock, emotional distress, physical manifestations of emotional distress, embarrassment, loss of self-esteem, disgrace, fright, grief, humiliation, enjoyment of life, were prevented and will continue to be prevented from performing daily activities and obtaining the full enjoyment of life, and have sustained and continue to sustain loss of earning and loss of earning capacity.

### COUNT SEVENTEEN

### VICARIOUS LIABILITY
**(Plaintiffs Abigail Mealy, Amanda Mealy and
Meaghan Ashcraft against Defendant USAG)**

607.    Plaintiffs reallege and incorporate by reference the allegations contained in the previous paragraphs.

608.    Vicarious liability is indirect responsibility imposed by operation of law where an employer is bound to keep its employees within their proper bounds and is responsible if it fails to do so.

609.    Vicarious liability essentially creates agency between the principal and its agent so that the principal is held to have done what the agent has done.

610.    Defendant USAG's website contains sites portraying Defendant Nassar as the recipient of distinguished awards and boasts him as having been "instrumental" to the success of USA gymnastics.

611.    Defendant USAG employed and/or held Defendant Nassar out to be its employee, agent, and/or representative from approximately 1986 to 2015.

612.    A special, confidential, and fiduciary relationship was created and existed at all times pertinent hereto between the MSU Defendants and Defendant Nassar, as described herein this Complaint, resulting in the MSU Defendants owing Plaintiffs a duty to prevent them from Defendant Nassar's sexual assault, battery, molestation, and discrimination.

613.    Defendant USAG is vicariously liable for the actions of Defendant Nassar, as described above, that were performed during the course of his employment, agency, and/or representation with Defendant USAG.

614.    Defendant USAG had actual and/or constructive knowledge of Defendant Nassar sexually assaulting, battering, molesting, and harassing young females on several occasions under the guise of medical treatment and during the course of his employment, agency, and/or representation with Defendant USAG, beginning in 1997 and/or 1998, including, but not limited to, the following knowledge:

    a.    Upon information and belief, in 1996, Defendant USAG received a complaint about Defendant Nassar's sexual abuse by a parent of Jane A71 Doe. The complaint was made directly to US Olympic Gymnastics Head Coach, John Geddert, who was the head coach for the US World Gymnastics team, and who is a longtime agent of USAG.

    b.    Upon information and belief, the parent of Plaintiff Jane A71 Doe, also complained of Nassar's sexual abuse to other USAG coaches while Plaintiff Jane A 71 Doe was engaged in gymnastics activities at the Twistars' facility, which is a USAG registered

gymnastics club.

c.   Upon information and belief, based on reports made by the Indianapolis Star, "at least seven women now say they raised concerns about Nassar starting in the late 1990 's."

d.   During Nassar's preliminary examination on May 12, 2017 in the 55th District Court in Ingham County, Michigan, a young woman testified regarding an instance of sexual assault that occurred at Twistars' facility in Dimondale, Michigan in approximately 2010 when she was fifteen years old. She testified that, "Mostly all I remember is [Nassar} doing the treatment on me with his fingers in my vagina, massaging my back with a towel over my butt, and John [Geddert] walking in and making a joke that I guess my back really did hurt, and then I was uncomfortable because John [Geddert] was in there during that."

e.   Altogether, between 1999 and 2016, at least thirty-two (32) USAG gymnasts were sexually abused by Larry Nasser while participating in USAG-sanctioned events, at USAG's famed Karolyi Ranch, and at the USA Gymnastics Club, Twistars. Upon information and belief, the living quarters and scheduling routines of these gymnasts were such that it was nearly impossible for USAG coaches, USAG trainers, and USAG agents to not know what Larry Nasser was doing.

615.   Defendant USAG had actual and/or constructive knowledge of Defendant Nassar's propensity for sexually assaulting, battering, molesting, and harassing his patients and other females under the guise of medical treatment and during the course of his employment, agency, and/or representation with Defendant USAG, as described herein this Complaint, and took no action to prevent such conduct.

616.   It was reasonably foreseeable that Defendant Nassar would continue to sexually assault, batter, molest, and harass females under the guise of medical treatment and during the course of his employment, agency, and/or representation with Defendant USAG, with the actual and/or constructive knowledge Defendant USAG had of such conduct.

617.   As a direct and proximate result of Defendant USAG's actions and/or inactions, Plaintiffs have suffered and continue to suffer pain of mind and body, mental anguish, shock,

emotional distress, physical manifestations of emotional distress, embarrassment, loss of self-esteem, disgrace, fright, grief, humiliation, enjoyment of life, were prevented and will continue to be prevented from performing daily activities and obtaining the full enjoyment of life, and have sustained and continue to sustain loss of earning and loss of earning capacity.

## COUNT EIGHTEEN

### EXPRESS/IMPLIED AGENCY
**(Plaintiffs Abigail Mealy, Amanda Mealy and
Meaghan Ashcraft against Defendant USAG)**

618.    Plaintiffs incorporate by reference the allegations contained in the previous paragraphs.

619.    An agent is a person who is authorized by another to act on its behalf.

620.    Defendant USAG intentionally and/or negligently made representations that Defendant Nassar was its employee, agent, and/or representative.

621.    On the basis of those representations, Plaintiffs reasonably believed that Defendant Nassar was acting as an employee, agent, and/or representative of Defendant USAG.

622.    Upon information and belief, Defendant USAG referred significant numbers of gymnasts to Defendant Nassar for medical treatment at his office on Defendant MSU's campus.

623.    Plaintiffs were injured as a result of Defendant Nassar's sexual assault, abuse, and molestation, as described above. These acts were performed during the course of Defendant Nassar's employment, agency, and/or representation with Defendant USAG.

624.    Plaintiffs were injured because they relied on Defendant USAG to provide employees, agents, and representatives who exercise reasonable skill and care.

625.    As a direct and proximate result of Defendant Nassar's actions carried out in the

course of his employment, agency, and/or representation of Defendant USAG, Plaintiffs have suffered and continue to suffer pain of mind and body, mental anguish, shock, emotional distress, physical manifestations of emotional distress, embarrassment, loss of self-esteem, disgrace, fright, grief, humiliation, enjoyment of life, were prevented and will continue to be prevented from performing daily activities and obtaining the full enjoyment of life, and have sustained and continue to sustain loss of earning and loss of earning capacity.

## COUNT NINETEEN

### NEGLIGENT SUPERVISION
### (Plaintiffs Abigail Mealy, Amanda Mealy and
### Meaghan Ashcraft against Defendant USAG)

626.   Plaintiffs reallege and incorporate by reference the allegations contained in the previous paragraphs.

627.   Defendant USAG had a duty to provide reasonable supervision of its employee, agent, and/or representative, Defendant Nassar, while he was in the course of his employment, agency, and/or representation with Defendant USAG and while he interacted with young female athletes and Plaintiffs.

628.   Given the known sexual abuse in youth sports and gymnastics, it was reasonably foreseeable that Defendant Nassar, who had prior allegations against him, would sexually abuse his patients, including Plaintiffs, unless properly supervised.

629.   Defendant USAG by and through its employees, agents, managers, and/or assigns, such as Mr. Penny and Mr. Colarassi, knew or reasonably should have known of Defendant Nassar's conduct and/or that Defendant Nassar was an unfit employee, agent, and/or representative because of his sexual interest in children and young adults.

630.   Defendant USAG breached its duty to provide reasonable supervision of Defendant Nassar, and permitted Defendant Nassar, who was in a position of trust and authority, to sexually assault, abuse, molest, and harass Plaintiffs.

631.   The aforementioned sexual assault, abuse, molestation, and harassment occurred while Defendant Nassar was in the course of his employment, agency,  and/or representation with Defendant USAG.

632.   Defendant USAG tolerated, authorized, and/or permitted a custom, policy, practice, or procedure of insufficient supervision and failed to adequately screen, counsel, or discipline such individuals, resulting in the allowance of Defendant Nassar to violate the rights of persons such as Plaintiffs with impunity.

633.   As a direct and proximate result of the Defendant USAG's failure to adequately supervise, Plaintiffs have suffered and continue to suffer pain of mind and body, mental anguish, shock, emotional distress, physical manifestations of emotional distress, embarrassment, loss of self-esteem, disgrace, fright, grief, humiliation, enjoyment of life, were prevented and will continue to be prevented from performing daily activities and obtaining the full enjoyment of life, and have sustained and continue to sustain loss of earning and loss of earning capacity.

### COUNT TWENTY

### NEGLIGENT FAILURE TO WARN OR PROTECT
**(Plaintiffs Abigail Mealy, Amanda Mealy and
Meaghan Ashcraft against Defendant USAG)**

634.   Plaintiffs reallege and incorporate by reference the allegations contained in the previous paragraphs.

125

635.    Given the direct or indirect knowledge of sexual abuse in youth sports, and in particular gymnastics, it was reasonably foreseeable that sexual abuse of young females may occur if proper procedures were not put in place by Defendant USAG.

636.    Defendant USAG knew or should have known that Defendant Nassar posed a risk of harm to Plaintiffs and/or others in Plaintiffs' situation.

637.    Defendant USAG knew or should have known that Defendant Nassar committed sexual assault, abuse, and molestation and/or was continuing to engage in such conduct.

638.    Defendant USAG had actual and/or constructive knowledge as to the dangerous conduct of Defendant Nassar and failed to act reasonably and responsibly in response.

639.    Defendant USAG had a duty to warn or protect the public, Plaintiffs, and others in Plaintiffs' situation against the risk of injury by Defendant Nassar.

640.    The special, trusting, confidential, and fiduciary relationship between Defendant Nassar, in his capacity as an employee, agent, and/or representative of Defendant USAG, and Plaintiffs created a duty to disclose this information.

641.    Defendant USAG breached the duty owed to Plaintiffs by failing to warn the public and Plaintiffs and/or by failing to take reasonable steps to protect the public and Plaintiffs from Defendant Nassar.

642.    Defendant USAG breached its duties to protect Plaintiffs by failing to detect and/or uncover evidence of sexual assault, abuse, molestation, and harassment.

643.    Defendant USAG breached its duty to protect Plaintiffs by failing to investigate, adjudicate, suspend, and/or ban Defendant Nassar from USAG affiliation.

644.    Defendant failed to adequately screen, counsel and/or discipline Defendant

126

Nassar for physical and/or mental conditions that might have rendered him unfit to discharge

the duties and responsibilities of a physician in his capacity as an employee, agent, and/or

representative of Defendant USAG, resulting in violations of Plaintiffs' rights.

645.    Defendant USAG willfully refused to notify, give adequate warning, and implement

appropriate safeguards to protect Plaintiffs from Defendant Nassar's conduct.

646.    As a direct and proximate result of the Defendant USAG's failure to warn or

protect, Plaintiffs have suffered and continue to suffer pain of mind and body, mental anguish,

shock, emotional distress, physical manifestations of emotional distress, embarrassment, loss

of self-esteem, disgrace, fright, grief, humiliation, enjoyment of life, were prevented and will

continue to be prevented from performing daily activities and obtaining the full enjoyment of life,

and have sustained and continue to sustain loss of earning and loss of earning capacity.

### COUNT TWENTY-ONE

### NEGLIGENT FAILURE TO TRAIN OR EDUCATE
**(Plaintiffs Abigail Mealy, Amanda Mealy and
Meaghan Ashcraft against Defendant USAG)**

647.    Plaintiffs incorporate by reference the allegations contained in the previous

paragraphs.

648.    Defendant USAG had a duty to protect the public and Plaintiffs and others in

Plaintiffs' situation against the risk of injury by Defendant Nassar.

649.    Defendant USAG breached the duty owed to the public and Plaintiffs to take

reasonable protective measures to protect Plaintiffs, and others in Plaintiffs' situation, by failing

to properly train or educate Plaintiffs, and other individuals in Plaintiffs' situation, about how to

avoid a risk of sexual assault and/or sexual abuse, including sexual assault and/or sexual abuse by Defendant Nassar.

650.    Defendant USAG failed to implement reasonable safeguards to:

a.       Prevent acts of sexual assault, abuse, and molestation by Defendant Nassar; and

b.       Avoid placing Defendant Nassar in positions where he would have unsupervised contact and interaction with Plaintiffs and other young athletes.

651.    As a direct and proximate result of the Defendant USAG's failure to train or educate, Plaintiffs have suffered and continue to suffer pain of mind and body, mental anguish, shock, emotional distress, physical manifestations of emotional distress, embarrassment, loss of self-esteem, disgrace, fright, grief, humiliation, enjoyment of life, were prevented and will continue to be prevented from performing daily activities and obtaining the full enjoyment of life, and have sustained and continue to sustain loss of earning and loss of earning capacity.

## COUNT TWENTY-TWO

### NEGLIGENT RETENTION
**(Plaintiffs Abigail Mealy, Amanda Mealy and
Meaghan Ashcraft against Defendant USAG)**

652.    Plaintiffs reallege and incorporate by reference the allegations contained in the previous paragraphs.

653.    Defendant USAG had a duty owed to Plaintiffs and others in Plaintiffs' situation when credentialing, hiring, retaining, screening, checking, regulating, monitoring, and supervising employees, agents, and/or representative to exercise due care.

654.    Defendant USAG breached the duties owed to Plaintiffs by failing to adequately investigate, report, and address complaints about Defendant Nassar's conduct, which

Defendant USAG knew or should have known.

655.   Defendant USAG breached the duties owed to Plaintiffs when Defendant USAG retained Defendant Nassar as an employee, agent, and/or representative after Defendant USAG discovered or should have reasonably discovered Defendant Nassar's conduct, which reflected a propensity for sexual misconduct.

656.   Defendant USAG's failure to act in accordance with the standard of care resulted in Defendant Nassar gaining access to and sexually assaulting and/or sexually abusing Plaintiffs and an unknown number of other individuals.

657.   The aforementioned conduct of Defendant USAG in credentialing, hiring, retaining, screening, checking, regulating, monitoring, and supervising Defendant Nassar created a foreseeable risk of harm to Plaintiffs and other minors and young adults.

658.   Defendant USAG's retention of Defendant Nassar resulted in Plaintiffs relying on such credentials as they sought medical treatment.

659.   As a direct and proximate result of the Defendant USAG's actions in retaining Defendant Nassar, Plaintiffs have suffered and continue to suffer pain of mind and body, mental anguish, shock, emotional distress, physical manifestations of emotional distress, embarrassment, loss of self-esteem, disgrace, fright, grief, humiliation, enjoyment of life, were prevented and will continue to be prevented from performing daily activities and obtaining the full enjoyment of life, and have sustained and continue to sustain loss of earning and loss of earning capacity.

## COUNT TWENTY-THREE

## FRAUD AND MISREPRESENTATION

129

**(Plaintiffs Abigail Mealy, Amanda Mealy**
**and Meaghan Ashcraft against Defendant USAG)**

660.    Plaintiffs incorporate by reference the allegations contained in the previous paragraphs.

661.    From approximately 1996 to summer 2015, Defendant USAG represented to Plaintiffs and the public that Defendant Nassar was a competent, safe, and highly regarded physician.

662.    By representing that Defendant Nassar was a team physician and an athletic physician at Defendant MSU and a National Team Physician with Defendant USAG, Defendant USAG represented to Plaintiffs and the public that Defendant Nassar was safe, trustworthy, and of high moral and ethical repute and that Plaintiffs and the public need not worry about being harmed by Defendant Nassar.

663.    The aforementioned representations were false when they were made because Defendant Nassar had and was continuing to sexually assault, batter, molest, and harass unknown number of his patients and other individuals.

664.    Additionally, complaints were made to Defendant USAG, yet Defendant USAG did not contact Plaintiffs, the MSU Defendants, other individuals it had referred to Defendant Nassar, or any other clubs or organizations affiliated with Defendant Nassar to inform them of the allegations and potential harm to Plaintiffs and others.

665.    Defendant USAG continued to portray Defendant Nassar as a competent and safe physician, intentionally inducing Plaintiffs and the public to rely on the reputation of Defendant Nassar that Defendant USAG was perpetuating.

130

666.    Plaintiffs relied on the assertions of Defendant USAG and sought medical treatment from Defendant Nassar while Defendant USAG knew of concerns and dangers.

667.    As a result of Plaintiffs' and the public's reliance on Defendant USAG's fraudulent misrepresentation regarding Defendant Nassar, Plaintiffs and others in Plaintiffs' situation were sexually assaulted, abused, molested, and harassed by Defendant Nassar.

668.    Plaintiffs were subjected to sexual assault, abuse, molestation, and harassment as a result of Defendant USAG's fraudulent misrepresentations regarding Defendant Nassar.

669.    As a direct and proximate result of the Defendant USAG's actions and knowingly false representations, Plaintiffs have suffered and continue to suffer pain of mind and body, mental anguish, shock, emotional distress, physical manifestations of emotional distress, embarrassment, loss of self-esteem, disgrace, fright, grief, humiliation, enjoyment of life, were prevented and will continue to be prevented from performing daily activities and obtaining the full enjoyment of life, and have sustained and continue to sustain loss of earning and loss of earning capacity.

## CLAIMS AGAINST TWISTARS AND GEDDERT

## COUNT TWENTY-FOUR

### NEGLIGENCE
### (Plaintiffs Abigail Mealy, Amanda Mealy and Meaghan Ashcraft against Defendant Twistars, Defendant Geddert and Defendant Nassar)

670.    Plaintiffs reallege and incorporate by reference the allegations contained in the previous paragraphs.

671.    In or around 1998, a parent of a gymnast at Defendant Twistars' facility complained to Mr. Geddert, the owner and operator of Defendant Twistars, regarding Dr.

131

Nassar's conduct alleging sexual abuse, assault, and molestation.

672.    Despite being informed of Defendant Nassar's conduct, Mr. Geddert recommended Defendant Nassar as a physician to members and guests of Defendant Twistars.

673.    Mr. Geddert owed the public and Plaintiffs a duty of ordinary care to ensure their safety and freedom from sexual assault, abuse, and molestation.

674.    In recommending Defendant Nassar with knowledge of Defendant Nassar's conduct, Mr. Geddert breached the duty of ordinary care to Plaintiffs and the public.

675.    Defendant Twistars breached the duty of ordinary care to Plaintiffs and the public in failing to investigate the 1998 allegations, which were made to Mr. Geddert.

676.    Defendant Twistars breached the duty of ordinary care to Plaintiffs and the public by failing to report the 1998 allegations, which were made to Mr. Geddert, to law enforcement.

677.    By seeking medical treatment from Defendant Nassar, a special, confidential, and fiduciary relationship between Plaintiffs and Defendant Nassar was created, resulting in Defendant Nassar owing Plaintiffs a duty to use ordinary care.

678.    Plaintiffs, as members of the public, in taking the recommendation of Defendant Geddert to seek medical treatment from Defendant Nassar had a reasonable expectation that Defendant Nassar would carry out medical treatment without subjecting them to sexual assault, abuse, or molestation.

679.    Defendant Nassar owed Plaintiffs a duty of ordinary care in carrying out medical treatment.

680.    Defendant Twistars' failure to adequately train and supervise Defendant Nassar breached the duty of ordinary care.

132

681.    Defendant Nassar's conduct in sexually assaulting, abusing, and molesting Plaintiffs in the course of and under the guise of rendering medical "treatment" was a breach of the duty to use ordinary care.

682.    As a direct and/or proximate result of Defendants' conduct, actions and/or inactions, Plaintiffs have suffered and continue to suffer pain of mind and body, mental anguish, shock, emotional distress, physical manifestations of emotional distress, embarrassment, loss of self-esteem, disgrace, fright, grief, humiliation, enjoyment of life, were prevented and will continue to be prevented from performing daily activities and obtaining the full enjoyment of life, and have sustained and continue to sustain loss of earning and loss of earning capacity.

## COUNT TWENTY-FIVE

### GROSS NEGLIGENCE
### (Plaintiffs Abigail Mealy, Amanda Mealy and Meaghan Ashcraft against Defendant Twistars, Defendant Geddert and Defendant Nassar)

683.    Plaintiffs reallege and incorporate by reference the allegations contained in the previous paragraphs.

684.    Defendant Twistars and Defendant Geddert owed the public and Plaintiffs a duty to use due care to ensure safety and freedom from sexual assault, abuse, and molestation while interacting with their employees, representatives, and/or agents.

685.    Defendant Nassar owed the public and Plaintiffs a duty to use due care as an employee, representative, and/or agent of Defendant Twistars.

686.    By seeking medical treatment from Defendant Nassar in his capacity as an employee, agent, and/or representative of Defendant Twistars, a special, confidential, and fiduciary relationship between Plaintiffs and Defendant Nassar was created, resulting in

Defendant Nassar owing Plaintiffs a duty to use due care.

687.   Defendant Twistars and Defendant Geddert knew or should have known of complaints pertaining to Defendant Nassar's nonconsensual sexual touching and assaults that occurred under the guise of medical treatment.

688.   Given known sexual abuse which has taken place in youth sports including gymnastics and the reasonable foreseeability that harm may occur to athletes, Defendant Twistars and Defendant Geddert not only referred athletes to Defendant Nassar but also failed to adequately supervise Defendant Nassar. Defendants' action were so reckless as to demonstrate a substantial lack of concern for whether injury would result to Plaintiffs.

689.   Defendant Nassar's conduct in sexually assaulting, abusing, and molesting Plaintiffs in the course of his employment, agency, and/or representation of Defendant Twistars and under the guise of rendering medical "treatment" as an employee, representative, and/or agent of Defendant Twistars was so reckless as to demonstrate a substantial lack of concern for whether injury would result to Plaintiffs.

690.   Defendant Twistars' conduct and the conduct of Defendant Geddert demonstrated a willful disregard for precautions to ensure Plaintiffs' safety.

691.   Defendant Twistars' conduct and the conduct of Defendant Geddert as described above, demonstrated a willful disregard for substantial risks to Plaintiffs.

692.   Defendant Twistars and Defendant Geddert breached duties owed to Plaintiffs and were grossly negligent when they conducted themselves by actions described above, said acts having been committed with reckless disregard for Plaintiffs' health, safety, constitutional and/or statutory rights, and with a substantial lack of concern as to whether an injury would

134

result.

693.    As a direct and/or proximate result of Defendants' gross negligence, Plaintiffs have suffered and continue to suffer pain of mind and body, mental anguish, shock, emotional distress, physical manifestations of emotional distress, embarrassment, loss of self-esteem, disgrace, fright, grief, humiliation, enjoyment of life, were prevented and will continue to be prevented from performing daily activities and obtaining the full enjoyment of life, and have sustained and continue to sustain loss of earning and loss of earning capacity.

694.    In the alternative, the gross negligence of Defendants was so reckless as to demonstrate a substantial lack of concern for whether an injury would result to Plaintiffs and constitutes gross negligence that is the proximate cause of Plaintiffs' damages. Plaintiffs have suffered and continue to suffer pain and suffering, pain of mind and body, shock, emotional distress, physical manifestations of emotional distress, embarrassment, loss of self-esteem, disgrace, fright, grief, humiliation, loss of enjoyment of life, post-traumatic stress disorder resulting in physically manifested injuries including anxiety, depressions, sleep disorders, nightmares, psychological injuries, and physical injuries. Plaintiffs were prevented and will continue to be prevented from performing Plaintiffs' daily activities and obtaining the full enjoyment of life, and have sustained and continue to sustain loss of earnings and earning capacity.

## COUNT TWENTY-SIX

### EXPRESS/IMPLIED AGENCY
### (Plaintiffs Abigail Mealy, Amanda Mealy and Meaghan Ashcraft against Defendant Twistars, Defendant Geddert, and Defendant Nassar)

695.    Plaintiffs reallege and incorporate by reference the allegations contained in the

135

previous paragraphs.

696.   An agent is a person who is authorized by another to act on its behalf.

697.   Defendant Twistars intentionally or negligently made representations that Defendant Nassar was their employee, agent, and/or representative.

698.   On the basis of those representations, Plaintiffs reasonably believed that Defendant Nassar was acting as an employee, agent, and/or representative of Defendant Twistars.

699.   Upon information and belief, Defendant Twistars referred significant numbers of gymnasts to Defendant Nassar for medical treatment at Twistars and at his office on Defendant MSU's campus.

700.   Plaintiffs were injured as a result of Defendant Nassar's sexual assault, abuse, molestation, and harssement as described above. These acts were performed during the course of Defendant Nassar's agency and/or representation with Defendant Twistars.

701.   Plaintiffs were injured because they relied on Defendant Twistars to provide employees, agents, and/or representatives who would exercise reasonable skill or care.

702.   As a proximate cause of Defendant Nassar's negligence carried out through his employment, agency, and or representation of Defendant Twistars, Plaintiffs have suffered and continue to suffer pain of mind and body, mental anguish, shock, emotional distress, physical manifestations of emotional distress, embarrassment, loss of self- esteem, disgrace, fright, grief, humiliation, enjoyment of life, were prevented and will continue to be prevented from performing daily activities and obtaining the full enjoyment of life, and have sustained and continue to sustain loss of earning and loss of earning capacity.

136

**COUNT TWENTY-SEVEN**

**NEGLIGENT SUPERVISION**
**(Plaintiffs Abigail Mealy, Amanda Mealy and Meaghan Ashcraft against Defendant**
**Twistars, Defendant Geddert and Defendant Nassar)**

703.    Plaintiffs reallege and incorporate by reference the allegations contained in the previous paragraphs.

704.    Defendant Twistars and Defendant Geddert each had a duty to provide reasonable supervision of its employee, agent, and/or representative, Defendant Nassar, while he was in the course of his employment, agency, or representation of Defendant Twistars when he interacted with young female patients including Plaintiffs.

705.    It was reasonably foreseeable given the known sexual abuse in youth sports and gymnastics in particular that Defendant Nassar who had prior allegations against him had or would sexually abuse children and young adults, including Plaintiffs, unless properly supervised.

706.    Defendant Twistars by and through their employees, agents, managers, and/or assigns, and in particular by Defendant Geddert, knew or reasonably should have known of Defendant Nassar's conduct and/or that Defendant Nassar was an unfit employee, agent, and/or representative because of his sexual interest in children and young adults and due to the 1998 complaint made to Defendant Geddert of the nonconsensual sexual touching during "treatment."

707.    Defendant Twistars and Defendant Geddert breached their duty to provide reasonable supervision of Defendant Nassar, and permitted Defendant Nassar, who was in a position of trust and authority, to commit the acts against Plaintiffs.

708.    The aforementioned sexual abuse occurred while Defendant Nassar was acting in the course of his employment, agency, or representation of Defendant Twistars and while on the premises on Defendant Twistars.

709.    Defendant Twistars and Defendant Geddert tolerated, authorized and/or permitted a custom, policy, practice or procedure of insufficient supervision and failed to adequately screen, counsel, or discipline such individuals, with the result that Defendant Nassar was allowed to violate the rights of persons such as Plaintiffs with impunity.

710.    As a direct and/or proximate result of Defendant Twistars' negligent supervision, Plaintiffs have suffered and continue to suffer pain of mind and body, mental anguish, shock, emotional distress, physical manifestations of emotional distress, embarrassment, loss of self-esteem, disgrace, fright, grief, humiliation, enjoyment of life, were prevented and will continue to be prevented from performing daily activities and obtaining the full enjoyment of life, and have sustained and continue to sustain loss of earning and loss of earning capacity.

## COUNT TWENTY-EIGHT

### NEGLIGENT FAILURE TO WARN OR PROTECT
### (Plaintiffs Abigail Mealy, Amanda Mealy and Meaghan Ashcraft against Defendant Twistars and Defendant Nassar)

711.    Plaintiffs reallege and incorporate by reference the allegations contained in the previous paragraphs.

712.    Defendant Twistars and Defendant Geddert knew or should have known that Defendant Nassar posed a risk of harm to Plaintiffs or those in Plaintiffs' situation.

713.    As early as 1998, Defendant Twistars, by a complaint made to its owner, employee, agent, and/or representative Defendant John Geddert, had direct and/or constructive

knowledge as to the dangerous conduct of Defendant Nassar and failed to act reasonably and responsibly in response.

714.    Defendant Twistars and Defendant Geddert knew or should have known that Defendant Nassar committed sexual assault, abuse, and molestation and/or was continuing to engage in such conduct.

715.    Defendant Twistars and Defendant Geddert had a duty to warn or protect Plaintiffs and others in Plaintiffs' situation against the risk of injury by Defendant Nassar.

716.    The duty to disclose this information arose by the special, trusting, confidential, and fiduciary relationship between Defendant Nassar, an employee, agent, and/or representative of Defendant Twistars and Plaintiffs.

717.    Defendant Twistars and Defendant Geddert breached said duty by failing to warn Plaintiffs and/or by failing to take reasonable steps to protect Plaintiffs from Defendant Nassar.

718.    Defendant Twistars and Defendant Geddert breached its duties to protect Plaintiffs by failing to detect and/or uncover evidence of sexual abuse and sexual assault, which was taking place on its premises and at its facility.

719.    Defendant Twistars and Defendant Geddert breached its duties to protect Plaintiffs by failing to investigate Defendant Nassar, and adjudicate and suspend and/or ban Defendant Nassar from Twistars sanctioned events.

720.    Defendant Twistars and Defendant Geddert failed to adequately screen, counsel, and/or discipline Defendant Nassar for physical and/or mental conditions that might have rendered him unfit to discharge the duties and responsibilities of a physician with their organization, resulting in violations of Plaintiffs.

721.    Defendant Twistars and Defendant Geddert willfully refused to notify, give adequate warning, and implement appropriate safeguards to protect Plaintiffs from Defendant Nassar's conduct.

722.    As a direct and/or proximate result of Defendants' negligent failure to warn or protect, Plaintiffs have suffered and continue to suffer pain of mind and body, mental anguish, shock, emotional distress, physical manifestations of emotional distress, embarrassment, loss of self-esteem, disgrace, fright, grief, humiliation, enjoyment of life, were prevented and will continue to be prevented from performing daily activities and obtaining the full enjoyment of life, and have sustained and continue to sustain loss of earning and loss of earning capacity.

### COUNT TWENTY-NINE

### FRAUD AND MISREPRESENTATION
### (Plaintiffs Abigail Mealy, Amanda Mealy and Meaghan Ashcraft against Defendant Twistars and Defendant Nassar)

603.    Plaintiffs reallege and incorporate by reference the allegations contained in the previous paragraphs.

604.    From approximately 1996 to September 2016, Defendant Twistars represented to the public and Plaintiffs that Defendant Nassar was a competent, ethical, and safe physician.

605.    By representing that Defendant Nassar was a team physician and athletic physician at Defendant MSU and a National Team Physician with Defendant USAG, Defendant Twistars represented to the public and Plaintiffs that Defendant Nassar was safe, trustworthy, of high moral and ethical repute, and that Plaintiffs and the public need not worry about being harmed by Defendant Nassar.

606.    The representations were false when they were made as Defendant Nassar had

and was continuing to sexually assault, abuse, and molest an unknown number of individuals, at times at Defendant Twistars' facility.

607.    As early as 1998, Defendant Twistars knew their representations of Defendant Nassar were false as Defendant Twistars received a complaint of Defendant Nassar's conduct.

608.    Between the time of the 1998 complaint and September 2016, Defendant Twistars continued to hold Defendant Nassar out as a competent and safe physician.

609.    Plaintiffs relied on the assertions of Defendant Twistars that Defendant Nassar was a safe, confident, trustworthy physician.

610.    Plaintiffs were subjected to sexual assault, abuse, and molestation as a result of Defendant Twistars' fraudulent misrepresentations regarding Defendant Nassar.

611.    As a direct and/or proximate result of Defendant Twistars' fraudulent misrepresentations, Plaintiffs have suffered and continue to suffer pain of mind and body, mental anguish, shock, emotional distress, physical manifestations of emotional distress, embarrassment, loss of self-esteem, disgrace, fright, grief, humiliation, enjoyment of life, were prevented and will continue to be prevented from performing daily activities and obtaining the full enjoyment of life, and have sustained and continue to sustain loss of earning and loss of earning capacity.

## CLAIMS AGAINST NASSAR

## COUNT THIRTY

## INVASION OF PRIVACY - INTRUSION
## (Against Defendant Nassar)

612.    Plaintiffs reallege and incorporate by reference the allegations contained in the

141

previous paragraphs.

613.     Defendant Nassar intruded upon Plaintiffs' seclusion or solitude by sexually assaulting, abusing, and molesting Plaintiffs without the consent of Plaintiffs or Plaintiffs' parents.

614.     Plaintiffs' genital areas, breasts, and sexual activity are secret and private subject matters.

615.     Plaintiffs possessed a right to keep these subject matters private.

616.     Defendant Nassar's method of sexually assaulting, abusing, and molesting Plaintiffs is objectionable to a reasonable person.

617.     As a direct and proximate result of Defendant Nassar's invasion of Plaintiffs' privacy, Plaintiffs have suffered and continue to suffer pain of mind and body, mental anguish, shock, emotional distress, physical manifestations of emotional distress, embarrassment, loss of self-esteem, disgrace, fright, grief, humiliation, enjoyment of life, were prevented and will continue to be prevented from performing daily activities and obtaining the full enjoyment of life, and have sustained and continue to sustain loss of earning and loss of earning capacity.

## COUNT THIRTY-ONE

### ASSAULT & BATTERY
### (Against Defendant Nassar)

618.     Plaintiffs reallege and incorporate by reference the allegations contained in the previous paragraphs.

619.     The acts committed by Defendant Nassar against Plaintiffs described herein constitute assault and battery, actionable under the laws of Michigan.

620.     Defendant Nassar committed nonconsensual sexual acts which resulted in

harmful or offensive contact with the bodies of Plaintiffs.

621.   Specifically, Defendant Nassar committed acts which caused injury to Plaintiffs by subjecting them to an imminent battery and/or intentional invasions of their rights to be free from offensive and harmful contact, and said conduct demonstrated that Defendant had a present ability to subject Plaintiffs to an immediate, intentional, offensive and harmful touching.

622.   Defendant Nassar assaulted and battered Plaintiffs by nonconsensual and unwanted digital vagina penetration, digital anal penetration, and touching some of Plaintiffs' breasts without notice or explanation of the "treatment."

623.   Plaintiffs did not consent to the contact, which caused injury, damage, loss, and/or harm.

624.   As a direct and/or proximate result of Defendants' gross negligence, Plaintiffs have suffered and continue to suffer pain of mind and body, mental anguish, shock, emotional distress, physical manifestations of emotional distress, embarrassment, loss of self-esteem, disgrace, fright, grief, humiliation, enjoyment of life, were prevented and will continue to be prevented from performing daily activities and obtaining the full enjoyment of life, and have sustained and continue to sustain loss of earning and loss of earning capacity.

625.   In the alternative, the gross negligence of Defendants was so reckless as to demonstrate a substantial lack of concern for whether an injury would result to Plaintiffs and constitutes gross negligence that is the proximate cause of Plaintiffs' damages. Plaintiffs have suffered and continue to suffer pain and suffering, pain of mind and body, shock, emotional distress, physical manifestations of emotional distress, embarrassment, loss of self-esteem, disgrace, fright, grief, humiliation, loss of enjoyment of life, post-traumatic stress disorder

143

resulting in physically manifested injuries including anxiety, depressions, sleep disorders, nightmares, psychological injuries, and physical injuries. Plaintiffs were prevented and will continue to be prevented from performing Plaintiffs' daily activities and obtaining the full enjoyment of life, and have sustained and continue to sustain loss of earnings and earning capacity.

## CLAIMS AGAINST DEFENDANTS KLAGES, STRAMPEL, KOVAN, AND STOLLAK

## COUNT THIRTY-TWO

## MICHIGAN CHILD PROTECTION LAW - FAILURE TO REPORT CHILD ABUSE
**(Against Defendants Klages, Strampel, Kovan, and Stollak)**

603.    Plaintiffs reallege and incorporate by reference the allegations contained in the previous paragraphs.

604.    Michigan's Child Protection Law, MCL 722.621 et seq., establishes mandatory reporting guidelines for suspected child abuse or neglect and provides penalties for failure to report child abuse or neglect.

605.    Specifically, MCL 722.623 provides in pertinent part:

A physician, dentist, physician's assistant, registered dental hygienist, medical examiner, nurse, person licensed to provide emergency medical care, audiologist, psychologist, marriage and family therapist, licensed professional counselor, social worker, licensed master's social worker, licensed bachelor's social worker, registered social service technician, social service technician, a person employed in a professional capacity in any office of the friend of the court, school administrator, school counselor or teacher, law enforcement officer, member of the clergy, or regulated child care provider who has reasonable cause to suspect child abuse or child neglect shall make an immediate report to centralized intake by telephone, or, if available, through the online reporting system, of the suspected child abuse or child neglect.

606.    Child abuse is defined as "harm or threatened harm to a child's health or welfare

144

that occurs through nonaccidental physical or mental injury, sexual abuse, sexual exploitation, or maltreatment, by a parent, a legal guardian, or any other person responsible for the child's health or welfare or by a teacher, a teacher's aide, or a member of the clergy." MCL 722.622(g).

607.    Child neglect is defined as "harm or threatened harm to a child's health or welfare by a by a parent, a legal guardian, or any other person responsible for the child's health or welfare that occurs through either of the following: (i) Negligent treatment, including the failure to provide adequate food, clothing, shelter, or medical care. (ii) Placing a child at an unreasonable risk to the child's health or welfare by failure of the parent, legal guardian, or any other person responsible for the child's health or welfare to intervene to eliminate that risk when that person is able to do so and has, or should have, knowledge of the risk." MCL 722.622(k).

608.    Under MCL 722.633(1), "A person who is required by this act to report an instance of suspected child abuse or neglect and who fails to do so is civilly liable for the damages proximately caused by the failure."

609.    Defendants Klages, Strampel, Kovan, and Stollak were mandatory reporters during the time Defendant Nassar was engaged in child abuse or child neglect.

610.    As established in the allegations above, Defendants Klages, Strampel, Kovan, and Stollak had reasonable cause to suspect child abuse or child neglect.

626.    Defendant Klages, Strampel, Kovan, and Stollak failed to report any instances of suspected child abuse or neglect.

627.    Defendants Klages, Strampel, Kovan, and Stollak are or were employed by Defendants Michigan State University and Michigan State University Board of Trustees during the time Defendant Nassar was engaged in child abuse or child neglect, and were acting in the

scope and course of their employment when they failed to report any instances of suspected child abuse or neglect.

628.    Defendants Klages, Strampel, Kovan, and Stollak are directly civilly liable for the damages proximately caused by their failure to report any instances of suspected child abuse or neglect. Defendants Michigan State University and Michigan State University Board of Trustees are vicariously liable for said damages.

629.    As a direct and proximate result of Defendant Nassar's invasion of Plaintiffs' privacy, Plaintiffs have suffered and continue to suffer pain of mind and body, mental anguish, shock, emotional distress, physical manifestations of emotional distress, embarrassment, loss of self-esteem, disgrace, fright, grief, humiliation, enjoyment of life, were prevented and will continue to be prevented from performing daily activities and obtaining the full enjoyment of life, and have sustained and continue to sustain loss of earning and loss of earning capacity.

630.    In the alternative, the actions or inaction of Defendants were so reckless as to demonstrate a substantial lack of concern for whether an injury would result to Plaintiffs and constitutes gross negligence that is the proximate cause of Plaintiffs' damages. Plaintiffs have suffered and continue to suffer pain and suffering, pain of mind and body, shock, emotional distress, physical manifestations of emotional distress, embarrassment, loss of self-esteem, disgrace, fright, grief, humiliation, loss of enjoyment of life, post-traumatic stress disorder resulting in physically manifested injuries including anxiety, depressions, sleep disorders, nightmares, psychological injuries, and physical injuries. Plaintiffs were prevented and will continue to be prevented from performing Plaintiffs' daily activities and obtaining the full enjoyment of life, and have sustained and continue to sustain loss of earnings and earning

capacity.

## DAMAGES - FOR ALL AFOREMENTIONED CAUSES OF ACTION

631.   Plaintiffs reallege and incorporate by reference the allegations contained in the previous paragraphs.

632.   As a direct and/or proximate result of Defendants' actions and/or inactions stated above, Plaintiffs have suffered and continue to suffer pain of mind and body, mental anguish, shock, emotional distress, physical manifestations of emotional distress, embarrassment, loss of self-esteem, disgrace, fright, grief, humiliation, enjoyment of life, were prevented and will continue to be prevented from performing daily activities and obtaining the full enjoyment of life, and have sustained and continue to sustain loss of earning and loss of earning capacity.

633.   The conduct, actions and/or inactions of Defendants as alleged in the above stated counts and causes of action constitute violations of Plaintiffs' constitutional and federal rights as well as the common and/or statutory laws of the State of Michigan, and the United States District Court has jurisdiction to hear and adjudicate said claims.

634.   In whole or in part, as a result of some or all of the above actions and/or inactions of Defendants, Plaintiffs have and continue to suffer irreparable harm as a result of the violations.

635.   The amount in controversy exceeds the jurisdictional minimum  of $75,000.00.

**WHEREFORE**, Plaintiffs request this Court and the finder of fact to enter a Judgment in Plaintiffs' favor against all named Defendants on all counts and claims as indicated above in an amount consistent with the proofs of trial, and seek against Defendants all appropriate damages arising out of law, equity, and fact for each or all of the above counts where applicable and hereby request that the trier of fact, be it judge or jury, award Plaintiffs all applicable damages, including

but not limited to compensatory, special, exemplary, and/or punitive damages, in whatever amount the Plaintiffs are entitled, and all other relief arising out of law, equity, and fact, also including but not limited to:

a)      Compensatory damages in an amount to be determined as fair and just under the circumstances, by the trier of fact including, but not limited to medical expenses, loss of earnings, mental anguish, anxiety, humiliation, and embarrassment, violation of Plaintiffs' constitutional, federal, and state rights, loss of social pleasure and enjoyment, and other damages to be proved;

b)      Punitive and/or exemplary damages in an amount to be determined as reasonable or just by the trier of fact;

c)      Reasonable attorney fees, interest, and costs; and

d)      Other declaratory, equitable, and/or injunctive relief, including, but not limited to implementation of institutional reform and measures of accountability to ensure the safety and protection of young athletes and other individuals, as appears to be reasonable and just.

Respectfully submitted,

/s/ Lisa M. Esser
LISA M. ESSER (P70628)
SOMMERS SCHWARTZ, P.C.
Attorney for Plaintiffs
1 Towne Square, Suite 1700
Southfield, MI 48076
Tel: (248) 355-0300
Email: lesser@sommerspc.com

Dated: April 10, 2018

## PLAINTIFFS' JURY DEMAND

Plaintiffs, by and through their attorneys, SOMMERS SCHWARTZ, P.C., hereby demand a trial by jury on all claims set forth above.

Respectfully submitted,

/s/ Lisa M. Esser
LISA M. ESSER (P70628)
SOMMERS SCHWARTZ, P.C.
Attorney for Plaintiffs
1 Towne Square, Suite 1700
Southfield, MI 48076
Tel: (248) 355-0300
Email: lesser@sommerspc.com

Dated:  April 10, 2018